JUDGE JONES

06 CV 1202

DOC # 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------X

AMY R. GURVEY,

        Plaintiff Pro Se,

-against-

COWAN, LIEBOWITZ & LATMAN, PC
CLEAR CHANNEL COMMUNICATIONS,
INC., LIVE NATION, INC., INSTANT LIVE
CONCERTS, LLC and
DOES 1-X, INCLUSIVE,

        Defendants.

----------------------------------------X

CASE NO.

JURY TRIAL REQUESTED

COMPLAINT

The Plaintiff *Pro Se*, Amy R. Gurvey, for her complaint against defendants alleges as follows:

## I. PARTIES

1.    Plaintiff Amy R. Gurvey is a resident of the State of New Jersey. Between January, 2002 and May, 2003, Plaintiff was a client of defendant New York law firm, Cowan, Liebowitz and Latman, PC (herein "CLL"). At times relevant herein, CLL was serving as Plaintiff's exclusive attorneys including before the United States Patent and Trademark Office ("USPTO").

2.    Defendant CLL is a New York law firm and professional corporation with primary expertise in trademark and intellectual property law. Its address is 1133 Avenue of the Americas, New York, NY 10036.

3.    Defendant Clear Channel Communications, Inc. ("CCC") is a resident corporation of Texas, and at all times relevant including while defendant CLL was

representing Plaintiff, CLL was also serving as attorney for CCC, and upon information and belief, also for the rock band, *Phish*.

4. Defendant LIVE NATION is a Delaware corporation or limited liability company, with its principal place of business in Beverly Hills, California. Defendant LIVE NATION is a resident of Delaware and California.

5. Defendant InstantLive Concerts, LLC ("InstantLive") is a Massachusetts limited liability company, formed in March, 2003 by principals of defendant CCC. In 2005, defendant InstantLive was acquired by defendant LIVE NATION.

## II. JURISDICTION AND VENUE

6. Jurisdiction of the Federal Courts is based on diversity of citizenship pursuant to 28 USC Section 1332 and the amount in controversy exceeds $75,000.

7. Pursuant to 28 USC Section 1391, venue is proper in the Southern District of New York where the cause of action arose, and where a contract between Plaintiff and CLL that is the subject of this action, was entered into.

## IV. FACTS IN SUPPORT OF ACTION

8. In February, 2002, Plaintiff commenced services under a guaranteed one-(1)- year Of Counsel contract with defendant CLL. That contract dated January 15, 2002 included grandfather clauses reserving to Plaintiff all rights in and to Plaintiff's confidential proprietary inventions, properties, business plans and projects.

9. CLL represented to Plaintiff when negotiating her contract in 2001 it had "missed out on the Internet bubble" and wanted a right to invest in Plaintiff's proprietary

properties and technologies as well as in new business opportunities presented from her "start-up" business clients that might include possible strategic ventures with its roster of trademark clients. CLL further represented to Plaintiff, who has a Masters in Public Health from Harvard as well as JD from the UCLA School of Law, that she would also receive legal work from its partners who had clients in the medical field.

10. Plaintiff accepted an offer from CLL and turned down a competing offer with the firm of Moses & Singer LLP. Two days after Plaintiff commenced services for CLL, partners of CLL ordered Plaintiff to present her confidential proprietary projects and inventions to them at the firm's monthly partners' conference, the next day. The partners represented that the purpose of Plaintiff's presentation was to familiarize members of the firm with the nature of Plaintiff's practice to see if there was a "good fit" for strategic partnerships between their clients and her confidential proprietary projects, inventions and start-up clients. CLL further represented that a main objective was to see if the firm wanted to invest in Plaintiff's confidential plans for new businesses and novel technologies.

11. Plaintiff received a standing ovation from 40+ attorneys and Of Counsels to CLL after her presentations. All her distributions were marked as "confidential". Plaintiff was told by partner, William Borchard, that her business plans for a new company describing methods for the management and distribution of live concert recordings on and off site at concerts including novel ticketing methods created "quite a buzz". Borchard also represented that they would be of significant interest to the firm's major client, CCC, that owned 130 US concert venues and 30+ abroad, and might be a perfect strategic partner

3

12.  Immediately after the conference, CLL's associate Susan Schick, who was then living with Mike Gordon, guitarist in the rock band "*Phish*" advised CLL managing partners of the huge market value of Plaintiff's inventions and associated confidential business models including their value to unsigned bands and new talent.

13.  At no time did Plaintiff authorize dissemination of any her confidential materials, invention descriptions and trade secrets to any third person party or entity.

14.  In April, 2002 Plaintiff's one-year guaranteed salary of $150,000 was confirmed by CLL in writing to the mortgage company that financed Plaintiff's home in New Jersey.

15.  At about the same time, the two medical rainmaking partners at CLL, William Dippert, Esq. and Michael Wolfson, Esq., announced they were leaving the firm to join Reid and Priest and taking their clients, including Medtronics. Plaintiff discovered afterward that CLL knew these partners were leaving when they made their offer to her in December 2001.

16.  The next month, in May, 2002, Plaintiff was called into a meeting with Mr. Borchard and two other partners Peter Porcino, Esq., and Simon Gerson, Esq., at which time she was advised that CLL was repudiating her contract for no reason other than "it changed its mind". Plaintiff responded that her contract stated that she had a guaranteed salary and office for one year. She also informed these partners that she had relied on the guaranteed salary and office in turning down the competing offer from Moses & Singer and in purchasing her home.

17.  Plaintiff attempted to reinstate the offer from Moses & Singer, to no avail.

18. Immediately thereafter, CLL partner J. Christopher Jensen, Esq., admitted and stated in e-mails to Plaintiff and co-partner Mark Montague, Esq., one of the two remaining patent partners, that CLL was filing Plaintiff's PPA's before the USPTO.

19. On May 22, 2002 and May 24, 2004, CLL partners, Montague, and R. Lewis Gable, Esq. filed Plaintiff's two Provisional Patent Applications ("PPA") before the USPTO naming Plaintiff as sole inventor and CLL as attorneys of record. The PPA #s assigned by the USPTO for Plaintiff's inventions were 60, 382,710 and 60, 382,949, respectively.

20. The PPA's covered certain inventions related to the packaging, editing, management and distribution of live recordings emanating from events at concert, sports and gaming venues. The PPA's filed by CLL on Plaintiff's behalf were based on Plaintiff's confidential inventions, trade secrets and business plans.

21. CLL partners Jensen, Borchard and Midge Hyman, Esq. thereafter attempted to get Plaintiff to sign a release concerning her salary. She refused to do so. CLL then requested that Plaintiff continue billing already started matters.

22. In August, 2002, CLL sent Plaintiff on, and paid for, a business trip to California to work with Legend Films on its patents with and her main prospective client, uWink, a new venture of "Pong"/Atari/Chuck E. Cheese videogame mastermind, Nolan Bushnell. Mr. Bushnell has been a consultant to Plaintiff's new company, LIVE-FI Technologies, that developed and markets the systems and designs described in her PPA's filed by CLL. uWink was taken public in 2003-4.

23. When Plaintiff returned to New York after two weeks in California, she learned that CLL had locked her out of the building and her office. CLL refused Plaintiff

access to her files including computer directories, and she was never again allowed access to the office to retrieve and pack up her belongings.

24. CLL told Plaintiff that it was mailing her files but many items and proprietary confidential materials were never received, including the disc directory of Plaintiff's computer directories, her Rolodex, confidential personal notes on the business plans related to the patent filings and the handouts at the first conference.

25. CLL paid Plaintiff $71,000 under the contract which is less than ½ her contracted guaranteed salary of $150,000.

26. Or about February 16, 2003, Plaintiff received notification from the USPTO that CLL had withdrawn as Plaintiff's attorney on PPA # 60,382,710 based on a "conflict of interest" not described or explained. USPTO's certified dockets reveal that it mailed to Plaintiff CLL's notice on February 13, 2003. CLL never withdrew as Plaintiff's attorney as to PPA #60,382,949.

27. Never once at that time or prior while serving as Plaintiff's attorneys, did any member of CLL reveal to Plaintiff what the existence of any "conflict of interest" was.

28. On May 5, 2003, *The New York Times* Business Section published an article over 2 pages and 6 columns announcing defendant CCC's new venture, InstantLive, and setting out Plaintiff's entire confidential business model for the onsite distribution of live recordings at concerts including for unsigned bands

29. Early March, 2003 pages from the website of InstantLive contained ads/statements that it was offering a new added service allowing audience members to

6

purchase live recordings at the time they bought their tickets.  <u>This is one major operating system claimed in both of Plaintiff's PPA's filed by CLL</u>.

30. Plaintiff advised InstantLive's executives of Plaintiff's patents pending and the joint representation by CLL of Plaintiff and CCC.  Virtually immediately, the ticket association offer was deleted from InstantLive's Web site.

31. Upon information and belief, defendant CCC never invested in any research and development for its own patents for the distribution of live recordings on site.

32. In fact, the press revealed that in or about September, 2004, defendant CCC back purchased a patent issued in July, 2004 to a third party named *Griner* which it has claimed gives it a monopoly on distributing live recordings at concerts.

33. In 2004, in response to defendant CCC's misleading press releases and being excluded from CCC's venues, other companies including DiscLive, now ImmediaTek, and Hyburn, upon information and belief, filed antitrust grievances with the Electronic Frontier Foundation ("EFF") against InstantLive and defendant CCC that has resulted in EFF's releases that it will attempt to invalidate the *Griner* patent.

34. These false and misleading press releases issued by defendants CCC, InstantLive and LIVE NATION have also interfered with Plaintiff's ability to get additional venture capital giving defendants unfair lead time in the marketplace to reverse engineer her systems and steal her clients, including record labels and artists.

35. Plaintiff is entitled to equitable relief and damages against LIVE NATION as the new parent of InstantLive.

7

## AS AND FOR A FIRST CAUSE OF ACTION

Restating her allegations in paragraphs 1-35 , Plaintiff seeks damages against defendant CLL for anticipatory repudiation and breach of Plaintiff's contract.

## AS AND FOR A SECOND CAUSE OF ACTION

Reinstating her allegations in paragraphs 1-35, Plaintiff seeks damages against defendant CLL for fraud in the inducement of Plaintiff's contract.

## AS AND FOR A THIRD CAUSE OF ACTION

Restating her allegations in paragraphs 1-35, Plaintiff seeks damages and equitable relief against defendant CLL including disgorgement for breach of the attorney-client relationship, intentional or negligent breach of the associated fiduciary duties of confidentiality and loyalty and failure to disclose conflicts of interest.

## AS AND FOR A FOURTH CAUSE OF ACTION

Restating her allegations in paragraphs 1-35, Plaintiff seeks damages and equitable disgorgement against all defendants for intentional or negligent misappropriation of Plaintiff's trade secrets including by defendant CCC as principal for its attorney/agent CLL.

## AS AND FOR A FIFTH CAUSE OF ACTION

Restating her allegations in paragraphs 1-35, Plaintiff seeks an injunction against defendants CCC, InstantLive and LIVE NATION to enjoin its production of ticketing

software and systems containing any information in Plaintiff's trade secrets or PPA's as continued.

## AS AND FOR A SIXTH CAUSE OF ACTION

Restating her allegations in paragraphs 1-35, Plaintiff seeks a restraining order against defendants CCC, InstantLive and LIVE NATION to cease and desist in issuing misleading press releases related to the Griner patent.

## AS AND FOR A SEVENTH CAUSE OF ACTION

Restating her allegations in paragraphs 1-35, Plaintiff seeks a restraining order against defendants CCC, InstantLive and LIVE NATION to cease and desist from offering products or services to third persons, parties and entities that include Plaintiff's trade secrets or information in her PPA's as continued.

## AS AND FOR AN EIGHTH CAUSE OF ACTION

Restating paras. 1-35, as against defendants CCC, InstantLive and LIVE NATION or any of their affiliates, subsidiaries and assigns for disgorgement of profits.

## AS AND FOR A NINTH CAUSE OF ACTION

Restating paras. 1-35, against defendants CCC, InstantLive and LIVE NATION damages for unfair competition.

## AS AND FOR A TENTH CAUSE OF ACTION

Restating paras. 1-38, against all defendants for damages for breach of prospective business advantage.

## AS AND FOR AN ELEVENTH CAUSE OF ACTION

Restating paras. 1-35, against all defendants for Plaintiff's attorneys' fees and costs.

WHEREFORE, Plaintiff prays judgment against defendants as stated, for an award for her attorneys' fees and costs and such other and further relief in this Court's discretion as it deems just and proper.

Dated: February 12, 2006  
Essex County, NJ

Respectfully submitted,

_____  
Amy R. Gurvey  
Plaintiff *Pro Se*  
315 Highland Avenue  
Upper Montclair, NJ 07043  
(917) 733-9981