# United States District Court

| SOUTHERN | DISTRICT OF | NEW YORK |

AMY R. GURVEY,

                Plaintiff,

**V.**

WILLIAM BORCHARD, MIDGE HYMAN, BAILA
CELEDONIA, CHRISTOPHER JENSEN,
COWAN, LIEBOWITZ & LATMAN, PC., et al.,
                Defendants.

**SUPPLEMENTAL**

## SUMMONS IN A CIVIL CASE

CASE NUMBER:    06-CV-1202(BSJ)

TO: (Name and address of defendant)

William Borchard
c/o Hinshaw & Culbertson LLP
780 Third Avenue, 4th Floor
New York, New York 10017
(See Attached Rider for Continuation)

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY (name and address)

Lee Squitieri, Esq.
Squitieri & Fearon, LLP
32 East 57th Street
12th Floor
New York, New York 10022

an answer to the complaint which is herewith served upon you, within _____20_____ days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable period of time after service.

J. MICHAEL McMAHON

MAR 0 4 2008

CLERK

DATE

(BY) DEPUTY CLERK

AO 440  (Rev. 10/93)  Summons In a Civil Action -SDNY  WEB 4/99

## RETURN OF SERVICE

| | DATE |
|---|---|
| Service of the Summons and Complaint was made by me[1] | |
| NAME OF SERVER *(PRINT)* | TITLE |

*Check one box below to indicate appropriate method of service*

☐   Served personally upon the defendant.  Place where served: _____
_____

☐   Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein.
Name of person with whom the summons and complaint were left: _____
_____

☐   Returned unexecuted: _____
_____
_____
_____

☐   Other *(specify):* _____
_____
_____

### STATEMENT OF SERVICE FEES

| TRAVEL | SERVICES | TOTAL |
|---|---|---|
| | | |

### DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on _____          _____
                        Date                                          Signature of Server

                                                        _____
                                                        Address of Server

(1)      As to who may serve a summons see Rule 4 of the Federal Rules of Civil Procedure.

## RIDER TO SUMMONS

Midge Hyman
c/o Hinshaw & Culbertson LLP
780 Third Avenue
4th Floor
New York, New York 10017

Baila Celedonia
c/o Hinshaw & Culbertson LLP
780 Third Avenue
4th Floor
New York, New York 10017

Christopher Jensen
c/o Hinshaw & Culbertson LLP
780 Third Avenue
4th Floor
New York, New York 10017

Michael Gordon
Address Not Known

Susan Schick
Address Not Known

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

AMY R. GURVEY,

               Plaintiff,

   -against-

WILLIAM BORCHARD, MIDGE HYMAN,
BAILA CELEDONIA, CHRISTOPHER
JENSEN, COWAN, LIEBOWITZ & LATMAN,
PC, CLEAR CHANNEL COMMUNICATIONS,
INC., INSTANTLIVE CONCERTS, LLC, LIVE
NATION, INC., NEXTICKETING, LLC, DALE
HEAD, STEVE SIMON, MICHAEL GORDON
and SUSAN SCHICK,

               Defendants.
-----------------------------------------------------------x

CIVIL ACTION NO.:
06-CV-1202 (BSJ)

JURY TRIAL REQUESTED

THIRD AMENDED
COMPLAINT



       The Plaintiff, Amy R. Gurney, for her Third Amended Complaint against defendants

alleges as follows:

## I. PARTIES

    1.      Plaintiff Amy R. Gurney since before 1999 has devoted virtually all her time,

effort and money towards the development of processes, systems and methods for the editing,

packaging and distribution of live recordings emanating from live events and associated

electronic ticketing methods. Her attorneys, defendant Cowan, Liebowitz and Latman, PC

("CLL"), filed Provisional Patent Applications ("PPA") Nos. 60,382,710 and 60,382,949 on May

22, 2002 and May 24, 2002, respectively, on behalf of plaintiff, naming plaintiff as sole inventor

and themselves as attorneys of record of certain inventions including those related to the

packaging, editing, management and distribution of live recordings emanating from events at

concert, sports, conferencing and gaming venues including associated electronic ticketing

methods. The PPA's were based on plaintiff's confidential inventions, trade secrets and business plans including for her own 2000 business venture (the concert division of which plaintiff had tentatively called "*ConcertMaster*"). Plaintiff has experience in the field of live music concerts as a former concert producer and international distributor for artists Ella Fitzgerald, and Jose Carreras and in her capacity as a chief executive for videogame mastermind Nolan Bushnell (Inventor of "Pong", Atari and Chuck E. Cheese), she helped develop and launch the music industry's first digital jukebox technology. Plaintiff was an executive for a concern based in Geneva, Switzerland that developed one of the premier laser engraving kiosk technologies for retail distribution worldwide.

     2.     Defendant Cowan Liebowitz & Latman, PC ("CLL") is a New York law firm and professional corporation with primary expertise in trademark, copyright, intellectual property law and business litigation. Its address is 1133 Avenue of the Americas, New York, New York 10036. Between January, 2002 and continuing through at least February 2003 and May, 2003 plaintiff was a client of defendant CLL. At all times relevant hereto and while representing plaintiff, defendant CLL was also acting as attorney and agent for co-defendant herein Clear Channel Entertainment, Inc. ("CCE"), a subsidiary of Clear Channel Communications, Inc. ("CCC") (CCE was spun off from CCC at the end of 2005 and is now part of defendant Live Nation, Inc. a publicly traded corporation) and also for the rock band, *Phish* (including its individual members, including defendant Michael Gordon). Upon information and belief, defendant CLL continues to represent defendant CCC or some of its subsidiaries. CLL has served as plaintiff's exclusive attorney including before the United States Patent and Trademark Office in connection with plaintiff's aforementioned PPAs.

2

3.      Defendants William Borchard, Midge Hyman, Baila Celedonia and Christopher Jensen were at all relevant times partners at CLL who represented plaintiff and supervised patent attorneys Mark Montague and R. Lewis Gable.

4.      Defendant Susan Schick ("Schick") is an attorney licensed in the State of New York and was an employee of defendant CLL when plaintiff was a client of CLL. Schick, upon information and belief, revealed plaintiff's trade secrets to defendant Gordon.

5.      Defendant Michael Gordon ("Gordon") was at all times relevant to the complaint bass guitarist for the rock band Phish, and either he, Phish or both were clients of CLL. Mr. Gordon was at all times relevant a resident of the State of New York. Gordon, upon information and belief accessed plaintiff's trade secrets knowing that defendant Schick's disclosure thereof to him was wrongful on the part of Schick.

6.      The CLL defendants named herein at ¶¶2-5 are sued herein for breach of duties and obligations CLL owed to plaintiff in CLL's capacity as plaintiff's attorneys, and for its acts and omissions in connection with its representation of Plaintiff and for misappropriating and helping other defendants misappropriate plaintiff's trade secrets.

7.      Defendant Clear Channel Communications, Inc. ("CCC") is a corporation existing under the laws of Delaware with its principal place of business in San Antonio, Texas and at all times relevant, CCC and/or CCE, its wholly owned subsidiary, was a client of defendant law firm, CLL. Upon information and belief, defendant CCC, through its wholly owned subsidiaries, is the owner of some 1,200 radio stations in the United States with 24 in the tri-state area alone and 150 pop concert venues, 5 being in New York City. For the relevant period in this case, defendant CCC owned majority market share in the US in the two fields of radio stations and live concert venues. In an action entitled Nobody In Particular Presents v. Clear Channel

3

Communications, Inc. et al., 311 F. Supp. 2d 1048 (D. Colo. 2004), United States District Judge
Edward Nottingham held that there was sufficient credible evidence for a jury to find that CCC
was the alter-ego of its wholly owned corporate subsidiaries. Accordingly, CCC is present in
this district for jurisdictional purposes.

8.      Defendant LiveNation, Inc., upon information and belief, is a Delaware
corporation with its principal place of business at 9348 Civic Center Drive, Beverly Hills,
California 90210 and is the surviving entity spun off in 2005 from CCE. Subsequent to the spin-
off, Live Nation is an entity distinct from defendant CCC. Defendant LiveNation, through its
wholly owned subsidiaries, is a leading producer and promoter for pop concerts and events
staged at concert venues around the world some of which it owns through wholly owned
subsidiaries and are located in New York City. The recordings of these concerts are also
broadcast on CCC-owned radio stations, over the Internet and also sold in CD format through
retail channels in every state in the Union. Defendant LiveNation also currently employs several
of the former major executives of defendant InstantLive. Defendants CCC and Live Nation
continue to buy more and more chains and individual venues in NYC including House of Blues
and local clubs.

9.      Defendant InstantLive Concerts, LLC ("InstantLive"), a Massachusetts limited
liability company formed in March, 2003 was at all relevant times up to late 2005, a division of
Clear Channel Entertainment Inc., a wholly owed division or subsidiary of defendant CCC. It
was formed by officers of defendant CCE, who, upon information and belief, include CCE's
Dale Head, Esq., the general counsel of its Live Entertainment business. Instant Live was spun
off with defendant Live Nation, Inc. in late 2005. It was formed to produce, promote and
distribute live concert recordings including on site for unsigned bands at CCC-owned venues.

4

Defendant InstantLive is now located at 9348 Civic Center Drive, Beverly Hills, California in the same building with defendant LiveNation. Defendant InstantLive Concerts regularly conducts business in the State of New York out of which the instant claims arise.

10.    Defendant NexTicketing, LLC, is a Delaware limited liability company and is a wholly owned subsidiary of Live Nation, Inc.  Nexticketing, LLC was acquired by CCC in 1998 in connection with SFX Entertainment Inc.'s acquisition of the operations of promoter Don Law who worked on the InstantLive Cambridge, Massachusetts office since 2003.  Nexticketing, LLC was operated by CCC continuously on a nationwide basis from the time of its acquisition by CCC until it was spun off as part of the Live Nation spin-off.  Defendant Nexticketing regularly conducts business in many states including the State of New York out of which the instant claims arise.

11.    Defendant Dale Head ("Head) was at all relevant times hereto, CCE's general counsel and later became counsel at Live Nation of Live Entertainment business.

12.    Defendant Steve Simon ("Simon") was at all relevant times hereto, a Chief Executive of Instant Live and an executive Vice President of CCC.

13.    Defendants named in paragraphs 7 to 12 herein are sometimes referred to collectively herein as the "Clear Channel Defendants."  The CC Defendants are named as defendants and sued herein for their misappropriation of plaintiff's trade secrets and inventions and their misuse of such trade secrets and inventions to monopolize and restrain the market for electronic ticketing and electronic distribution of recorded live concerts.

## II.  JURISDICTION AND VENUE

14.     This Court has jurisdiction over this action pursuant to 28 USC §§1331 and 1337 because, *inter alia*, it is an action brought under the laws of the United States including for violations of the Sherman Act, 15 USC Section 2, et seq. and the Lanham Act.

15.     This Court has supplemental jurisdiction pursuant to 28 USC Section 1367 over other claims that are related to the claims within the original jurisdiction of the Court that form part of the same case or controversy.

16.     A separate basis for federal subject matter jurisdiction exists based on diversity of citizenship between plaintiff and each of the defendants herein pursuant to 28 USC Section 1332 as plaintiff is a citizen and resident of the State of New Jersey and all defendants are citizens and residents of States other than New Jersey.

17.     Pursuant to 28 USC Section 1391, venue is proper in the Southern District of New York where the cause of action that is the subject of this action arose at the time that defendant CLL was also the authorized agent/attorney of defendant CCC and/or CCE *(CCC's wholly owned subsidiary).

18.     Should any of plaintiff's pending patents, as continued, issue during the course of this litigation, the Federal Courts would have exclusive jurisdiction over plaintiff's claims against defendants for patent infringement, retroactive to CLL's early filing dates of plaintiff's PPA's in May, 2002.

19.     The amount in controversy exceeds $75,000.00 exclusive of interest and costs in that the Clear Channel defendants have reportedly earned millions of dollars from the misappropriation of plaintiff's trade secrets which plaintiff seeks to recover through this suit.

### III.  SUMMARY OF CLAIMS

20.     The gravamen of plaintiff's action is that all defendants got access to Plaintiff's

trade secrets through known illegal means and then  misappropriated plaintiff's trade secrets and

inventions including but not limited to those set forth in the PPAs (never published),

subsequently implemented and publicizing them to the world including passing them off as their

own invention, to unfairly complete with Plaintiff's and other smaller live recording companies'

ability to enter the market.

21.     Plaintiff's confidential business plans described novel systems and methods that

would, *inter alia*, capture, digitally edit and manage otherwise lost live content, assist with

discovery of unsigned talent, and use plaintiff's proprietary ticketing and e-ticketing methods on

mobile devices including cellular phones to enable distribution of live recordings and event

merchandise to audience members onsite and non-attending global purchasers through enabled

terminals over wired and wireless networks including PC's.  At the time defendant CLL was

representing plaintiff and had access to plaintiff's trade secrets, there was no such technology

implemented in the relevant live concert marketplace for live concert recording distribution and

the content of plaintiff's PPAs that were never published.

22.     Defendants Clear Channel Communications, Inc., Instant Live Concerts LLC,

Live Nation, Inc., Nexticketing LLC, Dale Head and Steve Simon (hereinafter sometimes

referred to as the "Clear Channel Defendants") used such misappropriated ideas, know-how,

inventions, technologies, processes and plans (all constituting trade secrets) for their own benefit

and commercial profit at the expense of plaintiff.  In connection with their misappropriation of

plaintiff's trade secrets, the Clear Channel defendants attempted to monopolize and restrain trade

and did monopolize and did restrain trade and competition in violation of § 2 of the Sherman

Act, 15 USC Sections 2, et seq. in the relevant product market of onsite live pop concert recording distribution including electronic ticketing and mobile ticketing on a worldwide basis causing damage to plaintiff and the competitive market. The Clear Channel Defendants also violated the Lanham Act and committed other acts of false advertising by passing off plaintiff's inventions as their own thereby damaging the prospects for plaintiff's own commercial exploitation of her trade secrets and inventions.

23.     As to the CLL Defendants, this action seeks damages for intentional and negligent breach of fiduciary duty and loyalty breach of confidentiality, breach of the duty of disclosure to plaintiff, professional malpractice, misappropriation of trade secrets and  interference with business relations and treble damages for acting in concert with the Clear Channel defendants as their agent to violate the antitrust laws including misappropriation of plaintiff's trade secrets thereby enabling  the CCC defendants to establish or attempt to establish a monopoly and/or restrain trade in the relevant market of live pop concert recording distribution and associated electronic ticketing and earn many millions of dollars and suppress and preclude plaintiff's commercial exploitation of her trades secrets and inventions.

## IV.  FACTS IN SUPPORT OF THE CLAIMS

**A.     Plaintiff's Trade Secrets, Inventions, Properties And Projects**

24.     Since at least 1999, plaintiff has expended time, effort and money to develop her proprietary trade secrets.  Since her development of the trade secrets, plaintiff has maintained the confidentiality thereof and expended time effort and money in seeking patent protection for the inventions developed from plaintiff's trade secrets.  She had been actively engaged in seeking ways to commercially exploit her trade secrets and inventions.

8

25.    CLL filed Plaintiff's Provisional Patent Application ("PPA") Nos. 60,382,710 and 60,382,949 on May 22, 2002 and May 24, 2002 naming plaintiff as sole inventor of record of certain inventions including those related to the packaging, editing, management and distribution of live recordings emanating from events at concert, sports and gaming venues including associated electronic ticketing methods. The PPA's were the culmination of years of time effort and money investments by plaintiff. The contents of the PPAs and all other work product attendant thereto constitute trade secrets under applicable law.

26.    Plaintiff's trade secrets described novel systems and methods that would, *inter alia*, capture, digitally edit and manage otherwise lost live content, assist with discovery of unsigned talent, and use plaintiff's proprietary ticketing and e-ticketing methods on mobile devices including cellular phones, PC's, blackberrys, treos, palms, etc., to enable distribution of live recordings and event merchandise to audience members onsite and non-attending global purchasers through enabled terminals over wired and wireless networks.

27.    At no time did plaintiff authorize dissemination of any her confidential materials, business proposals, invention descriptions and trade secrets to any third person party or entity, including not to any other client of CLL.

28.    Prior to February 2002, defendant CLL agreed to represent plaintiff in connection with her PPAs. At the time defendant CLL was representing plaintiff there was no such technology implemented in the relevant live concert marketplace for live concert recording distribution.

**B.    The CLL Defendants Induced Plaintiff To Become Of Counsel To
CLL To Obtain Access To Her Trades Secrets Inventions And Business**

29.    In late 2001 and early 2002, plaintiff was negotiated an "of counsel" relationship with CLL. CLL represented that new corporate attorneys were being hired to supervise

9

structuring of joint ventures and strategic alliances including for plaintiff's clients and new businesses. In February, 2002, plaintiff commenced services under a one year salary-guaranteed Of Counsel contract with defendant CLL wherein plaintiff was to provide both legal and non-legal business development services for CLL's roster of trademark clients as well as some of her own and some legal services. That "Contract" dated January 15, 2002, included grandfathered clauses set forth on the Contract's Schedule "A" reserving to plaintiff all right, title and interest in and to plaintiff's confidential proprietary inventions, properties, and projects including those for her own 2000 venture, then called *ConcertMaster and Electronic Ticketing*. This rider has CLL's codes imprinted at the bottom. Plaintiff's Contract provided for a guaranteed base salary of $150,000 through December 31, 2002 and a formula for calculating a contingent draw. Plaintiff now believes that CLL's offer to her to become "of counsel" at CLL for non-legal business development services was only a ruse to convince her to reveal her trade secrets to CLL partners and employees. Plaintiff's belief is based upon the following facts:

(a)     At about the time of plaintiff's hiring, the two medical rainmaking partners at CLL, William Dippert, Esq. and Michael Wolfson, Esq., announced they were leaving the firm to join Reid and Priest and taking their clients including Medtronics;

(b)     Plaintiff since discovered that CLL knew these partners were leaving when they made their offer to her in 2001, meaning that their representation that plaintiff's medical and biotech background would be used for their own client accounts and provide a part of the service billings for her draw, was an additional misrepresentation;

(c)     CLL prevented plaintiff from doing the business development job she was hired to do including pitching strategic deals and brining in new business from its roster of trademark clients;

10

(d)     CLL reneged on its representation that it would take stock in her start-up clients and insisted on straight fee for service rates; CLL partners represented to plaintiff that CLL had "missed out on the Internet bubble" in 2000 and CLL admitted it wanted a right to invest in plaintiff's proprietary properties and technologies including her trade secrets as well as in new business opportunities and productions presented from her "start-up" businesses and clients that might include possible strategic ventures with its trademark clients;

(e)     Plaintiff also later learned that at the time she was hired there was a hold on hiring additional corporate attorneys with M&A restructuring experience and the type of joint venture work which the CLL defendants claimed CLL wanted plaintiff to pursue; and

(f)     Shortly after plaintiff became "of counsel" to CLL, CLL attorney Mark Montague was introduced to plaintiff's client, Legend Films, whom plaintiff had also served as General Counsel up to 2002. CLL orchestrated plaintiff's ouster from Legend and induced Legend to renege on its obligation to pay plaintiff for her services.

## C.   Defendant CLL's Conflicting Roles As Plaintiff's Attorneys And Attorneys For Parties Who Desired To Compete With Plaintiff In Designing, Implementing And Exploiting Technologies For Live Music Distribution

30.     After sending Plaintiff a Letter of Intent, CLL subsequently told plaintiff the firm would serve as plaintiff's lawyers before the US Patent and Trademark Office for her own inventions that were reserved in the Of Counsel Agreement.

31.     As evidence unraveled, however, it is clear that at all times relevant CLL was acting as "scout" and agent for its most coveted client defendant CCC (CCE). CLL's only intent from the get go, as demonstrated by its heinous subsequent behavior, was to get access as soon as possible to plaintiff's trade secrets and to steal plaintiff's clients, confidential business plans and technology ideas, and then terminate plaintiff's Contract. Defendant CLL knew then that

11

plaintiff's business models and trade secrets had been of interest to cellist Yo-Yo Ma,

singer/songwriter Laura Nyro and tenor Jose Carreras would likewise be of interest to their

client, CCC. However, at this time, defendant CLL withheld from plaintiff its true motives as

well as material information concerning defendant CCC's already cited anti-competitive and

predatory practices in the broadcasting, radio and pop concert industries.

32.    Later, CLL admitted that it had always had a conflict of interest in its

representation of plaintiff. On February 16, 2003, plaintiff received notification from the United

States Patent and Trademark Office that CLL had unilaterally withdrawn as plaintiff's attorney

on PPA # 60, 382,710 for an alleged "conflict of interest" without explanation and had given

plaintiff's address above as the new attorney address for this application. CLL never served

Plaintiff with this notice. CLL's withdrawal notice forwarded to plaintiff by the USPTO did not

contain an affirmation of service on plaintiff. CLL, however, never withdrew as plaintiff's

attorney with respect to the second PPA that it filed for plaintiff on May 24, 2002, PPA App. No.

60,382,949, that by law, remained in effect for one year.

**D.    Defendants CLL William Borchard, Midge Hyman,
       Baila Celedonia and Christopher Jensen Had A Duty
       To Maintain The Confidentiality Of Plaintiff's Trade Secrets**

33.    As plaintiff's attorneys CLL, Borchard, Hyman, Celedonia and Jensen had

fiduciary duties to plaintiff to act with utmost loyalty to plaintiff's interests, to avoid conflicts of

interest, to disclose to plaintiff all conflicts of interest, to maintain the confidentiality of all

communications by and between plaintiff and CLL and its promoters, employees and associates.

The CLL Defendants have professional duties to represent plaintiff competently and faithfully in

accordance with prevailing professional standards. The CLL Defendants had additional common

law duties arising out of their access to plaintiff's trade secrets and their knowledge that

12

plaintiff's trade secrets were valuable, confidential and that plaintiff was in the process of forming a new company, attempting to commercially exploit her trade secrets and inventions and seek patent protection for her inventions.

E.  **The CLL Defendants, Gordon And The Clear Channel
    Defendants Misappropriated Plaintiff's Trade Secrets**

34.   While representing her as attorney and her second day on the job, managing partners of CLL, William Borchard, Esq., Midge Hyman, Esq., Baila Celedonia, Esq. and Christopher Jensen, Esq. *ordered* plaintiff to present her confidential proprietary projects, business plans, and inventions to them at the firm's monthly partners' conference. Mr. Borchard, the chief managing partner, falsely represented that the purpose of plaintiff's presentation was to familiarize members of the firm and Of counsel with the nature of plaintiff's practice to see if there was a "good fit" for strategic partnerships between their clients and her confidential proprietary projects, inventions and start-up clients and to encourage their sending Plaintiff entertainment and IP legal work for their own clients.

35.   Plaintiff received a standing ovation from 40+ attorneys and Of Counsels at CLL after her presentations and handouts including "marked confidential" business models for use of her technologies for unsigned bands and immediately received a copy of Schick's email to defendant partners. All her distributions were marked as "Confidential" including plaintiff's 1999 confidential business proposal requested by cellist Yo-Yo Ma's office for "new media" distribution of *"The New Goldberg Variations"* that he premiered at Carnegie Hall. Plaintiff advised CLL's partners that this proposal afforded plaintiff a personal call from Mr. Ma's Boston office within two days and meeting with Peter Gelb, then President of SONY Classical who just assumed the position of General Manager of *The Metropolitan Opera.*

13

36.     Plaintiff was told by CLL partner William Borchard that her business plans describing methods for the management and distribution of live concert recordings on and off site at concerts including novel ticketing methods and use of the systems for unsigned bands created "quite a buzz". Borchard also represented that they would be of significant interest to the firm's major client, CCC that might be a perfect strategic partner. That plaintiff's inventions would be of interest for CLL's client, CCC, was the only true representation Mr. Borchard and CLL ever made to plaintiff. At no time did plaintiff ever give anyone permission to disclose her trade secrets and inventions.

37.     Borchard also told Plaintiff at that time that he preferred to have plaintiff as a client of CLL rather than as "of counsel."

38.     Immediately after the conference, CLL's senior associate defendant Susan Schick, who was then living with defendant Mike Gordon, bass guitarist in the rock band "*Phish*" (also upon information and belief another CLL client) advised CLL managing partners of the huge market value of plaintiff's inventions, ideas for a new ticketing management company and associated confidential business models including their value to unsigned bands and new talent.

39.     CLL did not advise plaintiff that non-attorneys were also in attendance at the firm conference and as such, failed to ensure the confidentiality and protection of plaintiff's properties, inventions and trade secrets.

40.     About this same time, CLL was soliciting name suggestions by interoffice e-mail from the firm's attorneys for the firm's Website.  Schick was pushing a few names including "Cowan Connect".  At this time she and plaintiff had a discussion for alternative names for the music division *ConcertMaster*.  Plaintiff suggested the names "Live Concerts", "Instant Concerts" and "Live Networks" because of a fear that a trademark for "*ConcertMaster*" might

not be granted. "InstantLive Concerts" was the name later used by CLL client CCC when it launched its on site live music electronic distribution business.

41. About the same time, CLL hosted a firm party at the Waldorf Astoria. Plaintiff and her husband met guitarist defendant Mike Gordon of *Phish* there and were shocked to discover how much Mr. Gordon knew of plaintiff's confidential business plans and technology including use for unsigned bands. Upon information and belief, Mr. Gordon learned confidential information of plaintiff's trade secrets from the CLL defendants and the Clear Channel Defendants learned plaintiff's trade secrets through CLL and the individual CLL defendants.

**F.  After Misappropriating Her Trade Secrets, Defendant CLL Fired Plaintiff From Her Employ At The Firm But Continued To Represent Her In Connection With The PPAs**

42. In early May, 2002, plaintiff was called into a meeting with Mr. Borchard and two other partners Peter Porcino, Esq., and Simon Gerson, Esq. who advised that CLL was repudiating her Of Counsel contract for no reason other than "it changed its mind". Plaintiff responded that her contract stated that she had a guaranteed salary and office for one year. She also informed these partners that she had relied on the guaranteed salary and office in turning down the competing offer from Moses & Singer and in purchasing her home. Plaintiff attempted to reinstate the offer from Moses & Singer, to no avail.

43. Immediately thereafter, CLL partner J. Christopher Jensen, Esq., admitted and stated in e-mails to plaintiff and to co-partner Mark Montague, Esq., one of the two remaining patent partners, that CLL had interest in the subject matter of plaintiff's patents and would file plaintiff's PPA's before the USPTO. No conflict of interest was revealed to plaintiff at this time or any time thereafter.

44.    On May 22, 2002 and May 24, 2004 – after plaintiff's Of Counsel Contract was already repudiated by CLL - CLL partners, Montague, and R. Lewis Gable, Esq. filed plaintiff's two Provisional Patent Applications ("PPA") before the USPTO naming plaintiff as sole inventor and CLL as attorneys of record. The PPA #s assigned by the USPTO for plaintiff's inventions were 60, 382,710 and 60, 382,949, respectively.  CLL never withdrew as plaintiff's attorney as to the first application.

45.    CLL managing partners Jensen, Borchard and Hyman attempted to get plaintiff to sign a release as to her Of Counsel contract  that she refused to do.  Thereafter, CLL requested that plaintiff continue billing already started matters.

46.    In August, 2002, CLL sent plaintiff on and paid for a business trip to CA to work with her own clients including Legend Films and uWink, a new venture of "Pong"/Atari/Chuck E. Cheese videogame mastermind, Nolan Bushnell. Mr. Bushnell had been a consultant to plaintiff's *ConcertMaster* now renamed LIVE-FI™ Technologies, LLC, a combined content and solutions company, that implements and markets systems and apparatuses for live recording distribution and electronic ticketing methods including but not limited to those described in her PPA's filed by CLL, as continued.  uWink was taken public in 2003-4.

47.    When plaintiff returned to New York after two weeks in California, she learned that CLL had locked her out of the building and her office.  CLL also refused plaintiff access to her files including computer directories at the firm and was never again allowed her back to the office to retrieve and pack up her belongings.

48.    CLL told plaintiff that it was mailing her files but many items and proprietary confidential materials were never received including the complete disc directory of plaintiff's computer directories, her Rolodex, confidential personal notes on the business plans related to

16

the patent filings and certain of her confidential handouts at the first conference. CLL also did not take adequate precautions to ensure that plaintiff's confidential trade secrets were protected. Several boxes that plaintiff did receive showed signs of tampering and unauthorized access in that they had been opened and/or broken. Some of plaintiff's files were left by the CLL Defendants in public places with access to anyone.

49.     In or about November, 2002, CLL sent plaintiff a CD ROM disc alleged to be with all her computer directories including e-mail at the firm. Multiple deletions were made by the firm on the disc plaintiff received, all done by CLL's computer systems on a common date in October, 2002.

50.     In or about February 16, 2003, plaintiff received notification from the USPTO that CLL had unilaterally withdrawn as plaintiff's attorney on PPA # 60,382,710 admitting a "conflict of interest". USPTO's certified dockets reveal that it, rather than defendant CLL, mailed plaintiff CLL's notice. The notice did not contain an affidavit of service on plaintiff and CLL never withdrew as plaintiff's attorney as to PPA #60,382,949.

51.     Never once at that time or prior while serving as plaintiff's attorneys, did any member of CLL reveal to plaintiff what the "conflict of interest" was.

**G.     Defendants Exploit Plaintiff's Trade Secrets**

52.     Less than three months later, on May 5, 2003, *The New York Times* Business Section published an article over 2 pages and 6 columns announcing and introducing defendant CCC's newest venture, [defendant] InstantLive Concerts - a name substantially similar to those thought up by Plaintiff a year earlier at CLL during her discussion with Schick. This article described Plaintiff's entire confidential business models for the onsite distribution of live recordings at concerts including for unsigned bands but attributed same to CLL and InstantLive.

The article also interviewed members of the rock band *Phish* and identified their interest in the technology. Upon information and belief, the *New York Times* is another trademark client of CLL.

53.     In 2001, when Plaintiff was recruited by defendant CLL, no CCC-affiliated or owned entity existed to distribute live concert recordings on site at CCC venues nor did CCC have a venture existing or in formation for implementing new electronic ticketing operations to assist with live recording distribution.

54.     It was CLL's and CCC joint misappropriation, as agent and principal, respectively, of Plaintiff's trade secrets, confidential business models including those contained in Plaintiff's PPA's filed by defendant CLL before the USPTO that empowered defendant CCC and its principals including defendant Dale Head, Esq. with the ideas and knowledge to form InstantLive to compete with Plaintiff's ConcertMaster, now LIVE-FI™ Technologies, LLC, using their readily-available financial resources.

55.     In early March, 2003 pages of the InstantLive's first Website contained ads/statements that defendant InstantLive was offering a new added benefit to concert audience members allowing them to purchase live recordings of the concerts attended with their tickets. This is one of the several major confidential operating systems claimed in both of Plaintiff's PPA's filed by CLL that were entitled "Premium Performance Ticket" that were not then and have not been published.

56.     After seeing these Website pages, plaintiff then immediately advised CCC's and InstantLive's executives, defendants Steve Simon and Dale Head, Esq. of Plaintiff's patents pending and the joint representation by CLL of Plaintiff and CCC. Virtually immediately, the ticket association offer was deleted from InstantLive's Website.

57.     However, in Fall, 2005, after CCC's formation of LiveNation and LiveNation's acquisition of defendant InstantLive, press releases in the Wall Street Journal and Billboard revealed that in fact CCC defendants were re-deploying Plaintiff's proprietary ticketing methods, marketing Plaintiff's proprietary technologies to record labels and concert audiences as their own invention and thereby causing further unfair competition to the relevant market as well as the entire music industry.

58.     Upon information and belief, defendant CCC never invested in any research and development for its own patents for the distribution of live recordings including on site at venues and using electronic means for authenticated distribution. As of the date of filing of Plaintiff's original Complaint in February, 2006 there were no patent applications published with defendant CCC or its other affiliated defendants named as inventors. In February, 2006, Billboard magazine reported that Clear Channel joint ventured with Ticketmaster and Nokia to put tickets on mobile devices.

59.     Press releases issued by defendant CCC, InstantLive and LiveNation not only interfered with Plaintiff's ability to get additional venture capital, but gave defendants unfair lead time in the marketplace to reverse engineer her systems and steal her clients, including record labels, co-producers and artists, pass the systems off as their own invention and disseminate her technology ideas to other competitors in the marketplace. They further empowered CC defendants, already in possession of monopoly power, to wield that power in creating additional illegal combinations in restraint of trade, including with outside telecom entities and also illegally tie artists' performances at their venue with live recording distribution rights.

**H.     Defendants Live Nation And Clear Channel Pass Off As**
**     Their Own The Trade Secrets Misappropriated From Plaintiff**

60.     In 2004, the press reported that on or about September, 2004, defendant CCC purchased and acquired an assignment in and to a patent issued in July, 2004 to a third party named *Griner* that affixes single tracks onto a master as titles/songs are performed. An operating system that performs this one function does not give the owner a monopoly on distributing live concert recordings since many other methods to package, edit and manage distribution exist including those that are more comprehensive, faster and more beneficial to the relevant industry.

61.     In response to defendants' misleading press releases and being excluded from CCC's venues to record live concerts for featured artists, in 2004 other companies including DiscLive, now ImmediaTek, and Hyburn, filed antitrust grievances between 2004 and 2005 with the national Electronic Frontier Foundation ("EFF") against CCC and InstantLive. Notations of these grievances and the EFF investigation that thereafter ensued can be found on the www.EFF.org Website, along with confirmation that EFF was prosecuting a lawsuit to invalidate the Griner patent CCC acquired in a proceeding before the USPTO. This is de facto confirmation that damages from defendants' predatory practices had an anti-competitive effect on the entire relevant market and not just on Plaintiff.

62.     Through digital media conferences in Fall, 2005, Plaintiff first learned that additional ticketing methods proprietary with Plaintiff were being considered for implementation by LiveNation and InstantLive.

63.     In September and October, 2005, Plaintiff notified Michael Rapino and Stephen Prendergast, executives of LiveNation and InstantLive respectively, that when Plaintiff in 2003 had previously informed defendants Dale Head, Esq. and Steve Simon that an alleged

misappropriation of her proprietary technologies had taken place through CLL, ads for certain systems were removed from InstantLive's first Website.

64.     Mr. Prendergast then told Plaintiff that he thought patents could be used by anyone but asked Plaintiff for a proposal to settle her claims against defendants.

65.     In February, 2006, Plaintiff read in several trade journals that defendants CCC, LiveNation and Nexticketing were now in fact implementing additional electronic ticketing solutions related to Plaintiff's proprietary methods on mobile devices.  This is another operating system described in Plaintiff's 2002 confidential business plans with description set forth in the unpublished PPAs filed by CLL.

66.     On March 13, 2007, the United States Patent and Trademark Office announced it would revoke a patent held by the Clear Channel defendants which figures prominently in the claims asserted in this action.

## I.     Defendants Live Nation And Clear Channel's Anti-Competitive Activity

67.     Unbeknownst to plaintiff and never disclosed to her by CLL as her attorney, but known to CLL as CCC's attorney/agent, at the inception of plaintiff's relationship with CLL in 2001, defendant CCC already had a notorious reputation for predatory anti-competitive practices and had a history of antitrust misconduct cited by the FCC:  (a) defendant CCC had in fact been "parking" stations that it owned with other companies in order to circumvent FCC limitations on ownership of the number of stations that one company could own in a local market.  CCC's "parking" practice in turn led Congressman Howard Berman in 2002 to write the US Department of Justice and the FCC concerning CCC's predatory practices and to seek House Judiciary Committee hearings on that subject; (b) on July 10, 2002, the FCC announced it would conduct hearings on various pending CCC radio acquisitions due to competitive concerns; (c) in 2001,

21

defendant CCC was separately sued by Florida entity Spanish Broadcasting Company, Inc. for additional anti-competitive and predatory practices aimed at monopolizing the Hispanic radio, television and advertising markets. See *Spanish Broadcasting v. [defendant herein] Clear Channel Communications, Inc.*, Case No. 02-CV-21755 (SD FL), *affirmed*, 376 F. 3d 1065 (11th Cir. 2002); (d) defendant CCC's press releases around this time point to its recent large AM/FM merger as well as CCC's acquisition of concert promoter SFX in 2000 as important aspects of CC's additional growth in market power. Defendant CCC's releases ominously forecast that CC will continue to misuse its market power, as follows:  *"The opportunities for synergies among all these CC divisions are explosive... and are in the very early innings."*

68.    CCC's continuing anticompetitive and predatory practices finally led to Senator Feingold's introduction of the "Competition in Radio and Concert Industries Act" on June 27, 2002.

69.    Starting in Fall, 2004 and throughout 2005, multiple press releases around the world were issued by CCC and executives of defendants InstantLive Concerts and Live Nation that CCC and InstantLive had a monopoly on distributing live concert recordings. Such ads demonstrate defendants' intent de facto at attempted monopoly in the relevant market in violation of Section 2 of the Sherman Act. They were also understood as true by other major players in the entertainment industry including major labels, concert promoters and producers, Plaintiff's clients, licensees and her investors, causing Plaintiff significant damage to her business.

70.    In response to defendants' misleading press releases and being excluded from CCC's venues to recording live concerts for featured artists, in 2004 other companies including DiscLive, now ImmediaTek, and Hyburn, filed antitrust grievances between 2004 and 2005 with

22

the national Electronic Frontier Foundation ("EFF") against CCC and InstantLive. This is de facto confirmation that damages from defendants' predatory practices had an anti-competitive effect on the entire relevant market and not just on Plaintiff.

71.     The CCC Defendants are already competing in the relevant market and not just investing in other companies. Specifically, InstantLive Concerts, LLC was actually formed starting in 2003 by CCC (or principals of CCC/CCE, including defendant herein Dale Head) after their misappropriation of plaintiff's trade secrets in consort with their attorney/agents CLL in an aggressive and to date successful attempt to get in the market first before plaintiff and other competitors; create illegal combinations in restraint of trade; create added levels of "holding companies" limiting the ability of aggrieved competitors to reach parent CCC and abort defendants' anti-competitive predatory tactics; attempt to monopolize and complete monopolization of the relevant pop concert market by wielding its already existing monopoly power in the relevant market; and unfairly compete with other live recording companies including plaintiff's by passing off plaintiff's misappropriated proprietary technology as its own invention to record labels and telecom companies.

72.     The CCC Defendants' misappropriation of plaintiff's trade secrets, confidential business models and proprietary technologies, acting jointly with its agent, CLL, is *the* vehicle that CCC used to establish or attempt to establish a monopoly in the relevant market of live pop concert recording distribution pursuant in Sherman Act, Section 2.

73.     When Plaintiff called other venue owners and artist managers they informed her they thought CC had a monopoly in the technology.

74.     Plaintiff was also told by executives of defendants InstantLive and LiveNation during this time and throughout 2005 that she, too, would not be permitted to record or distribute concert recordings at CC's venues, thereby causing her further problems with her investors.

75.     The CCC Defendants' predatory and anti-competitive acts include its undisputed majority market share owning some 150 US pop concert venues and 1,200 US radio stations (over which live concerts staged at CCC-owned venues may be aired), its unlawful misappropriation of plaintiff's trade secrets for *ConcertMaster* described in her 2002 Provisional Patent Applications ("PPAs") filed by plaintiff's attorneys defendant CLL, with CLL also serving as CCC's attorney/agent without mandated disclosure; wielding its monopoly power and majority market share in connection with misappropriation of plaintiff's trade secrets and contents of her PPA filed by CLL to form three new companies, defendants InstantLive Concerts, LLC, LiveNation, Inc. and NexTicketing, Inc. herein; creating illegal combinations in restraint of trade in the relevant market including through "holding companies" thereby making it impossible for aggrieved competitors to pierce the corporate veil and abort CC defendants' predatory practices; further wielding its monopoly power  to claim a monopoly in the relevant market to the press after acquiring but one operating system for live concert recording when others methods exist; and entering into additional combinations in further restraint of trade with record labels and telecom companies including while passing off plaintiff's trade secrets and proprietary technologies as their own invention thereby serving to steal and limit the competitions' access to artists and solutions as well as financing.

76.     In 2001/early 2002 when plaintiff was defendant CLL's client, there was no company in operation (and defendant CCC had not yet formed the other three corporate defendants herein) to hand out or distribute live pop concert recordings at venues – not for

24

unsigned bands or major artists. Nor were defendants forming any ticketing or electronic ticketing operations to associate live recording orders with ticketing or prospective recording purchasers' information. This is because these are trade secrets proprietary with plaintiff, misappropriated by defendant CCC by its agent, CLL, or acting in consort with CLL as its scout.

77.     The delays in finalizing deals with artists and her other industry contracts have further damaged plaintiff's since 2003 and damaged her in her relations with her investors, strategic partners, labels, agents and managers.

78.     In further restraint of trade, CC defendants continue to pass off plaintiff's proprietary technologies as their own invention.

79.     In further restraint of trade, CC defendants are using plaintiff's proprietary technology to illegally contract with the with major labels such that when booking their artists for performances at CCC-owned venues, CC defendants now also mandate that they be granted the added exclusive right to distribute the live concert recordings as a condition of those bookings. This new practice, covered by Billboard in October, 2005 absolutely shuts the door for other management and recording companies to compete in the relevant market.

80.     Recent February, 2006 *Billboard* articles, released after plaintiff filed her first Complaint in this action (never served), confirms that in a further attempt to monopolize pop concert recording distribution and restrain trade, CC defendants are now additionally implementing plaintiff's proprietary e-ticketing methods with telecom venture partners including those described in her PPAs filed by CLL, as continued.

### AS AND FOR A FIRST CAUSE OF ACTION
### THE LANHAM ACT (15 U.S.C. § 1125(a))
### FOR FALSE AND MISLEADING DESCRIPITIONS

25

81.    Plaintiff repeats and realleges the allegations of paragraphs 1 to 80 as if fully set forth herein.

82.    Section 43(a) of the Lanham Act prohibits any use of a false or misleading description or representation in commercial advertising or promotion that "misrepresents the nature, characteristics, qualities, or geographic origin of . . . goods, services, or commercial activities.

83.    Defendants Live Nation and CC have made false and misleading statements of fact in advertising.

84.    Those statements have actually deceived and had the capacity to deceive a substantial segment of the audience of those statements.

85.    The deception was material as evidenced by the fact that many persons used LN's and CC's Live Concert music distribution system.

86.    Live and CC offered its Live Concert music distribution system in several states of the United States and to persons in states outside of the state where the live performance was held and recorded.

87.    As a result of LN and CC's violations of the Lanham Act plaintiff has been injured and is likely to continue to be injured and there has been a material adverse economic impact on her own business.

88.    Plaintiff was at all relevant times a business competitor of defendants' LN and CC.

**AS AND FOR A SECOND CAUSE OF ACTION**
**FOR MISAPPROPRIATION OF TRADE SECRETS AGAINST ALL DEFENDANTS**

89.    Plaintiff repeats and realleges the allegations of paragraphs 1 to 80 as if fully set forth herein.

90. The matters set forth in the (never published) PPAs and in the presentation material described herein constitute formulae, compilations of information, devices and special knowledge used by plaintiff in her business (the "Trade Secrets").

91. The Trade Secrets gave plaintiff an advantage (and/or the opportunity for an advantage) over competitors (or potential competitors) who did not know or use the Trade Secrets.

92. The Trade Secrets were not known outside of plaintiff's business.

93. Plaintiff took all reasonable means to guard the secrecy of the Trade Secrets.

94. The Trade Secrets are extremely valuable to plaintiff's business and were highly valued by LN and CC, plaintiff's competitors.

95. Plaintiff expended significant skill, effort, money and investment of time in developing the trade secrets.

96. The Trade Secrets could not be properly acquired or duplicated by others even with significant effort money and investments of time.

97. Defendants used plaintiff's Trade Secrets in breach of confidential duties and relationships and/or as a result of discovery by improper means.

98. As a result of the foregoing plaintiff has suffered injury and loss and seeks compensation in the form of lost profits, rents and royalties.

## AS AND FOR A THIRD CAUSE OF ACTION AGAINST ALL DEFENDANTS FOR UNFAIR COMPETITION AND MISAPPROPRIATION OF IDEAS AND LABOR, SKILL AND EXPENDITURES

99. Plaintiff repeats and realleges the allegations of paragraphs 1 to 80 as if fully set forth herein.

100.    If the Trade Secrets are not trade secrets, then they constitute "novel and concrete ideas" under New York law or investments in labor, skill and expenditures in which plaintiff has a predictable property interest under New York law.

101.    Defendants unlawful use of plaintiff's novel and concrete ideas and here labor skill and expenditures constitute misappropriation of ideas or information have given rise, under New York law to claims for unfair competition.

102.    Plaintiff and LN and CC had implied-in- fact contracts or quasi- contracts with plaintiff for the use of her ideas.  Prior to CC and LN's appropriation of plaintiff's ideas, the ideas were reduced to concrete form and upon CC and LN's use thereof an implied in fact or implied in law contract to pay for use of the idea arose.

103.    As a result of the foregoing, plaintiff has suffered loss and damage and is entitled to damages in the form of the value derived by defendants from plaintiff's ideas and information.

### AS AND FOR A FOURTH CAUSE OF ACTION
### AGAINST THE CLL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY

104.    Plaintiff repeats and realleges the allegations of paragraphs 1 to 80 as if fully set forth herein.

105.    At all relevant times there was a fiduciary relationship between CLL defendants and plaintiff.

106.    The CLL defendants represented plaintiff in connection with plaintiff's PPA, including representation to assist plaintiff in the commercial exploitation of her inventions, ideas and trade secrets.

107.    As a result thereof, the CLL Defendants stood in a relation of trust and confidence with its client, plaintiff, and owed her fiduciary responsibilities, including duties of undivided

loyalty, good faith, fair dealing, fairness and honesty and the duty to act in their client's best interests.

108.    In addition to the acts described herein, the CLL defendants also breached their fiduciary duties to plaintiff by submitting misleadingly incomplete documents to the First Department of the Supreme court of the New York's Disciplinary Committee and this Court by concealing a rider to plaintiff's of counsel agreement with CLL which carved out plaintiff's trade secrets and inventions and all activities connected thereto from the of counsel agreement.

109.    CLL Defendants' actions constituted a breach of the foregoing duties and responsibilities owed to plaintiff by the CLL defendants.

110.    The CLL defendants also breached their duty to provide plaintiff with a signed retainer agreement.

111.    Because CLL Defendants acted knowingly, intentionally, purposefully, maliciously and with regard for the rights and interests of plaintiff, she is further entitled to punitive damages for the alleged misconduct alleged herein.

## AS AND FOR A FIFTH CAUSE OF ACTION
## FOR TORTIOUS INTERFERENCE WITH CONTRACT AGAINST CLL

112.    Plaintiff repeats and realleges the allegations of paragraphs 1-80 herein as if fully set forth herein.

113.    From prior to 2001 through the present, plaintiff has had a valid contract with Legend pursuant to which Legend Films was to pay plaintiff in Legend stock for her services as Legend's General Counsel from 1999 through 2002 when plaintiff entered into an of counsel agreement with CLL

114.    Defendants CLL were aware of that contract.

29

115. Defendant CLL intentionally procured the breach of that contract by inducing Legend to refrain from performing the contract.

116. Defendants CLL were motivated by their desire to become counsel to Legend and appropriate for themselves and obtain for itself a contract from Legend similar to the one between plaintiff and Legend.

117. As a result of the breach of contract, plaintiff has sustained and suffered loss and damages.

### AS AND FOR A SIXTH CAUSE OF ACTION
### AGAINST ALL CLL DEFENDANTS FOR PROFESSIONAL MALPRACTICE

118. Plaintiff restates and realleges her allegations in paragraphs 1-80 as if fully set forth hereat and seeks damages against the CLL Defendants for professional malpractice.

119. At all relevant times the CLL Defendants were under a duty to exercise their professional skills for the benefit of their client, plaintiff herein. The CLL Defendants also owed plaintiff duties of loyalty and to take all steps to avoid conflicts and/or to disclose such conflicts to plaintiff.

120. The CLL Defendants failed to exercise the requisite skill and core of legal professionals by: (1) failing to protect and safeguard plaintiff's trade secrets from disclosures and misappropriate; (2) failing to properly advise plaintiff with respect to the opportunities for commercial exploitation of plaintiff's inventions and trade secrets; (3) failing to eliminate conflicts of interest; (4) failing to resolve conflicts of interest before undertaking representation of plaintiff.

121. As a result thereof, the CLL Defendants are liable to plaintiff for damages caused by the CLL Defendants' professional malpractice.

## AS AND FOR AN SEVENTH CAUSE OF ACTION
## FOR AN ACCOUNTING AGAINST THE CCC DEFENDANTS

122.    Plaintiff repeats and realleges the allegations of paragraph 1 to 80 as if fully set forth herein.

123.    Since at least 2002 the CCC Defendants have obtained commercial benefit, including fees and other names and considerations through the use of the unlawful conduct described herein.

124.    The CCC Defendants have received such commercial benefit, fees and other monies and consideration at the expense of plaintiff and some or all of said benefits, fees, monies and consideration are rightfully due to plaintiff.

125.    The amount of such benefits, monies, fees, or consideration due from The CCC Defendants to plaintiff cannot be ascertained without an accounting of the income and gross profits which the CCC Defendants have obtained through their wrongful conduct. Plaintiff is entitled therefore to an accounting.

## AS AND FOR A EIGHTH CAUSE OF ACTION AGAINST THE
## CCC DEFENDANTS FOR VIOLATIONS OF SECTION 2 OF THE SHERMAN ACT
## AND AGAINST THE CLL DEFENDANTS FOR AIDING AND ABETTING THEREOF

126.    Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 80 above.

127.    Under Sherman Act, Section 2, plaintiff alleges both completed and attempted monopoly claims.

128.    Pursuant to Section 2's cause of action for completed monopoly, plaintiff alleges that defendant CCC, already with monopoly power in the relevant live concert venue market in the United States, willfully and unlawfully acquired plaintiff's trade secrets, confidential business models and content of her PPAs by acting in consort with its agent, CLL, to further

31

wield and maintain that power. Specifically plaintiff alleges that the misappropriation of plaintiff's trade secrets enabled defendant CCC with know-how and ideas to form the three other corporate defendants herein, defendants InstantLive, Live Nation and now NexTicketing, organize them into "holding companies" and make it virtually impossible for competitors to pierce the corporate veil and reach parent CCC to abort defendants' predatory practices. In addition, plaintiff alleges that defendants have sought to expand their history of creating illegal combinations in restraint of trade including with record labels and telecom solutions companies. Plaintiff contends  that CC defendants have intentionally and after notice been passing off plaintiff's proprietary technology to corporations as their own invention. These acts have served to interfere with the competition's relationships with artists because CC defendants are now requiring labels to grant live recording distribution rights as a condition of artists being booked at CCC-owned venues. This has in turn served to eradicate the competition in pop concert live recording distribution and electronic ticketing in the relevant market. In claiming a completed monopoly, plaintiff also points to defendant CCC's prior citing for anti-competitive history and predatory actions already cited by the FCC.

129.    Pursuant to Sherman Act Section 2 prohibition against attempted monopoly, plaintiff contends that CC defendants have already demonstrated specific intent to monopolize and a dangerous probability of attaining a monopoly in the market by publicly asserting that it had a "monopoly" in the market for on site live recording distribution. At this time, CC defendants already possessed monopoly power in US pop concert venues and radio markets. Griner, even if it were not now being invalided by the Electronic Frontier Foundation before the USPTO, presents only one method to expedite on site live recording distribution and many others including plaintiffs are more comprehensive and benefit the industry as a whole.

130. Major recording industry and label executives including at Robert Sillerman's CKX, Inc. (Craig Fox), Universal Music Group (Jeff Bronikowski), The William Morris Agency (Mark Geiger) and members of the Warner Music Group have admitted to plaintiff they believed defendant CCC's 2004 claims of monopoly in the relevant market and that CCC's predatory practices were the cause in fact of their aborting/delaying negotiations for engaging plaintiff's services or licensing her technologies for their artists.

131. Clear Channel has monopoly power in the relevant market and has the ability to control prices and exclude competition.

132. The CCC Defendants used their market power to control prices and exclude competition by: (a) falsely claiming to own a monopoly on all-in-one technologies that produce post-concert live recordings on digital media; (b) forcing bands like the Pixies to use Clear Channel's CD-burning systems instead of their own or those of small start-up companies; (c) threatening to sue anyone who produces post-show live recordings at any of its 100+ venues in the U.S.;(d) twisting artists' arms to give up a significant chuck of their concert merchandise sales, one of the few revenue streams not already taxed by most recording labels; (e) inhibiting investment and innovation in the post-event content distribution market by companies such as Kufala and Hyburn; and (f) preventing competitors such as plaintiff from entering the market; (g) misappropriating plaintiff's trade secrets.

133. Clear Channel has willfully acquired and maintained monopoly power with the intent to gain an unfair competitive advantage. Clear Channel continues to dominate this market through the unlawful conduct described above, to the detriment of plaintiff and the Class.

134. As a direct and proximate result of Clear Channel's monopolistic conduct, competition in the relevant market has been unreasonably restrained and injured, and

competition has been damaged.  Plaintiff will continue to suffer damages as a result of CCC

defendants' wrongdoing as alleged herein.

135.    Damages directly attributable to defendants' anti-competitive and predatory

practices have been suffered by extrinsic third party live recording entities, i.e., DiscLive and

Hyburn, who as early as 2004, filed grievances with the Electronic Frontier Foundation in San

Francisco without communicating with plaintiff whatsoever.  Each of DiscLive, Hyburn,

plaintiff, and upon information and belief other entities as well, have been forcibly precluded

from CCC-owned  venues and informed they would no longer be permitted to record and/or

distribute the live performances of featured artists.

136.    Concerning defendants CCC, LiveNation, InstantLive Concerts and

NexTicketing, Plaintiff also seeks treble damages for antitrust violations including violations of

Section 2 of the Sherman Act, 15 USC Section 1, et seq. and injunctive relief in the form of an

Order:

(i)    shutting down defendants' existing operations that package and distribute

live concert recordings at their hosting venues that deployed or continue to deploy any of

plaintiff's misappropriated trade secrets;

(ii)    enjoining defendants from issuing further press releases claiming a

monopoly in the relevant field and mandating retraction of  prior releases;

(iii)    enjoining defendants' practice of precluding outside companies from

accompanying featured artists into CCC-owned venues to record and distribute live

performances;

(iv) enjoining CC defendants' unlawful contractual dealings in further restraint of trade passing off plaintiff's proprietary technology in electronic ticketing as its own invention to third party strategic partners;

(v) enjoining defendants' from unlawful contractual dealings with record labels to require artists performing at CC venues to also grant CC exclusive live recording rights as a condition of their performing contracts;

(vi) enjoining defendants from passing off plaintiff's trade secrets, proprietary technologies and services including methods associating live recording distribution and ticketing operations as their own invention;

(vii) enjoining defendants from advertising or marketing plaintiff's trade secrets, proprietary technologies and services; and

(viii) enjoining defendants from using in any manner whatsoever, implementing, licensing or distributing electronic ticketing methods that use in any way plaintiff's confidential trade secrets, business plans and patents pending including those described in PPAs filed by CLL in May, 2002.

137. Clear Channel possesses, and has demonstrated, a dangerous probability of achieving monopoly power in the relevant market. Clear Channel continues to dominate this market through the unlawful conduct described above, to the detriment of plaintiff and the Class.

138. As a direct and proximate result of Clear Channel's monopolistic conduct, competition in the relevant market has been unreasonably restrained and injured, and plaintiff has suffered damages.

139. Plaintiff seeks treble damages against all defendants for violations of antitrust laws and/or the aiding and abetting thereof.

35

## AS AND FOR A NINTH CAUSE OF ACTION AGAINST THE
## CCC DEFENDANTS FOR VIOLATION OF STATE ANTITRUST LAWS AND
## AGAINST THE CLL DEFENDANTS FOR AIDING AND ABETTING THEREOF

140.   Plaintiff restates and realleges her allegations in paragraphs 1 to 80 as if fully set

forth herein and seeks damages against defendants CCC. Live Nation, Instant Live and

NexTicketing for violations of the antitrust laws of the states of New York, Texas and California.

## AS AND FOR A TENTH CAUSE OF ACTION
## AGAINST THE CCC DEFENDANTS FOR UNJUST ENRICHMENT

141.   Plaintiff incorporates by reference the allegations contained in paragraphs 1

through 80 above.

142.   As a result of the unlawful conduct described above, the CCC defendants have

been and will continue to be unjustly enriched.

143.   The CCC Defendants have benefited from their unlawful acts and it would be

inequitable for the CCC Defendants to be permitted to retain any of the ill-gotten gains.

144.   Plaintiff is entitled to the amount of the CCC Defendants' ill-gotten gains

resulting from its unlawful, unjust and inequitable conduct.  Plaintiff is entitled to the

establishment of a constructive trust.

## AS AND FOR AN ELEVENTH CAUSE OF ACTION
## AGAINST ALL DEFENDANTS FOR
## INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS

145.   Plaintiff incorporated by reference the allegations contained in paragraphs 1

through 80 above.

146.   As a result of the unlawful conduct described above, plaintiff lost the opportunity

to complete a private placement offering of securities to be issued by her own company which

was to have served as seed money for the development of technologies utilizing her trade secrets and inventions.

147.   As a result of defendants' conduct plaintiff has suffered ascertainable loss and damage.

**WHEREFORE**, Plaintiff prays judgment against defendants as stated and for such other and further relief in this Court's discretion as it deems just and proper, including:

(i)   injunctive relief against defendants CCC, InstantLive, LiveNation and NexTicketing to abort implementation of any systems or solutions including Plaintiff's trade secrets and/or systems including those described in Plaintiff's PPAs filed by its attorney/agent, defendant CLL;

(ii)   shutting down defendants' existing operations that package and distribute live concert recordings at their hosting venues that deployed or continue to deploy any of Plaintiff's misappropriated trade secrets;

(iii)   enjoining defendants from issuing further press releases claiming a monopoly in the relevant market  and mandating retraction of  prior releases;

(iv)   enjoining defendants' practice of precluding outside companies from accompanying featured artists into CCC-owned venues to record and distribute live performances;

(v)   enjoining CC defendants' unlawful contractual dealings with labels, telecom and solutions companies, in further restraint of trade, passing off Plaintiff's proprietary technologies in live concert recording, editing, packaging, distribution and electronic ticketing as its own invention;

(vi)    enjoining defendants from unlawful contractual dealings with record labels requiring artists performing at CCC-owed venues to also grant CC defendants live recording and distribution rights as a condition of their performing contracts;

(vii)    enjoining defendants from advertising or marketing Plaintiff's trade secrets, proprietary technologies and services; and

(viii)   enjoining defendants from using in any manner whatsoever, implementing, licensing or distributing electronic ticketing methods that use, in any way, Plaintiff's confidential trade secrets, business plans and patents pending including those described in PPAs filed by CLL in May, 2002;

(ix)    compensatory damages, attorneys fees, costs and interests;

(x)    punitive damages;

(xi)   an accounting.

Dated: March 4, 2008

SQUITIERI & FEARON, LLP

By:_____

Lee Squitieri (LS-1684)
32 East 57th Street
12th Floor
New York, New York 10022
(212) 421-6492

## CERTIFICATE OF SERVICE

I, Lee Squitieri hereby certify that on March 4, 2008 I caused the accompanying

SUPPLEMENTAL SUMMONS AND THIRD AMENDED COMPLAINT to be served upon the

following parties by depositing a true copy of the same enclosed in a post-paid properly addressed

wrapper in an official depository under the exclusive care and custody of the United States Postal

Service within the State of New York or otherwise indicated:

Andrew B. Cripe, Esq.
HINSHAW & CULBERTSON, L.L.P.
222 N. LaSalle Street
Chicago, Illinois 60601

John R. Supple, Jr., Esq.
HINSHAW & CULBERTSON, L.L.P.
780 Third Avenue
New York, New York 10017

Eric Roman, Esq.
BAKER BOTTS LLP
30 Rockefeller Plaza
44th Floor
New York, New York 10112

Lee Squitieri