*Original*
*Court Copy*

*Pro Se office*
*Docketing*
*Rm 200*

**Amy R. Gurvey**
**US Patentee/Plaintiff Pro Se**
**315 Highland Avenue**
**Upper Montclair, NJ 07043**
**PH: (917) 733-9981**
**amygurvey@gmail.com**

Application for reconsideration DENIED. Plaintiff does not raise any new information compelling a different result on her Motion to Vacate the March 17, 2009, Order dismissing Defendant Live Nation (Dkt. No. 65):

1. Contrary to Plaintiff's claim that the Order dismissing Live Nation -- which she is now challenging -- was dated April 24, 2009, the dismissal Order was dated March 17, 2009 (Dkt. No. 65). Accordingly, as this Court's February 13, 2020, Order explains: even if Plaintiff had filed an April 22, 2010, motion to vacate the March 17, 2009, order, any such motion would have "not [have been] reasonably prompt, because it would have been filed over a year after the March 17, 2009, Order. *Cf.* Fed. R. Civ. P. 60(c)(1) (Rule 60 motions generally should not be made "more than a year after the entry of the... order" being challenged.)"

2. Any appeal of the March 17, 2009 Order is not timely. *See* Fed. R. App. P. 4; *Gurvey v. Cowan, Liebowitz & Latman, P.C.*, 462 F. App'x 26, 30 n.5 (2d Cir. 2012) ("*Gurvey I*") (finding that Second Circuit did not have jurisdiction to consider appeal of the March 17, 2009, Order, because Plaintiff did not timely include the Order in her notice of appeal). The issues in this action have been fully adjudicated and appealed twice. *See Gurvey I*, 462 F. App'x 26; *Gurvey v. Cowan, Liebowitz & Latman, P.C.*, 757 F. App'x 62 (2d Cir. 2018), *cert. denied*, 140 S. Ct. 161, 205 L. Ed. 2d 52 (2019), *reh'g denied*, No. 18-8930, 2019 WL 6257536 (U.S. Nov. 25, 2019).

3. None of the documents Plaintiff attaches below are the April 22, 2010 filings she references. Among the attachments, the one closest in time is a May 10, 2010, notice of motion to vacate the April 24, 2009, Order. Both Judge Jones in a reconsideration Order (Dkt. No. 80) and the Second Circuit conclusively reviewed the April 24, 2009, Order.

4. The January 28, 2020, Amended Final Judgment and Consent Decree, in the Department of Justice's antitrust action against Live Nation Entertainment, Inc. (available at https://www.justice.gov/atr/case-document/file/1241016/download), does not bear on the issues below or warrant vacatur of Orders in this action.

**Accordingly, reconsideration of the February 13, 2020, Order (Dkt. No. 428) -- denying Plaintiff's untimely motion to vacate -- is DENIED. If Plaintiff files frivolous materials, an injunction may be imposed, requiring Plaintiff seek permission first before filing anything further on the docket.** The Clerk of Court is respectfully directed to close Dkt. No. 429, and to mail a copy of this Order to Plaintiff.

**DISTRICT COURT**

**...CT OF NEW YORK**

--------------------------------X

Amy R. Gurvey v. Cowan, Liebowitz & Lathman, PC, ET AL.

**CASE NO. 06-1202-cv (LGS)**

**NOTICE OF MOTION TO RECONSIDER DENIAL OF US PATENTEE/PLAINTIFF'S MOTION TO VACATE SDNY ORDERS BASED ON FAILURE TO ADJUDICATE APRIL 2010 AMENDED COMPLAINT STATING DAMAGES FOR PATENT INFRINGEMENT, AIDING & ABETTING INFRINGEMENT AND CLAYTON ANTITRUST VIOLATIONS [35 USC § 271 271(b) 285 286; 15 USC§18]**

Dated: March 9, 2020
New York, New York

LORNA G. SCHOFIELD
UNITED STATES DISTRICT JUDGE

1

**CC: DEPARTMENT OF JUSTICE ("DOJ") Media and Entertainment Division, Hon. Owen Kendler, Chief Hon. Geoffrey Berman, US Attorney for the SDNY Public Corruption Division  US Patents and Antitrust**

**CC: Hon. Ruth Bader Ginsburg, in Her Honor's capacity as Chief Administrative Judge of the Second Circuit**

## SDNY'S UNNOTICED REMOVAL OF DOCKETED ENTRIES, FAILURE TO ADJUDICATE A FILED AMENDED COMPLAINT FOR PATENT INFRINGEMENT, SPOLIATION OF DOCKETED USPTO SUBPOENAS AND DEFIANCE OF NY'S JUDICIARY LAW

Plaintiff/US Primary Ticketing Patentee *Pro Se* Amy R. Gurvey swears to the truth of the following statements in moving this Court, Hon. Lorna G. Schofield, the fourth rotating judge after three previous judges and magistrates left the Court, to reconsider the Court's February 13, 2020 order denying Plaintiff's second motion since April 22, 2010 to reinstate defendant Live Nation, Inc. to answer for willful infringement, aiding and abetting infringement of Plaintiff's US ticketing patents and Clayton Antitrust violations as found by the Department of Justice ("DOJ").  The Court also failed to adjudicate Plaintiff's infringement and USPTO misconduct claims against defendant Instant Live Concerts, LLC, defendant Live

2

Nation's wholly owned subsidiary. *Therasense v. Becton Dickinson*, 649 F. 3d 1276 (Fed. Circ. 2011)

The Court's recent order is contrary to the early record in this lawsuit since 2006. <u>This is because docketed entries were since unlawfully removed by the Court and because Plaintiff's filed 4AC to recover patent infringement and Clayton Antitrust damages filed April 22, 2010 was never adjudicated</u>. In addition, after NY's Legislature changed the law in enacting Judiciary Law Part 1240 effective October 1, 2016, the Court defied the governing state statutes by failing to order mandatory withdrawal of defense attorneys at Hinshaw & Culbertson, LLC and in particular Richard Supple, Esq. This enabled defense attorneys to unilaterally alter and corrupt court files after the same attorneys were already found to have corrupted confidential state files by inserting forged and unserved documents by an order of the AD 1st Dept. entered April 21, 2016.

Plaintiff's company LIVE-Fi Technologies®, LLC's complaint was solicited by the Dept. of Justice ("DOJ") in 2010. It was docketed as "E" on the DOJ Media and Entertainment website with 153 pages and was one factor resulting in DOJ's sanctioning of

defendant Live Nation and its 2009 partner Ticketmaster. However, based on this Court's removal of docketed entries, Plaintiff's 4AC appending the same documents was never adjudicated.

## FACTS IN SUPPORT OF MOTION

1.    Defendant Live Nation's crimes against the public in the field of primary ticketing with associated Clayton antitrust violations were found by Department of Justice ("DOJ") twice first on January 25, 2010 and again on January 8, 2020 when the DOJ issued sanctions against defendant and its 2009 merged partner Ticketmaster, Inc. in the amount of $1mil per violation.  15 USC §18.

2.    In January 2010, the DOJ and DC District Court made the February 2009 merger of defendant Live Nation and Ticketmaster expressly conditional upon discharge of all obligations and terms set forth in a consent decree and competitive impact statement signed by defendant Live Nation on January 25, 2010. 2010 WL 975407, 975408.  Those conditions involved proscriptions in the field of primary ticketing.  They also made expressly unlawful the merged entity's use of ticket data to enable other non-ticketing

4

benefits, such as distribution of event recordings, to pay for parking and sell targeted ads. 2010 WL 975408, pp. 8, line 10.

3. On January 8, 2020, ten years later, the DOJ found the terms of the consent decree and competitive impact statement were intentionally breached. The DOJ extended and enlarged the mandates through 2026.

4. Plaintiff and her company, LIVE-Fi Technologies®, LLC invented, own and control US method and apparatus patents in primary ticketing and ticket management including those that enable other non-ticketing benefits. Other federal courts have already found that ticket data is not copyrightable. There is no dispute Plaintiff's issued US patent claims have been willfully infringed by defendant Live Nation, its subsidiary Instant Live Concerts, LLC and Ticketmaster since before the merger and after.

5. In 2008-2009, Plaintiff's attorney in this lawsuit O. Lee Squitieri, who representing plaintiffs in a ticketing class action against defendant Live Nation's predecessor in interest, defendant Clear Channel Entertainment SPINCO ("CCE") emphatically opposed defendant Live Nation's 2008 Rule 12(b) motion papers falsely alleging under oath that defendant "*had no NY contacts to*

*confer personal jurisdiction in this Court*". More than 12 Live Nation employees and Baker Botts attorneys falsely swore to these allegations over 2 ½ years, causing Mr. Squitieri to withdraw from the case and leaving Plaintiff to proceed pro se.

6. Directly contrary to defendants' motion papers, however, defendant Live Nation <u>admitted</u> to multiple NY contacts when it executed the DOJ consent decree and competitive impact statement in the DC District Court proceedings on January 25, 2010. In particular, defendant Live Nation *admitted* it was distributing its own primary ticketing systems since 2008 in NYC including to its owned and operated venues Roseland Ballroom, House of Blues and Irving Plaza. 2010 WL 975408. Moreover, defendant had an office in the same building with the Cowan defendants and has since moved to the meat packing district where it houses several hundred employees.

7. Defendant Live Nation's signed DOJ mandates demonstrate actionable fraud in this lawsuit, even before the case was closed on April 24, 2009 and Plaintiff's first US ticketing patent issued thereafter issued 5 1/2 months later on October 13, 2009. Defendant Instant Live Concerts, LLC, that was acquired by

defendants Live Nation in 2005, was also was infringing Plaintiff's patents and aiding and abetting defendant Live Nation and others to infringe Plaintiff's patents. 35 USC §271, 271(b), 285, 286.

8.     In February 2010, when Plaintiff and her company LIVE-Fi Technologies® filed its DOJ opposition to the merger, docketed were complaints of the merged entity's prospective negative impact on small businesses and technology companies and referred to defendant Live Nation's fraud in this lawsuit.  The objection was one of thirteen docketed and posted as "E" on the DOJ Media and Entertainment website.

9.     Plaintiff then immediately submitted the same papers to this Court on April 22, 2010 as an exhibit to Plaintiff's 4AC complaint.  153 pages were filed including concrete documentary evidence of defendant's fraud.  Plaintiff included statements from defendant's executive Stephen Prendergast that he thought "*Plaintiff's patents could be used by anyone*".

10.    At the same time, defendants Live Nation, Instant Live Concerts and Prendergast were engaging in misconduct before the USPTO related to the Griner concert recording patent defendants acquired in 2005 (6,614729) that was invalidated by the USPTO in

2006-7 on application of the Electronic Frontier Foundation. In moving for reexamination for 12 years, defendants failed to cite to Plaintiff's patents as prior art; and continued to use ticket data for non-ticketing business, demonstrating willfully infringement of patent claims proprietary with Plaintiff.

11.   In fact, Plaintiff's first issued US ticketing patent on October 13, 2009, was being willfully infringed by defendants since before this case was closed by ordered entered by former Judge Barbara Jones <u>on April 24, 2009</u>. Contrary to the Court's recent order, the 4AC with Plaintiff's motion papers <u>was timely filed by the SDNY within one year on April 22, 2010 as to fraud and mistake claims</u>. There is a SDNY stamp on the papers with this date. However, Plaintiff's first patent of October 13, 2009 constitutes new evidence" and qualifies for Rule 60(b)(6) relief that has no statutory deadline.

12.   Many of the early docketed entries in this lawsuit between 2006-2009 were since unlawfully removed without notice in violation of Plaintiff's right to due process of law. Most of the removed entries pertain to breaches of fiduciary duty and fraud by defendants' Baker Botts attorneys and other attorneys, defendant

Cowan Liebowtz & Latman who were representing Plaintiff before the USPTO at times relevant. Plaintiff contends the attorneys who engaged in conflict of interest violations and defiance of USPTO mandates are secondarily liable for Plaintiff's damages if she cannot recover against Live Nation and Instant Live defendants. The ex parte removal of docketed entries without notice to Plaintiff demonstrates organized corruption.

13.   US Supreme Court decisions and Federal Circuit law are unanimous that Plaintiff's 4AC was required to be granted for service and adjudicated against existing defendants. This is old established law. *Reedy v. Scott*, 90 US 352 (1874). It never was in breach of administrative duty by two judges and two magistrate judges since 2010.

14.   In addition, Judge Schofield failed to compel withdrawal of  defense attorneys at Hinshaw & Culbertson, LLP and in particular, Richard Supple, no later than October 1, 2016, the effective date of Judiciary Law Part 1240.   See JL Part 1240.6, Part 1240.18. An order of the Appellate Division entered April 21, 2016 found that Supple had been corrupting confidential state files contrary to Plaintiff's interests in this case and failed to disclose he

was an executive appointee to the Attorney Grievance Committee along with other Hinshaw partners. There was parallel corruption of files in this lawsuit, ex parte removal of docketed entries and spoliation of USPTO subpoenas. Supple's ex parte state crimes, corruption of files and insertion of untruthful and forged unserved documents, induced the extrajudicial bias of this Court on matters unrelated to this case.

15. Plaintiff Gurvey's first US primary ticketing patents and ticketing management patents, 7603321; D647910S issued on October 13, 2009 and November 1, 2011, respectfully. By the time of issuance, both patents were being willfully infringed by defendants Live Nation and its subsidiary defendant Instant Live Concerts, LLC, the latter never dismissed in any order from this lawsuit.

16. It is relevant that in 2006 when this lawsuit was filed, Plaintiff's valuable patent claims had been unduly delayed for issuance at the USPTO based on the defendant Cowan practitioners' breaches of duty, conflict of interest violations, .and filing of defective patent applications and fraudulent declarations of

inventorship by the Cowan defendants before the USPTO. 37 CFR 2.19, 10.66, 11.116, 1.36, 35 USC 256.

17. The Cowan defendants were representing defendant Live Nation's predecessor in interest defendant Clear Channel Entertainment SPINCO, its executives who formed Instant Live Concerts, LLC in 2003.

18. The Cowan defendants attempted abandonment of Plaintiff's early patent applications in 2003 but were never granted unilateral withdrawal by the USPTO after two attempts in 2003 and 2007. The Cowan defendants admitted did not exercise Plaintiff's expedited prosecution rights or advise Plaintiff she had those rights that would have achieved issued the same US patents no later than 2005, which then would been immediately enforceable when this lawsuit was filed in 2006.

19. Plaintiff's 4AC was filed on April 22, 2010 to recover infringement, aiding and abetting infringement and antitrust treble damages as soon as the first claims issued; and Plaintiff's constitutional rights to enforce and protect her patents continues through the full term of protection. There is no viable defense of laches can that be claimed and, contrary to its recent order, this

Court cannot legally prevent Plaintiff from pursuing claims to protect her property.

20.    Further contrary to the Court's order, any appeal to this motion sequence would be in the exclusive appellate jurisdiction of the Federal Circuit and not the 2d Circuit.  28 USC 1338, 1295.

21.    The Griner patent acquired by defendants in 2005 disclosed a pure recording method found non-patentable and of no utility by the USPTO in 2007.  Important is that it discloses no means of distribution of event recordings or benefits using ticket data, which defendants and Ticketmaster were all admittedly outsourcing since the attempted merger in 2009.

22.    There is no laches defense available during the full term of patent protection.  A patentee who gets new or additional claims is absolutely entitled to file an amended complaint in a lawsuit in which infringers are parties.  Reedy v. Scott, 90 US 352 (1874); In re Global Tech Appliances, 563 US 754 (2011); Halo Electronics v. Pulse Electronics, 136 S. Ct. 1923 (2016); SCA Hygiene Products Aktiebolag v. First Quality Baby Products, 137 S. Ct. 954 (2017).

23.    Moreover, contrary to the Court's order, there is no time limit for a patentee to file Rule 60(b)(6) motion.

24.    Defendant Live Nation was formally dismissed when the case was closed on April 24, 2009.  Plaintiff's Rule 60(b)(6) motion filed and stamped by the Court on April 22, 2010 was based on new evidence, i.e., the recent issuance of Plaintiff's first US patent claims.  Ergo the 4AC was timely filed even as concerns the other subdivisions of the Rule 60(b) statute that govern matters of fraud, mistake, etc.

25.    Plaintiff is entitled to recover 6 years of relate back willful infringement damages, aiding and abetting infringement damages and get an injunction from this Court from the time she got a patent and filed for infringement damages.  Plaintiff's damages should be trebled under law based on the abominable fraud and misconduct of defendants.  Reedy v. Scott, 90 US 352 (1874); In re Global Tech Appliances, 563 US 754 (2011); Halo Electronics v. Pulse Electronics, 136 S. Ct. 1923 (2016); SCA Hygiene Products Aktiebolag v. First Quality Baby Products, 137 S. Ct. 954 (2017). Plaintiff remains entitled to recover patent damages for the full term of protection.

26.    The Court, however, has continued to misapply the law and ignore the prevailing patent and antitrust laws .and defendant's

ongoing Clayton antitrust violations found by the DOJ on January 8, 2020, that were stated with specificity in Plaintiff's early complaints.

27.    The removal of docketed entries by the Court constitutes a per se violation of Plaintiff's right to due process of law – it shocks the conscience.   The Court's continued failure to adjudicate Plaintiff's 4AC.   The fourth judge's order that it can't find the complaint constitutes organized corruption, or at minimum, inexcusable breaches of administrative duty.

28.    Other meritless demonstrations of extrajudicial bias by this Court including defiance of NY's Judiciary Law Part 1240, failing to provide an unbiased tribunal also contra to Plaintiff's constitutional rights and the Court's issuance of unconscionable decisions frame Plaintiff for crimes of defense counsel since 2013.

29.    The totality of the Court's ongoing judicial breaches of duty, failure to grant service of the 4AC, and demonstrations of extrajudicial bias on matters unrelated to the case warrant recusal and reassignment.

WHEREFORE, Plaintiff prays that her motion seeking reconsideration of the Court's February 13, 2020 order be granted in all respects, that the Court award Plaintiff attorneys' fees and costs and such other and further relief as it deems just and proper.


Dated:  February 28, 2020
Coconut Creek FL

AMY R. GURVEY
US PATENTEE PRO SE

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 2/13/2020

*Original*
*Court Copy*
*Clerk Pro Se*
*Office Rm 200*

**Amy R. Gurvey**
**US Patentee/Plaintiff Pro Se**
**315 Highland Avenue**
**Upper Montclair, NJ 07043**
**PH: (917) 733-9981**
**amygurvey@gmail.com**

FEB 6 - 2020

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF NEW YORK

—————————————————————X

**AMY R. GURVEY,**

   **Plaintiff *Pro Se*,**

This motion to vacate is DENIED. There is no
April 22, 2010, motion on the docket. In any
case, this motion to vacate is untimely.
Federal Rule of Civil Procedure 60(c)(1)
requires that any motion to vacate, under
Rule 60(b)(6), "be made within a reasonable
time." It's been over a decade since the
March 17, 2009, order was entered. Even if
the April 22, 2010, motion to vacate were
filed, that motion was also not reasonably
prompt, because it would have been filed
over a year after the March 17, 2009, Order.
*Cf.* Fed. R. Civ. P. 60(c)(1) (Rule 60 motions
generally should not be made "more than a
year after the entry of the . . . order" being
challenged.) This action has been appealed
several times to the Second Circuit, and has
been resolved and closed.

The Clerk of Court is respectfully directed to
close Dkt. No. 427, and to mail a copy of this
Order to Plaintiff.

Dated: February 13, 2020
       New York, New York

**CASE NO. 06-1202-cv (LGS)**

**NOTION OF MOTION TO
VACATE SDNY ORDERS
AS TO DEFENDANT LIVE
NATION [FRCP 60(b)(6)]
[NOTE: Plaintiff's previous
motion filed April 22, 2010 to
vacate March 17, 2009 order
dismissing defendant Live Nation,
Inc. was never adjudicated]
RETURN DATE FEB. 21, 2020**

*Volume II*

**LORNA G. SCHOFIELD**
**UNITED STATES DISTRICT JUDGE**

1

**A-637**

```
┌─────────────────────────────────┐
│ USDC SDNY                        │
│ DOCUMENT                         │
│ ELECTRONICALLY FILED             │
│ DOC #                            │
│ DATE FILED:   4/27/09            │
└─────────────────────────────────┘
```

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X

AMY R. GURVEY,

                              Plaintiff,                                06 **CIVIL** 1202 (BSJ)

          -against-                                                     **JUDGMENT**

COWAN, LIEBOWITZ & LATMAN, P.C., CLEAR
CHANNEL COMMUNICATIONS, INC.,
INSTANT LIVE CONCERTS, LLC, LIVE NATION,
INC., NEXTICKETING, INC., DALE HEAD,
STEVE SIMON, and DOES I-VIII, INCLUSIVE
                              Defendants.
-----------------------------------------------------------X

        Whereas the above-captioned action having come before this Court, and the matter having

come before the Honorable Barbara S. Jones, United States District Judge, and the Court, on April

23, 2009, having rendered its Opinion and Order dismissing plaintiff's claims against all defendants,

it is,

        **ORDERED, ADJUDGED AND DECREED:** That for the reasons stated in the

Court's Opinion and Order dated April 23, 2009, plaintiff's claims against all Defendants are

dismissed; accordingly, the case is closed.

**Dated:** New York, New York
           April 27, 2009

                                                        **J. MICHAEL McMAHON**
                                                        _____
                                                            **Clerk of Court**
                                        **BY:**
                                                        _____
                                                            **Deputy Clerk**

                    **THIS DOCUMENT WAS ENTERED**
                    ON THE DOCKET ON _____

**A-663**

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

FILE NUMBER:  06-CIV-1202 (BSJ)

-----------------------------------------------------------x
                                          )
AMY R. GURVEY,                            )
                                          )
                  Plaintiff,              )          **NOTICE OF APPEAL**
                                          )
           v.                             )
                                          )
COWAN LIEBOWITZ & LATMAN, PC.,            )
CLEAR CHANNEL COMMUNICATIONS, INC.,       )
INSTANTLIVE CONCERTS, LLC, LIVE           )
NATION, INC., NEXTICKETING, INC., DALE    )
HEAD, STEVE SIMON, and DOES I-VIII,       )
INCLUSIVE,                                )
                                          )
                  Defendants.             )
                                          )
-----------------------------------------------------------x

FILED U.S. DC

MAY 2 2 2009

S.D. OF N.Y.

        Notice is hereby given that Amy R. Gurvey, plaintiff in the above-named case, hereby

appeals to the United States Court of Appeals for the Second Circuit from the Opinion and Order

dismissing plaintiff's claims against all defendants entered in this action on the 24th day of April,

2009.

Date:   May 22, 2009


                          SQUITIERI & FEARON, LLP
                          Attorneys for Plaintiff

                          By: _____
                                   Lee Squitieri
                          32 East 57th Street
                          12th Floor
                          New York, New York 10022
                          (212) 421-6492

SDNY/NYNY
06-cv-1202
Jones, J.
Katz, J.

## A-664

# UNITED STATES COURT OF APPEALS
## FOR THE
## SECOND CIRCUIT

At a stated Term of the United States Court of Appeals for the Second Circuit, held at the Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, in the City of New York, on the 17th day of June, two thousand and nine,

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: JUN 1 8 2009

UNITED STATES COURT OF APPEALS
FILED
JUN 1 7 2009
Catherine O'Hagan Wolfe, Clerk
SECOND CIRCUIT

Amy R. Gurvey,

    Plaintiff-Appellant,

    v.

**ORDER**
Docket Number: 09-2185-cv

Cowan, Liebowitz & Lathman, PC, Clear Channel Communications, Inc., Live Nation, Inc., Instant Live Concerts, LLC, Does 1 - X, Nexticketing, Inc., William Borchard, Midge Hyman, Baila Celedonia, Christopher Jensen, Dale Head, Steve Simon, Michael Gordon, Susan Schick,

    Defendants-Appellees.

A motion or motions of the type specified by Rule 4(a)4 of the Federal Rules of Appellate Procedure having been filed in this matter, and now pending before the district court, the above numbered and entitled appeal is hereby stayed to await final disposition of said motion(s).

Movant below is hereby directed to inform this Court, in writing, as to the status of each such motion, at thirty-day interval from the date of filing and immediately upon final disposition of the last outstanding motion, and to provide the Court a copy of all dispositive orders.

Parties are advised that appellate review of the lower court's disposition regarding any such motion requires a timely filed amended notice of appeal.

Very truly yours,
Catherine O'Hagan Wolfe, Clerk

By: _____
Dylan Beesley, Deputy Clerk

A TRUE COPY
Catherine O'Hagan Wolfe, Clerk
by _____
DEPUTY CLERK

CERTIFIED:

JUN 1 7 2009

# A-671

AMY R. GURVEY, Pro Se
315 Highland Avenue
Upper Montclair, NJ 07043
(917) 733-9981



ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------X

AMY R. GURVEY,
(and LIVE-FI™ TECHNOLOGIES, LCC
as the real party-in-interest assigned
Gurvey's US patents),

             Plaintiffs,

    -against-

COWAN, LIEBOWITZ & LATMAN, PC;
CLEAR CHANNEL COMMUNICATIONS,
INC.INSTANTLIVE CONCERTS, LLC;
LIVE NATION, INC.; NEXTICKETING, et al.,

             Defendants,

------------------------------------------------X

CASE NO. 06-CV-1202 (BSJ)

NOTICE OF MOTION

RECEIVED
APR 2 2 2010
U.S.D.C. S.D. N.Y.
CASHIERS

**PLEASE TAKE NOTICE** that Plaintiff Amy R. Gurvey and (proposed) new Plaintiff

LIVE-FI™ Technologies, LLC as the real party-in-interest assigned Gurvey's issued US patents

and other rights of enforcement in and to Plaintiff's proprietary technologies and trade secrets,

will move this Court on May 10, 2010 pursuant to FRCP Rule 60(b), Title 35 and Title 15 of the

US Code, for an order, *inter alia*, vacating the Court's previous order of April 24, 2009 as moot,

joining LIVE-FI™ Technologies as a party plaintiff, granting Plaintiffs an extension of time to

retain new counsel, severing certain claims against the different groups of defendants, and

ordering service of Plaintiff's Fourth Amended Complaint herein for a temporary restraining

order, damages for patent infringement, unfair competition, violation of the antitrust laws,

sanctions for fraud, attorneys fees and costs, damages pursuant to 18 USC 1030, breach of

fiduciary duty and such other and further relief as the Court deems just and proper.

1

RECEIVED

MAR 2 3 2010

LITIGATION III, ANTITRUST DIV.
U.S. DEPT. OF JUSTICE





**LIVE-FI™**

TECHNOLOGIES INC.

www.live-fi.com
(917) 733-9981

March 18, 2010

**FEDERAL EXPRESS**
Hon. Rosemary M. Collyer
US District Court
District of Columbia
333 Constitution Avenue, NW
Washington, DC 20001

cc:  John R. Read, Chief
US Dept. of Justice
Litigation III Section
450 Fifth Street, NW    Suite 4000
Washington, DC  20540

cc:  Cong. Rick Baucher
Chair, Telecommunications Committee
US House of Representatives

cc:  Steve Waldman, FCC Deputy Commissioner

cc:  Cong. Ed Markey
Former Chair, Telecommunications Committee

Re:  Comments to Competitive Impact Statement of January 25, 2010
Ticketmaster and Live Nation, Inc. Merger   USDC Dist. of Col. No. 1:10-CV-00139

Dear Judge Collyer:

In accordance with the Justice Dept.'s January 25, 2010 Competitive Impact Statement ("CIS") inviting comments within sixty (60) days to the Court's revised order re the prospective merger between defendants Ticketmaster and Live Nation, Inc., as Inventor and President of an early stage live event digital distribution company, LIVE-FI™ Technologies, LLC with its first US patents issued on October 13, 2009 (US Patent No. 7,603, 321) (**Exhibit 1**), I respectfully submit on behalf of LIVE-FI™, the public and other entities similarly situated, "inadequacy" and material omission objections to the order.  It is contended that if the CIS is adopted in its present form without further revision, it will have a significant anti-competitive impact on the future of all live industries including music, sports, gaming and education contrary to the public interest in violation of the Tunney Act, 15 USC §§ 16(b)-(h).

Most respectfully, LIVE-FI™ has three primary concerns with the CIS as published:

(1)  The Court has omitted all discussion of the negative anticompetitive impact the merger will have upon live event and recording distribution particularly electronic broadcasts and transmissions that are the future of the converging TV and mobile markets.  As *admitted* in Live Nation's own papers and press releases, monopolization of the domestic and international concert market has been one of the company's primary objectives since it was formed in 2005. (See **Exhibit 2** and pp. 3 *infra*). There exists an inherent danger from a merged entity that will be, all at the same time, a promoter, majority venue owner for concerts and sports, label for performing artists, and the owner of ticketing and mobile ticketing systems, venue contracts and

1

ticketholder lists from 80% of US venues going back 25 years. As this Court correctly found, Live Nation already owns some 80-100 US venues and 30 in foreign territories. Ticketmaster's lists will now give the merged entity the added unfair advantage to promote and fulfill consumer electronic requests for live concerts and sports merchandise throughout the world even for artists and celebrities not represented by Live Nation but who are appearing at venues that deploy Ticketmaster systems;

(2)  The Court wrongly assumes at pp. 7 that the merged entity will have no significant impact on small companies. As such, it speaks only to the ticket pricing interests of large promoters and venues such as AEG and Comcast Spectator. This is contended prejudicial error. The Court's most recent revised solution that mandates giving AEG access to Ticketmaster's systems and divests Ticketmaster of its Paciolan venue software in favor of Comcast-Spectator, presents a source of even greater concern for small entities. This is because the result will be a larger number of public concert and sports venues with access to the same basic ticketing, mobile ticketing operating systems including interfaces without equal access given to small companies, making the field even harder for smaller technology firms to penetrate; and

(3)  The Court has failed to adopt explicit protocols and safeguards to ensure that private litigants and smaller entities maintain equal and fair access to the Courts to protect their rights and remedies against the individual defendants and the merged entity. This is the Court's stated objective in Section IV.

In fact, Live Nation and its former parent Clear Channel Entertainment, Inc., a division of Clear Channel Communications, Inc. have a long history of defrauding private litigants before the Courts that must not be overlooked and most respectfully, should be investigated by this Court prior to adoption of a final plan. Live Nation's practice for years has been to *falsely deny under oath all contacts with individual States* to avoid jurisdiction to answer for anticompetitive misconduct.

In particular, I draw this Court's attention to the appended untruthful papers sworn to under oath in 2006 and 2008 by defendant Live Nation and their Baker Botts attorneys in an antitrust case before Southern District of New York [Case No. 06-CV-1202 (BSJ) (SDNY)]. Live Nation, Clear Channel, and their attorneys falsely *deny under oath all contacts with New York State* (**Exhibit 3**).

As this Court correctly found and contrary to these sworn papers, Live Nation owns many New York venues including House of Blues, Jones Beach Amphitheatre, Blue Note, and at times relevant, 24 major radio stations in the tri-state area including WLTW-Lite 106.7 FM. Live Nation filed similar untruthful papers before other tribunals in lawsuits brought by private litigants. (**Exhibit 4**)

In addition, just prior to Live Nation's acquisition of Clear Channel's new affiliate Instant Live Concerts in 2005, Live Nation, *admittedly* sought to monopolize live concert distribution. In 2004, Live Nation acquired a third party inventor's patent called "Griner" (US Patent No. 6,614,729). Griner discloses only a single operating system that affixes tracks on a master

recording as individual selections are being performed during a concert as but one method to expedite distribution of onsite concert CD's.

Yet, immediately after acquiring Griner, Live Nation issued a series of false press releases throughout the US and the world that it owned a *monopoly* on distributing live concert recordings. (**Exhibit 5**). Live Nation's clear intent and ensuing practice was to prevent smaller recording companies from accompanying artists into its venues to achieve unfair market penetration of its recording distribution systems even at venues owned by others. This is, in part, how Live Nation attracted major artists such as Madonna, Jay-Z, Bono and Shakira, to leave their respective labels and sign with Live Nation in all fields during a time that the recording industry was vulnerable and experiencing plummeting CD sales from digital piracy of shared MP3 files over the Internet.

In 2005, LIVE-FI™ was itself denied access to Live Nation's venues. This was after LIVE-FI™'s USPTO unpublished provisional patent applications were believed to have been misappropriated to Live Nation through a New York intellectual property law firm representing LIVE-FI™ and Clear Channel simultaneously without disclosure. The misappropriation resulted in the formation Clear Channel's affiliate, Instant Live Concerts, LLC in 2003 by principals of Clear Channel Entertainment ("CCE"). Instant Live Concerts was subsequently acquired by Live Nation in 2005 after it was spun off from CCE and both remain headquartered at 9348 Civic Center Drive, Beverly Hills, CA.

Relevant here is that the New York Times article of May 5, 2003 that introduced Instant Live Concerts (**Exhibit 6**), also included sound bites from Irving Azoff, President of Front Line Management and now CEO of defendant Ticketmaster.

Now that live recording distribution has evolved into a digital rather than a hand-out business, Live Nation has continued to preclude LIVE-FI™ and other recording companies from its venues. If defendants' merger is approved without further revision, penetration of other company's technologies will be significantly impeded. This is because Ticketmaster's lists will afford Live Nation the ultimate advantages of controlling all of live concert promotion, venue entry access and event content distribution to the detriment of the public and all other entertainment companies.

In 2006, the press confirmed LIVE-FI™'s premise when it reported that Live Nation was in fact precluding smaller recording companies from accompanying artists to record concerts at its venues. At that time, Live Nation did not represent any artists or their recording rights.

In response, certain recording companies including DiscLive and Hyburn filed complaints against Live Nation and Clear Channel with the Electronic Frontier Foundation in San Francisco and were found to have meritorious claims. (**Exhibit 7**) Shortly thereafter, EFF invalided the Griner patent before the USPTO on other grounds, leaving Live Nation without a patent. This paved the way, as this Court correctly found, for Live Nation's 2006 alliance with German technology giant CTS Eventim and Clear Channel's other new subsidiary, Next Ticketing (**Exhibit 8**). This venture failed leading to Live Nation's more recent partnership with Ticketmaster (**Exhibit 9**).

3

**Live Nation's history of unfair and anticompetitive practices should now raise a red flag to this Court** on *the* most pressing antitrust issues potentially affecting the future of the entire music and sports industries.

Without speaking directly to the issues of live event and recording distribution, the Court, most respectfully, is doing the public a disservice.

The CIS as it stands does nothing to protect the interests of small recording and technology firms that have invested huge monies in development and may be able to compete with Live Nation and online subdistributors such as iTunes and Google to reverse the last ten years of industry losses emanating from digital piracy of MP3 files.

In summary, unless the Court mandates further revisions and sharing of assets with small companies, the pooling of the portfolio of powerful assets already controlled by Ticketmaster and Live Nation will enable the merged entity to unduly monopolize all of public access to concerts and events, majority lists of ticketholders and in turn, live recording distribution to those most likely to buy event recordings and podcasts.  The end result will make it virtually impossible for new technology companies that have no equal access to Ticketmaster's operating systems to have a fair chance to compete.

Respectfully submitted,

Amy R. Gurvey
Inventor and President
LIVE-FI™ Technologies
amyg@live-fi.com
Ph: 917-733-9981

EXHIBIT 1



US007603321B2

(12) **United States Patent**       (10) Patent No.:     **US 7,603,321 B2**
Gurvey                             (45) Date of Patent:        **Oct. 13, 2009**

(54) **ELECTRONIC SYSTEM AND METHOD COUPLING LIVE EVENT TICKETING AND INTERACTIVE ENTRIES WITH THE SALE, DISTRIBUTION AND TRANSMISSION OF EVENT RECORDINGS, MASTERING SYSTEM AND INTELLIGENT TERMINAL DESIGNS**

(76) Inventor:   **Amy R. Gurvey**, 315 Highland Ave., Upper Montclair, NJ (US) 07043

( * ) Notice:   Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **11/253,912**

(22) Filed:   **Oct. 18, 2005**

(65)         **Prior Publication Data**
       US 2006/0173701 A1     Aug. 3, 2006

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 10/442,468, filed on May 20, 2003.

(60) Provisional application No. 60/382,710, filed on May 22, 2002, provisional application No. 60/382,949, filed on May 24, 2002, provisional application No. 60/619,754, filed on Oct. 18, 2004.

(51) **Int. Cl.**
       *G06Q 99/00*       (2006.01)
(52) **U.S. Cl.** ............................ **705/65**; 705/50; 705/64; 705/52; 726/26
(58) **Field of Classification Search** ............ 705/50–59; 369/1; 726/26
       See application file for complete search history.

(56)             **References Cited**

U.S. PATENT DOCUMENTS

5,825,876 A   * 10/1998   Peterson, Jr. ................. 705/52

| | | | |
|---|---|---|---|
| 6,614,729 B2 * | 9/2003 | Griner et al. | 369/1 |
| 2001/0018660 A1 * | 8/2001 | Sehr | 705/5 |
| 2002/0199198 A1 * | 12/2002 | Stonedahl | 725/86 |
| 2003/0023564 A1 * | 1/2003 | Padhye et al. | 705/54 |
| 2003/0097307 A1 * | 5/2003 | Greene | 705/26 |
| 2004/0137929 A1 * | 7/2004 | Jones et al. | 455/517 |
| 2008/0133416 A1 * | 6/2008 | Rhoads | 705/51 |

OTHER PUBLICATIONS

"Broadway Television Network Selects On.2.com to Poer Video-On-Demand Webcasts of Broadway Shows", Jun. 15, 2000.*

* cited by examiner

*Primary Examiner*—Jalatee Worjloh
(74) *Attorney, Agent, or Firm*—Allan Chan; Allan Chau & Assoc

(57)           **ABSTRACT**

The present disclosure provides a method and system of electronically associating one or any combination of the production, balancing, editing, transmission, distribution and sale of live event "Recordings" with the sale of a "ticket" [defined to include any entrance payment/receipt, (tournament) entrance fee or logged placed bet] to or during the event, such that both or either of a ticket purchaser and/or non-ticket purchaser are able to automatically acquire a Recording or participate in interactive offerings related to the event by means of [optional] authenticated retrieval systems at a terminal device when connected to the Internet or wireless network. A method for electronically converting a balanced audience feed to the value for optimal Recording balance is also disclosed for optional integration. Distribution and/or retrieval of a Recording by patrons, non-attendee purchasers and/or licensees may occur when the Recording is embodied in a fixed medium of expression and/or when the Recording is in digital or other encoded format.

**10 Claims, 9 Drawing Sheets**





FIG. 1

TRANSACTION PROCESSING



FIG. 2A

FIG. 2B

FIG. 2C



FIG. 3

### Manufacturing Process



FIG. 4

AMY R. GURVEY
[LIVE-FI™ TECHNOLOGIES, LLC]
315 Highland Avenue
Upper Montclair, NJ 07043
(917) 733-9981

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————————X

| | |
|---|---|
| AMY R. GURVEY<br>(and LIVE-FI™ TECHNOLOGIES, LCC<br>as the real party-in-interest assigned<br>Plaintiff's US patents),<br>              Plaintiffs,<br>   -against- | CASE NO. 06-CV-1202 (BSJ)<br><br><br><br>AFFIDAVIT IN SUPPORT<br>PLAINTIFFS' MOTION TO<br>VACATE AND SERVE<br>FOURTH AMENDED COMPLAINT |
| COWAN, LIEBOWITZ & LATMAN, PC;<br>CLEAR CHANNEL COMMUNICATIONS,<br>INC.; LIVE NATION, INC.;<br>INSTANTLIVE CONCERTS, LLC;<br>NEXT TICKETING; ET AL.,<br><br>         Defendants. | |

—————————————————————————X

## I.    INTRODUCTION

This motion is brought pursuant to FRCP Rule 60(b), Titles 35, 15 and Rule 15 of the US

Code, the Restatement of Torts Second and the Uniform Trade Secrets Act.[1]  In it, Plaintiff *pro*

*se*, Amy R. Gurvey[2], an inventor, producer and attorney, seeks to:

---

[1] See also, *Schreiber Foods, Inc. v. Beatrice Cheese and Kustner Industries*, 402 F. 3d 1198, 61 Fed. R.Serv.3d 174, 74 USPQ 2d 1204 (USCA Fed. Cir.) (2005); *Vaxiion v. Foley & Larnder*, 593 F. Supp. 2d 1153 (SD CA 2008); *Opals On Ice Lingerie v. Bodylines*, 425 F. Supp. 2d 286 (EDNY 2004)

[2] Plaintiff's 2008-9 arbitration attorney, Lee Squitieri, Esq., moved to withdraw pursuant to Local Rule 1.4 on or about April 16, 2010.  Plaintiff now seeks time to retain new counsel who does not notice a conflict of interest with Live Nation defendants, their new proposed merger partner, Ticketmaster, Inc. or with defendant CLL.

(1)     Vacate the April 24, 2009 order of SDNY, Hon. Barbara S. Jones (annexed as

Plaintiff's **Exhibit 1**) pursuant to FRCP Rule 60(b)(2) based on new evidence, *i.e.*, two US

patents issued to Plaintiff Gurvey in October, 2009 and January, 2010 [3] representing separate

inventions premised on two unpublished USPTO provisional patent application Nos. 60/382,710

and 60/382,949 ("PPAs") filed by defendant NY law firm Cowan Liebowitz & Latman, PC

("CLL") as Plaintiff's attorneys on May 22 and 24, 2002;

(2)     Vacate this Court's April 24, 2009 order pursuant to FRCP Rule 60(b)(3) and the

catchall fraud phrase of Rule 60(b) based on two distinct sets of untruthful/frivolous Rule 12(b)

motion papers submitted in 2006 and 2008 by opposing law firm Baker Botts on behalf of its

clients, defendants Clear Channel, Live Nation, Inc., Instant Live Concerts and Next Ticketing

(collectively "Live Nation defendants") wherein defendants falsely swore under oath "no

contacts with NYS" to attempt to avoid jurisdiction over them in this lawsuit  (**Exhibit 2**) [4] .

[NOTE:  Live Nation defendants' contacts with New York State were subsequently

acknowledged and found in the current proceedings before Hon. Rosemary M. Collyer in *United*

*States v. Ticketmaster and [defendant herein] Live Nation, Inc.*, Fed. R. Vol. 75, No. 27, Case

No. 1:10-cv-00139) (DC District Court, February 10, 2010) (**Exhibit 3**).   Live Nation

defendants also submitted similar untruthful motion papers denying all contacts with other

---

[3] US Patent Nos. 7, 603, 321(the "321 Patent") and 29/310,547 (the "547 Patent), the
latter issued Notice of Issuance with all fees paid in January, 2010.

[4] Defendants' motions papers were, in fact, knowing false when submitted, aimed only at
unduly prejudicing/dismissing Plaintiff's instant lawsuit, and merit sanctions in Plaintiff's favor
particularly because moving attorneys, with knowledge of the blatant falsity of their proffers,
never informed the Court or corrected the record. See, e.g., *Schreiber Foods v. Beatrice and
Kustner, supra,* 402 F. 3d 1198, 1205 (USCA Fed. Cir. 2005) on the issue of sanctions for fraud
under Rule 60(b) for an attorney's failure to take reasonable remedial measures after learning of
the falsity of his own proffered material evidence.

# A-674

jurisdictions in cases brought by private litigants (**Exhibit 4**), demonstrating defendants' pattern of prejudicial and frivolous documentary misconduct before the Federal Courts that is expressly proscribed in Section IV of Judge Collyer's Competitive Impact Statement issued January 25, 2010 and precedent for purposes of this lawsuit (**Exhibit 3**)];

(3)　Vacate this Court's April 24, 2009 order pursuant to FRCP Rule 60(b)(6) based on Live Nation defendants' antitrust crimes against society cited by the Electronic Frontier Foundation in 2005-2006 that are the same dishonest business practices defendants used to unlawfully preclude Plaintiff and LIVE-FI ™ Technologies from its venues (**Exhibit 5**) while, at the same time, unlawfully using its monopoly of 150 US concert venues, 30 abroad and 250 radio stations to attempt to destroy Plaintiff's business and violate the antitrust laws;

(4)　Join as a party plaintiff, real party-in-interest LIVE-FI™ Technologies, LLC, a Delaware limited liability corporation assigned Gurvey's patents and other rights of enforcement in and to Plaintiff's intellectual property interests and trade secrets;

(5)　Grant Plaintiffs an extension of time to retain new counsel and sever the claims against the Live Nation defendants on the one hand from those against the CLL defendants on the other; and

(6)　Order service of Plaintiff's Fourth Amended Complaint herein that seeks a TRO, double and treble damage claims, as the case may be, sanctions, and such other and further relief as the Court deems just and proper for defendants' infringement of Plaintiff's patents directly and through the doctrine of equivalents, dishonest business practices, unfair competition, violations of the Sherman Act and 18 USCA Section 1030, breach of fiduciary duty, misappropriation, malpractice, fraud before this Court and unauthorized continuing use and deployment of each of Plaintiff's inventions.

5

# PLAINTIFFS' FOURTH AMENDED COMPLAINT

## II.    JURISDICTION

Jurisdiction over Plaintiff's Fourth Amended Complaint is based on Titles 15 and 35 of the US Code, 18 USC Section 1030, the Uniform Trade Secrets Act, as they pertain to unlawful and unauthorized misappropriation of Plaintiff's trade secrets that resulted in two US patents, unauthorized deployment and infringement of Plaintiff's inventions directly and by the doctrine of equivalents, unfair competition, dishonest business practices, antitrust violations and defendant CLL's misappropriation of Plaintiff's trade secrets and misconduct before the United States Patent and Trademark Office that prejudiced prosecution of Plaintiff's patent portfolio.

Claims for CLL's breach of fiduciary duty, violations of 22 NYCRR 603 and tortious interference with Plaintiff's contract with Legend Films are joined as arising out the same nucleus of operative facts under the pendent jurisdiction of the Federal Courts.  FRCP Rule 60(b), _Schreiber Foods, Inc. v. Beatrice Cheese and Kustner Industries_, 402 F. 3d 1198, 61 Fed. R.Serv.3d 174, 74 USPQ 2d 1204 (USCA Fed. Cir.) (2005), _Vaxiion v. Foley & Larnder_, 594 F. Supp. 2d 1153 (SD CA 2008).

## III.    PARTIES

Plaintiff, Amy R. Gurvey, is an inventor, producer, development executive and CA attorney currently residing in Montclair, NJ.

LIVE-FI™ Technologies, LLC is a Delaware limited liability company assigned Plaintiff Amy R. Gurvey's patents and intellectual property interests including rights of enforcement therein.

Defendant CLL is a New York law firm with an international trademark practice headquartered at 1133 Avenue f the Americas, New York, NY 10036.

Defendants Midge Hyman, Esq., Simon Gerson, Esq., William Borchard, Esq., Christopher Jensen, Esq. and Baila Celedonia, Esq. are equity partners of defendant CLL. Defendants CLL, Hyman, Gerson, Borchard, Jensen and Celedonia are collectively referred to herein as "CLL defendants".

Defendant Michael Gordon is bass guitarist of the band *Phish*. Upon information and belief, either or both of Gordon or *Phish* were at times relevant, client(s) of defendant CLL. Upon further information and belief, defendant Gordon resides in Burlington, VT.

Defendant Clear Channel Communications, Inc. is a Texas corporation and the parent and/or holding company of defendant Clear Channel Entertainment Inc. ("CCE"), a client of defendant CLL, that became CCE Spinco and in turn defendant Live Nation, Inc. in 2005.

Defendant Live Nation, Inc. is the world's largest concert promoter, and is a Delaware corporation, located at 9348 Civic Center Drive, Beverly Hills, CA, assigned all defendant CCE's US and foreign concert venues.

Defendant Instant Live Concerts is a Massachusetts LLC formed in 2003 by principals of defendant CCE that was acquired by defendant Live Nation in 2005 and is now also located at 9348 Civic Center Drive, Beverly Hills, CA.

Defendant Next Ticketing is an affiliate of defendant Clear Channel based in San Antonio, TX.

Defendants Clear Channel Communications, CCE, Live Nation, Instant Live Concerts and Next Ticketing are collectively referred to herein as "Live Nation defendants", except when expressly referred to individually.

IV.    **LITIGATION HISTORY**

The following facts are undisputed in support of Plaintiff's motion-in-chief and instant

Fourth Amended Complaint since issuance of two US Patents to Plaintiff in October, 2009 and

January, 2010 assigned to proposed new plaintiff LIVE-FI™ Technologies, LLC:

(1)    In 2001, Plaintiff, an inventor, producer, development executive and attorney, was

General Counsel of a brand new company, Legend Films, a Nevada LLC, comprised then only of

three Class A shareholders - two founders and one investor, Jeffrey Yapp (Plaintiff's long

standing client and business colleague), Barry Sandrew and Alan Folkman.  Since then, and

based on Plaintiff's efforts, ideas for Legend's digital v. previous analog technology and work to

get Legend a patent, the LLC has become Legend Films, Inc. of San Diego, CA, employing

some 240 individuals worldwide in the field of black and white film and video colorization.

(2)    Plaintiff's contract with Legend Films for services since 1999 to its original

founders entitled Plaintiff to 3% of Class B authorized stock pre-dilution plus an in-house salary

to be negotiated to take effect when the company had its first significant round of venture

funding.

(3)    On April 17, 2002, defendant CLL partners, interested in representing Legend and

other of Plaintiff's entertainment and technology clients including videogame/Atari mastermind

Nolan Bushnell, signed a one-year Of Counsel contract with Plaintiff effective January 15, 2002

inclusive of a rider on which Plaintiff's reserved interests were expressly set stated.[5] [6]  Plaintiff's

---

[5]  That Plaintiff's Of Counsel contract including the rider was signed by defendant CLL on April 17, 2002, was found by arbitrator Charlotte Moses Fischman, Esq. in 2009 and is res judicata in this lawsuit.

6 CLL's first papers in this lawsuit submitted by attorney Hinshaw & Culbertson with a sworn affirmation by CLL partner Simon Gerson, Esq. omitted the rider that had CLL's own codes, in an attempt to defraud Plaintiff and the Court and improperly argue for a different date of

(grandfathered) reserved rights included, without limitation, Plaintiff's trade secrets, inventions, proprietary operating systems and designs pertaining to authenticated live event recording distribution, royalty accounting and mobile ticketing/electronic entry access control at live event venues (since assigned to LIVE-FI™ Technologies, LLC) and Plaintiff's 3% stock interest in Legend Films (**Exhibit 6**);

(4)     Unbeknownst to Plaintiff, Plaintiff's trade secrets, files and contact lists were input into defendant law firm's CLL computer networks and then misappropriated without authorization in violation of 18 USCA Section 1030 by defendant CLL attorneys to CLL clients including at least one of defendant Mike Gordon of *Phish* and defendant Clear Channel, its principals, subsidiaries, and affiliates;

(5)     On or about May 7, 2002, defendant CLL unilaterally repudiated Plaintiff's Of Counsel contract without cause when it told Plaintiff CLL "changed its mind". This was just after Plaintiff had already turned down a competing offer from law firm Moses & Singer and Plaintiff had submitted her CLL contract to a mortgage company that financed her home in Montclair, NJ.

(6)     Two weeks later, on May 22 and 24, 2002, defendant CLL by its attorneys Mark Montague, Esq. and R. Lewis Gable, Esq. filed Plaintiff's PPA Nos. 60/382,710 and 60/382,949 before the USPTO as Plaintiff's exclusive attorneys. At least one PPA was entitled "Premium Performance Ticket".

(7)     Plaintiff's PPAs remain unpublished and are trade secrets. They ultimately resulted in the issuance of two patents to Plaintiff Gurvey in 2009 and 2010, some seven+ years after CLL's filings, placing this case within the exclusive jurisdiction of the Federal Courts under

---

execution. This same argument was advanced by attorney Richard Supple, Esq. during the arbitration in 2008 that Plaintiff won against CLL on all counts.

Title 35 of the US Code. Plaintiff's claims for CLL's misconduct before the Patent Office, malpractice, breach of fiduciary duty and failing to reveal a conflict of interest are properly before this Court as pendent state claims arising out of the same nucleus of operative facts along with Plaintiff's claims against CLL for tortious interference of her General Counsel agreement with Legend Films. *Vaxiion v. Foley & Lardner*, 593 F. Supp. 2d 1153 (SDCA 2008)

(8) Because of defendant CLL's continuing torts as to Plaintiff, however, that included its unnoticed and incomplete withdrawal as Plaintiff's lawyer before the USPTO [Para. (17) *infra*], prosecution of Plaintiff's patent portfolio was prejudiced causing Plaintiff significant damages to her proprietary inventions and business;

(9) In fact, based on defendant CLL's torts, Live Nation defendants, as CLL's principals under agency/principal theory, were enabled to beat Plaintiff to the market with her own inventions and proprietary technology. Thusfar two separate operating systems and inventions belonging to Plaintiff exclusively have been deployed by Live Nation defendants.

(10) In August, 2002, three months after CLL's contract repudiation but while an interim arrangement for Plaintiff to maintain her CLL office was in effect, Plaintiff was locked out of defendant CLL offices upon returning from a business trip for Legend Films to CA. During this time, Plaintiff's files including digital files on CLL's computer were unlawfully confiscated by CLL attorneys, agents and employees, and some never returned;

(11) On October 14, 2002, defendant CLL attorneys and/or other CLL employees unlawfully deleted 1/3 of Plaintiff's computer files before sending her by Fed Ex in November, 2002 a significantly erased disk with some 50+ entries eradicated in violation of 18 USC Section 1030. The date of October 14, 2002 is imprinted on the disk as the date of deletion for all missing entries and upon information and belief, certain entries, that CLL attempted to conceal,

were misappropriated to other of CLL's clients, while Plaintiff was permanently denied access thereto;

(12)    Upon information and belief, at least one of CLL defendant partners defendants Midge Hyman, Esq., Simon Gerson, Esq., William Borchard, Esq. , Christopher Jensen, Esq. and Baila Celedonia, Esq. ordered the file erasures that pertained to, *inter alia*, Plaintiff's reserved rights under the Of Counsel contract, her trade secrets, the plans for her own live event distribution and mobile ticketing company, and separately, Legend Films;

(13)    In March, 2003, some six months later, principals of defendant Clear Channel first announced recent formation of a Massachusetts LLC they called [defendant herein] Instant Live Concerts, that had just begun authenticated distribution of live concert recordings at Clear Channel venues and had copied Plaintiff's business model for her own company from her files at CLL;

(14)    Defendant Instant Live Concerts was formally announced in trade journals and in the Business Section of the *New York Times* on May 5, 2003 as defendant Clear Channel's newest venture. The *New York Times* is, upon belief, another client of defendant CLL.

(15)    The *New York Times* article quoted verbatim from Plaintiff's unpublished PPAs, her files at the firm, and cited Plaintiff's identical trade secrets, plans and business model for her company that defendant CLL was obligated as Plaintiff's lawyers, to keep confidential. The article also included interviews from other of CLL's clients including members of *Phish* on the import of [Plaintiff's] inventions and novel business model. (**Exhibit 7**);

(16)    A CLL attorney, Susan Schick, Esq., who had the office two doors from Plaintiff, was engaged to Mike Gordon of Phish at this time and on several occasions, informed CLL

partners about the huge potential of Plaintiff's inventions (**Exhibit 8**). [7] When Plaintiff and her

husband met defendant Gordon at a firm party, Gordon knew all about Plaintiff's trade secrets.

(17)    In 2003 and unbeknownst to Plaintiff, defendant CLL allegedly filed a notice with

the USPTO withdrawing as Plaintiff's attorney for an **admitted** *"conflict of interest"* but only as

to PPA No. 949.

(18)    CLL never notified Plaintiff that it had ceased to represent Plaintiff's interests and

inventions, and in fact, never withdrew as to PPA No. 710.

(19)    Defendant CLL's alleged withdrawal notice although dated in 2003 was not found

by the USPTO until 2005 when it was sent to Plaintiff for the first time (**Exhibit 9**),

demonstrating an issue of fact as to when it was actually filed.

(20)    Defendant CLL's notice does not contain an affidavit or certificate of service and

in fact, was never docketed (**Exhibit 10**). It therefore did not constitute legal notice to Plaintiff

of attorney withdrawal as is required under the Rules of Professional Responsibility and 22

NYCRR 603, et seq. Technically CLL was still Plaintiff's lawyer on the 710 PPA filing.

(21)    Defendant CLL does not deny that it never withdrew as to the 710 PPA and also

never informed Plaintiff of its *admitted* conflict of interest.

(22)    Lack of notice prevented Plaintiff from being able to protect her inventions before

the USPTO.

(23)    Misappropriation of Plaintiff's patented event content distribution system using

Plaintiff's authentication methods as disclosed in Plaintiff's unpublished PPAs filed by

defendant CLL was admittedly exploited and advertised to consumer-end users by defendant

Instant Live Concerts on its first website posted in March, 2003 (**Exhibit 11**).

---

[7] Upon information, Mr. Gordon was subsequently arraigned on child molestation charges on
Long Island.

(24)     There was no InstantLive Concerts previous to misappropriation of Plaintiff's files and trade secrets by defendant CLL that CLL was required to be kept confidential pursuant to the attorney client privilege and the Computer Fraud and Abuse Act, 18 USCA 1030.

(25)     In 2004, Live Nation defendants falsely claimed a monopoly on Plaintiff's trade secrets and inventions at the time the USPTO had put Plaintiff's applications on the back burner because of an inability to reconcile CLL's single withdrawal notice with the two PPAs it filed.

(26)     In the meantime, Live Nation defendants continued to deploy Plaintiff's inventions without authorization, get to market first, and take advantage of the delay to the detriment of Plaintiff's business.

(27)     In 2005, defendant Live Nation, was spun off from defendant Clear Channel and then immediately acquired defendant Instant Live Concerts as a subsidiary.  Shortly thereafter defendant Live Nation aligned itself with another new Clear Channel subsidiary, defendant Next Ticketing, to deploy the second of Plaintiff's inventions.

(28)     In 2005, after notice by Plaintiff to Live Nation defendants and their in-house counsel, Dale Head, Esq., of the unlawful misappropriation of Plaintiff's trade secrets through its agent defendant CLL, the press reported that Live Nation had formed a joint venture with Universal Music Group to deploy Plaintiff's inventions demonstrating a second misappropriation after notice and without authorization by Live Nation defendants themselves.  (**Exhibit 12**).

(29)     In 2006, the press and Internet sites reported that defendant Next Ticketing had deployed Plaintiff's mobile ticketing operations and interfaces at defendant Live Nation venues and venues owned by others.  (**Exhibit 13**)  Plaintiff's mobile ticketing interfaces represent a distinct technology from Plaintiff's proprietary systems that associate event content distribution

with ticketing information as a means to expedite authenticated concert transmission and distribution including, without limitation, to audience members.

(30)     In 2006, Live Nation defendants were cited for antitrust crimes against society by the Electronic Frontier Foundation in San Francisco (**Exhibit 14**).  Aside from precluding entities DiscLive and Hyburn from its venues to record artist concerts, Live Nation defendants also precluded Plaintiff and used its monopoly of 150 US concert venues and defendant Clear Channel 250 radio stations to unlawfully violate the antitrust laws, and falsely claim a monopoly for itself on Plaintiff's inventions (**Exhibit 15**).

(31)     On February 6, 2006, Plaintiff filed and served a summons and complaint in this action, which is the date relevant for statute of limitation purposes.

(32)     Plaintiff next served an amended complaint on June 5, 2006 via process server while still seeking an attorney without a conflict of interest with each of Live Nation defendants and defendant CLL;

(33)     In the interim, Legend Films, Inc., that had terminated Plaintiff's services in December, 2002 after being apprised of difficulties with defendant CLL, continued to make assurances to Plaintiff to issue Plaintiff's due and owing 3% stock.  In spite of Legend's 2005-6 offer to issue Plaintiff 40,000 shares for her services as General Counsel, Legend failed to turn over the necessary due diligence documents so that Plaintiff could assess the value of that offer.

(34)     The documents subsequently produced by Legend principals demonstrated defendant CLL's interference with Plaintiff's agreement with Legend, a matter that is currently before the USDC SD CA Case No. 09-cv-0942 (IEG) (JMA).

(35)     In this lawsuit, in 2006 and 2008 Live Nation defendants and their Baker Botts attorneys filed two distinct sets of untruthful and frivolous rule 12(b) motions falsely swearing

under oath that Live Nation had no contacts with the State of New York to avoid jurisdiction (**Exhibit 2**).

(36)    In 2008 , this Court severed Plaintiff's contract claims against defendant CLL for binding arbitration along with defendants CLL's proffered defenses and counterclaims;

(37)    On April 24, 2009, the Court dismissed Plaintiff's claims against Live Nation defendants based on Live Nation defendants' fraudulent moving papers and statute of limitations grounds, a ruling that is now moot based on issuance of Plaintiffs' patents and undisputed deployment by Live Nation defendants including by and through its new merger partner, Ticketmaster, Inc., of Plaintiff's mobile ticketing and entry control access patent (**Exhibit 1**).

(38)    Thereafter, in August, 2009, Arbitrator Charlotte Moses Fischman, Esq. found in Plaintiff's favor on all counts and denied each and every one of defendant CLL's counterclaims and defenses (**Exhibit 16**).  This order is now res judicata concerning other claims against defendant CLL and its Live Nation defendant principals by law.

(39)    A motion to confirm the arbitration award is currently sub judice before this Court) (**Exhibit 17**).

(40)    On October 13, 2009, Plaintiff's 321 patent was issued and in January, the 547 patent received notice of issuance and all fees were paid to the USPTO (**Exhibit 18**).

(41)    In the interim, based in part on contended antitrust violations, defendant Clear Channel sold its 250 US radio stations to Thomas H. Lee and Bain partners for $22.7 bil after successfully marketing and passing off Plaintiff's inventions as its own which lured veteran artists such as Madonna, Bono, Jay-Z and Shakira to sign with Live Nation in all fields and in essence become a record label to steal Plaintiff's business;

(42)    Live Nation defendants have since noticed merger with Ticketmaster, Inc. and have continued to jointly use Plaintiff's mobile ticketing interfaces without authorization that were since issued a patent (**Exhibit 19**);

(43)    An injunction, infringement damages, double damages for unfair competition and treble damages for antitrust violation against Live Nation defendants are now sought based on direct infringement and/or infringement by the doctrine of equivalents;

(44)    Live Nation defendants took the risk that their unauthorized deployment and continued use of Plaintiff's trade secrets and two separate inventions after notice would not result in patent issuances to Plaintiff. They were wrong and must now pay.

(45)    There can be no prejudice to defendants if Plaintiff is permitted to amend her complaint and join LIVE-FI™ as a party plaintiff since Live Nation defendants and their attorneys defrauded the Court twice, under precedents should be sanctioned for misconduct that prejudiced Plaintiff's lawsuit, and discovery has not even begun.


**WHEREFORE**, Plaintiff prays judgment against defendants as follows:

1.  For an order vacating the Court's previous order of April 24, 2009 as moot;

2.  For an order joining LIVE-FI Technologies, LLC as a proper party plaintiff;

3.  For an order severing the claims against CLL defendants from those against the Live Nation defendants;

4.  For an order extended Plaintiffs' time to retain new counsel;

5.  For an order of res judicata of the arbitration decision and order in Plaintiff's favor and denying CLL's counterclaims and defenses on all counts

6. For an order of res judicata of the arbitration decision and order against CLL's principals, Live Nation defendants;

7. For damages against defendant CLL, for violation of the Uniform Trade Secrets Act, 18 USCA Section 1030, misappropriation of Plaintiff's trade secrets,, malpractice, breach of fiduciary duty, failing to reveal a material conflict of interest, tortious interference with contract, violation of 22 NYCRR 603, et seq. and the Rules of Professional Responsibility for withdrawing as Plaintiff's attorney deliberately without notice;

8. Against Live Nation defendants for an injunction aborting all use of Plaintiff's technology including though its new merged partner, Ticket Master Inc.

9. Against Live Nation for damages for infringement of Plaintiff's patents directly and through the doctrine of equivalents, double damages for unfair competition, treble damages for breach of the Sherman Act, damages for misappropriation and fraud before this Court;

10. For an order against Baker Botts attorneys for fraud before this Court;

11. For sanctions against Live Nation defendants and their Baker Botts attorneys for fraud before this Court;

12. For an award of attorneys' fees and costs in Plaintiffs' favor

13. For such other and further relief as the Court deems just and proper.

Dated: April 21, 2010
Montclair, NJ

Respectfully submitted,

_____

AMY R. GURVEY
Plaintiff Pro se

# A-687

CERTIFICAT E OF SERVICE

Amy R. Gurvey, the Plaintiff pro se, certifies that on April 21, 2010 she served a true and accurate copy of Plaintiff's instant Motion to Vacate Order and Serve a Fourth Amended Complaint in this lawsuit on attorneys for defendants, Baker Botts, LLP and Hinshaw & Culbertson, LLP, by depositing a true and accurate copy of same in post office boxes duly maintained by the US Postal Service.

_____

AMY R. GURVEY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
———————————————————————X

AMY R. GURVEY,                                                CIVIL ACTION NO.:
                                                             06-CV-1202 (BSJ)
                    Plaintiff,

        -against-

WILLIAM BORCHARD, MIDGE HYMAN,
BAILA CELEDONIA, CHRISTOPHER
JENSEN, COWAN, LIEBOWITZ & LATMAN,
PC, CLEAR CHANNEL COMMUNICATIONS,
INC., INSTANT LIVE CONCERTS, LLC,
LIVE NATION, INC., NEXT TICKETING, LLC,
DALE HEAD, STEVE SIMON, MICHAEL
GORDON and SUSAN SCHICK,

                    Defendants.
———————————————————————X


**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO
VACATE OPINION AND ORDER ENTERED APRIL 24, 2009, TO FILE AN
AMENDED PLEADING AND AMEND SUB JUDICE MOTION FOR
REARGUMENT**

## INTRODUCTION

This motion is based on Plaintiff's issued US Patent No. 7,603,321 issued October 13,

2009, assigned to her early-stage limited liability company, LIVE-FI™ Technologies of

Delaware, arbitrator Charlotte Moses, Esq's decision and order awarding Plaintiff contractual

damages against defendant law firm herein, Cowan Liebowitz & Latman, PC (hereinafter

"CLL") and denying all CLL's defenses and counterclaims.

Plaintiff now submits her annexed motion and instant Memorandum of Law to:

(i)      vacate the Court's Opinion and Order entered April 24, 2009 ("Order") as

         dismissed Plaintiff's misappropriation, unfair competition, legal malpractice,

and fiduciary breach claims against CLL and its clients defendants Clear

Channel, LiveNation, InstantLive Concerts and Next Ticketing;

(ii)      file an amended pleading to include claims for patent infringement under USC

Title 35, treble damages and injunctive relief pursuant to antitrust statutes,

Section 7 of the Clayton Act, 15 USC Section 18, and Section 2(b) of the

Antitrust Procedures and Penalties Act ("APPA" or "Tunney Act"), 15 USC

Sections 16 (b)-(h);

(iii)      add limited liability company LIVE-FI™ Technologies as the real party

plaintiff in interest to prosecute the infringement and antitrust claims;

(iv)      amend Plaintiff's motion for reargument now *sub judice* before the Court; and

(v)      for such other and further relief as the Court deems just and proper.

## INTRODUCTION

Plaintiff's instant motion pursuant to Rule 60(b) (2) and (3) and this Memorandum are

based on Plaintiff's issued patent of October 13, 2009 (USPTO Patent No. 7, 603, 321), the

January 25, 2010 decision of Hon. Rosemary M. Collyer rendered in *United States of America, et*

*al., v. Ticketmaster Entertainment, Inc. and Live Nation, Inc.*, [defendant Live Nation, Inc. herein

(hereinafter "LN")] Case: 1:10-cv-00139 (USDC Dist. of Columbia) (**Exhibit 1** annexed hereto)

documents submitted in the Ticketmaster-LiveNation antitrust litigation  that are public record,

the 2009 arbitration award rendered 100% in Plaintiff's favor by Charlotte Moses, Esq. in this

lawsuit that settled only certain contract claims and denied all defenses and counterclaims of

defendant CLL, and authority in the field of attorney misconduct and malpractice related to

patent services. *Landmark v. Morgan, Lewis & Bockius*, 2009 WL 160214 (ND CA); *Vaxiion v.*

*Foley & Lardner*, 593 F. Supp. 2d 1153; 2008 WL 5147201 (SD CA); *Attorney Liability Protection v. Swanson Law Office*, 2004 WL 3695281.  Plaintiff's right to damages including possible punitive damages for CLL's malpractice, breach of fiduciary duty, contract, representing conflicting client interests without disclosure and fraud.  Defending Legal Malpractice Claim Arising from Representation of Small Business.  62 Am. Jur. Trials 395 (August 2009).

Judge Collyer's January 25, 2010 order in the Ticketmaster-LiveNation antitrust litigation (**Exhibit 1**) and other documents filed in that lawsuit demonstrate previous documentary fraud upon this Court in papers submitted by defendants CLL and its clients Clear Channel, Live Nation, Instant Live Concerts, Next Ticketing, and their Baker Botts attorneys in support of defendants' 2006-7 motions to dismiss Plaintiff's action, warranting vacatur of this Court's April 24, 2009 Opinion and Order.

## NEW EVIDENCE WARRANTING RULE 60(b)(2) RELIEF

On October 13, 2009, Plaintiff was issued her first US Patent No. 7,603,321 (**Exhibit 2**) (hereinafter the "321 Patent") that when filed claimed the benefit of an early priority filing date of May 22, 2004 based on two provisional patent applications filed by Plaintiff's attorneys, Cowan, Liebowitz & Latman, LLP ("CLL" herein).  The provisional patent applications are No. 60/382,710 filed by CLL attorney Mark Montague, Esq. and 60/382,949 filed by CLL attorney R. Lewis Gable on may 22 and May 24, 2002 respectively.

Plaintiff's issue  321 patent has since been assigned to Plaintiff's early-stage company, LIVE-FI™ Technologies, LLC, a Delaware limited liability corporation, now sought to be added as a Plaintiff as the real party in interest to prosecute patent infringement and antitrust claims in this lawsuit.

The 321 patent claims thusfar issued by the USPTO fulfill user content requests on electronic terminals during and after a live event and deploy authentication methods including certain uniquely identifying user data to assist with the distribution and transmission of event content and event associated merchandise.  User identifying data might include a cell phone number, e-mail, credit card, account, bar code, etc., and any data that could be exchanged during event ticketing.

Plaintiff's 321 patent was based on two (2) unpublished provisional patent applications ("PPA") filed before the USPTO on May 22 and May 24, 2002 respectively by Plaintiff's then lawyers, defendant NYC law firm herein Cowan, Liebowitz and Latman, PC ("CLL"). This means that in theory, Plaintiff's inventions including continuation in part applications and divisional are entitled to get the benefit of an early May, 2002 filing date as they pertain or are an outgrowth of the same original inventions.

Defendants William Borchard, Christopher Jensen, Midge Hyman and Baila Celedonia are partners of defendant CLL and defendant Susan Schick is a former senior associate of the firm. Upon information and belief, defendant Schick has left the firm and both she and defendant Michael Gordon, who were engaged when the PPAs were filed, now live in Burlington, VT. Defendant Gordon is a member of the rock band, Phish.

The following facts are undisputed in this lawsuit.

On May 22, 2002 and May 24, 2002, defendant CLL filed two provisional patent applications ("PPA") identifying Plaintiff's inventions and disclosures in capsule form. These filings were assigned PPA Nos. 60/382,710 and 60/382,949. They disclose systems packaging and distribution/purchase of event recordings during a time line starting with purchase of event tickets until a time after the event concludes by ticket holders, viewers over all broadcast screens and other global fans.

Without ever notifying Plaintiff, in or about March, 2003, defendant CLL by its attorney-employee Mark Montague, Esq. served upon the USPTO a notice of withdrawal from Plaintiff's legal representation. Defendant CLL and its defendant partners, however, never served Plaintiff with the firm's withdrawal notice. In fact, there is no CLL certification, declaration or affirmation of service in the USPTO files. Ergo, there was a period of time when Plaintiff was not represented before the USPTO by an attorney, prejudicing her inventions and property interests.

More than two years later, in or about June, 2005, the USPTO notified Plaintiff that it had located defendant CLL's withdrawal notice and sent her a copy of it. When Plaintiff received the USPTO copy, this is the first time Plaintiff discovered that the reason for defendant CLL's withdrawal was its admitted "conflict of interest", that defendant CLL and its defendant partners herein, never previously disclosed to Plaintiff. Ergo, Plaintiff's claims for breach of fiduciary duty, malpractice and to disclose a material conflict of interest have a tolled statute of limitations.

In addition, CLL's withdrawal notice is stated as related to only one of the PPAs defendant CLL filed as Plaintiff's attorney. There was no withdrawal notice filed as to Plaintiff's second PPA.

In May, 2003, Plaintiff saw an article in the New York Times Business Section introducing defendant Clear Channel's newest venture, defendant InstantLive Concerts herein and noticing that InstantLive was distributing concert CDs at its Boston clubs and allowing the CDs to be pre-purchased with tickets.

Defendant Clear Channel Entertainment was a client of defendant CLL when it filed Plaintiff's provisional applications a year earlier in 2002. The InstantLive website was posted in March, 2003, also citing form Plaitniff's unpublished PPA filed by defendant CLL.

In 2005, Clear Channel Entertainment, a subsidiary of defendant Clear Channel communications, Inc. was spun off to become defendant LiveNation herein, the world's larger promoters. Shortly thereafter, defendant Live Nation acquired defendant InstantLive. Both defendants LN and InstantLive are located in the same building at 9348 Civic Center Drive, Beverly Hills, CA.

On February 6, 2006, Plaintiff filed this lawsuit well within all statutes of limitations. However, the breach of fiduciary duty, conflict of interest and malpractice claims against defendant CLL did not accrue until 2005.

In Februayr, 2006, defendants Clear Channel owned some 24 radio stations in NYS including WLTW Lite-FM 106.7, that had its studios in the same building with defendant CLL, 1133 Avenue of the Americas, New York, NY 10036. In addition, defendant Clear Channel owned 15+ concert venues in NYS including Jones Beach Theatre and the Blue Note. In 2008, defendant Clear Channel Communications sold its radio stations to Thomas H. Lee and Bain partners and assigned all US concert venues ownership rights to defendant LiveNation. Defendant LiveNation now now also owns House of Blues and other New York State venues, as found by the USDC Dist. of Columbia.

The Federal Courts have exclusive jurisdiction over all matters involving issued patents including attorney malpractice and breach of fiduciary duty with respect to their services that result in issued patents. *Vaxiion v. Foley & Lardner*, 2008 WL 5147201; *Landmark v. Morgan Lewis & Bockius*, 2009 WL 160214 (ND California 2009); *Attorney Liability Protection v. Swanson Law Offices*, 2004 WL 3695281.

Plaintiff is entitled to a priority date of May, 2002 for her inventions based on the PPAs filed by defendant Cowan. Loss of a priority date due to defendant CLL's malpractice, breach of fiduciary duty and failure to notify Plaintiff of its 2003 withdrawal.

## LITIGATION HISTORY

Currently sub judice before this Honorable tribunal is Plaintiff's motion to grant reargument of the portions of the Court's Order of April 24, 2009 that granted defendants' motion to dismiss the misappropriation, unfair competition, legal malpractice and fiduciary breach claims in this lawsuit. The grounds for reconsideration of dismissal of the misappropriation and unfair
competition is that the Court erred in dismissing both claims on statute of limitations grounds because the Court overlooked the fact that (1) plaintiffs original complaint was filed in February 2006 well within the three year statute of limitations based on the accrual date of May 2003 used

by the Court and (2) the Court overlooked the allegations (TAC ¶ **17** 62,65) that defendants'
first

*use* of the misappropriated trade secret was "Fall 2005" @) and thus overlooked the fact that
Fall 2005 was the proper accrual date of all of the foregoing claims.

The grounds for reconsideration of the Court's dismissal of plaintiffs claims for legal
malpractice, breach of fiduciary duty and unjust enrichment against the Cowan, Liehowitz &
Latman, P.C. defendants are that the Court overlooked the well pleaded allegations of (1)
malpractice acts and acts of fiduciary breach and (2) plaintiffs description of categorical
damages and causation.

## POINT I
### STANDARDS FOR RECONSIDERATION

Local Civil Rule 6.3, Motions for Reconsideration or Reargument, provides in relevant
part: "There shall he served with the notice of motion a memorandum setting forth concisely the
matters or controlling decisions which counsel believes the court has overlooked." To be
entitled to reargument, the movant must demonstrate that the Court overlooked controlling
decisions or factual matters on the underlying motion, which, had they been considered "might
reasonably have altered the result reached by the court." Consolidated Gold Fields v. Anglo Am.

**m,** 713 F. Supp. 1457, 1476 (S.D.N.Y. 1989); see also Dietrich v. Bauer, 76 F. Supp. 2d 312,
327 (S.D.N.Y. 1999); Ameritrust Co. Nat'l Ass'n v. Dew, 151 F.R.D. 237,238 (S.D.N.Y. 1993).
The standards for a motion for reargument are governed by Local Rule 6.3 and Fed. R. Civ. P.

. *See* Hertmer v. Henderson, 292 F.3d 302,303 (2d Cir. 2002).

Reargument may also be granted to "correct a clear error or prevent manifest injustice."
Doe v. New York City Dep't of Soc. Servs., 709 F.2d 782,789 (2d Cir. 1983) (quoting 18 C
Wright, A. Miller & E. Cooper, Federal Practice and Procedure *5* 4478 at 790 (1981).
Plaintiff easily meets these standards which warrant the relief sought herein.

## POINT II
### THE COURT OVERLOOKED WELL PLEADED ALLEGATIONS
### ESTABLISHING THE TIMELINESS OF PLAINTIFF'S
### MISAPPROPRIATION AND UNFAIR COMPETITION CLAIMS
### AND WRONGLY APPLIED APPLICABLE LAW

In its Order, the Court based its dismissal of plaintiffs misappropriation and trade secret
claims on statute of limitations grounds. Order at 4, 5. The Court held that the measure date for
determining whether the statute of limitations had expired was June 5,2006, the date of filing of
the Amended Complaint (Order at 5, 6) (rather than the date of filing of the original Complaint)
and that the claim accrual date was May 5, 2003 rather than Fall 2005 as argued by plaintiff. In
so holding, the Court failed to follow established procedural law that the date of commencement
of an action is the date of filing. *See* Fed. R. Civ. P. 3 "A civil action is commenced by filing a
complaint with the Court." As noted by the Court, in its Order &page 3, footnote 3) the
original complaint was filed on February 15,2006. However, the Court held, without
explanation or citation, in a footnote, that "Plaintiff has failed to establish that the earlier
Complaint should operate to bring these claims against the defendants within the applicable
period." Order at 5, footnote 6. The commencement of an action, of course, tolls the statute of
limitation. The Court ignored this principle and instead decided a factual issue: when defendants

first had "notice" of the claims. *See* Order at 6.

The Court also misapprehended the complaint's allegations of the accrual of the causes of action for misappropriation and unfair competition. The TAC alleges and plaintiff argued that the accrual date was Fall 2005, the date of *use* of the misappropriated secrets. The TAC contains detailed factual allegations alleging that the CLL Partners' shared plaintiffs trade secrets with Clear Channel (TAC 77 34-41) who then used plaintiffs trade secrets no earlier than Fall, 2005 when they implemented plaintiffs proprietary electronic ticketing solutions related to plaintiff's proprietary methods on mobile devices. TAC 7162-65.

The accrual date for such a claim is determined "either when the defendant discloses the trade secret when he first makes *use* of the plaintiffs ideas." [Emphasis supplied]. Lemelson v. Carolina Enterprises, Inc., 541 F. Supp. 645 (S.D.NY. 1982), citing Petnel v. American Teleuhone & Telemauh Co., 280 App. Div. 706, 117 N.Y.S.2d 294 (3d Dep't 1952). See also Greenliht Capital, Inc. v. Greenlight, No. 04 Civ. 3136 2005 WL 13682, at *7 (January 3,2005 S.D.N.Y.)

Therefore, plaintiff has alleged that defendants misappropriated plaintiffs trade secrets and used same in Fall 2005, and thus, the claim accrued at that time

## POINT I11
## PLAINTIFF HAS ADEQUATELY ALLEGED CLAIMS OF
## BREACH OF FIDUCIARY DUTY AND LEGAL MALPRACTICE

The Court dismissed plaintiffs malpractice and fiduciary breach claims against the Cowan defendants on the grounds that the allegations were not specific enough either as to the acts or the harm caused thereby. *See* Order at 12 - 15. However, the Court failed to properly consider the TAC's allegations of defendants' acts.

To state a prima facie case for legal malpractice, plaintiff needs only plead that there was a duty, that the duty was breached and that she was harmed by defendants' breach of the duties owed to her, which plaintiff has done. Tinelli v. Redl, 199 F.3d 603 (2d Cir. 1999), citing Marshall v. Nacht, 172 A.D.2d 727,569 N.Y.S.2d 113, 114 (2d Dep't 1991); TAC 7 77,79,121.

Plaintiff has alleged that CLL owed her the duties of utmost loyalty and care (TAC 7 119), that CLL breached that duty by misappropriating her trade secrets to Clear Channel, by failing to properly advise her regarding the commercial exploitation of her trade secret and by having an improper conflict of interest which damaged plaintiff. (TAW 120). Plaintiffs allegations that CLL did not advise Gurvey with respect to opportunities for the commercial exploitation of her own inventions and instead allowed its other client, Clear Channel to exploit Gurvey's trade ideas are allegations speaking directly to Cowan's representation as her potential counsel and the conflict that Cowan admitted. TAC 77 52-59.

CLL admitted to the USPTO that CLL had an impermissible conflict of interest regarding representation of Gurvey, and thus withdrew its representation of Gurvey. TAC 7 32 (plaintiff received notification from the USPTO that "CLL had unilaterally withdrawn as plaintiffs attorney on PPA # 60,382,710 for an alleged 'conflict of interest'").

These same allegations were also overlooked by the Court in dismissing the fiduciary breach claims. Attorneys can breach their fiduciary obligations by appropriating a client's business opportunity for the benefit of another client. See, e.g, Ulico Cas. Co. v. Wilson, Elser, Moskowitz, Edelman &Dicker, 16 Misc.3d 1051,843 N.Y.S.2d 749 *(N.Y.* Sup. Ct. 2007) (court

# A-695

refused to dismiss breach of fiduciary duty claim holding that it was not duplicative of the legal malpractice claim because "[t]here is thus substantial persuasive authority upholding fiduciary duty claims based on an attorney's appropriation of a former client's business opportunity for the benefit of the attorney or another client, where there is a reasonable probability or significant risk that the client's confidential information will be used in acquiring the business.")

The Court's dismissal on grounds that damages were speculative is also unsupported under applicable authority. At the motion to dismiss stage (pre-discovery), plaintiff "need only plead allegations from which damages attributable to [defendant's] conduct might be inferred'". InKine Pham. Co v. Coleman, 305 A.D.2d 15 1,152 (N. Y. App. Div. 1 st Dep't 2003), quoting Tenzer, Greenblatt, Fallon & Kaplan v. Ellenberg, 199 A.D.2d 45 (N.Y. App. Div. 1st Dep't 1993). Therefore, plaintiff has adequately alleged all the elements of a legal malpractice and fiduciary breach claims.

## CONCLUSION

For all of the foregoing reasons, plaintiffs motion for reargument and reconsideration should be granted in its entirety and upon reconsideration defendants' motions for dismissal of plaintiffs claims of misappropriation, unfair competition, malpractice and breach of fiduciary duty should be denied.

Dated: May 8,2009
SQUITIERI & FEARON, LLP
By: s/Lee Squitieri
Lee Squitieri (LS-1684)
32 East 57& Street
12& Floor
New York, New York 10022
Tel: (212) 421-6492
Fax: (212) 421-6553

## CERTIFICATE OF SERVICE

I certify that on May 8,2009, copies of the foregoing NOTICE OF MOTION FOR REARGUMENT AND RECONSIDERATION OF ORDER AND OPINION ENTERED APRIL 24.2009 and PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR REARGUMENT AND RECONSIDERATION OF ORDER AND OPINION ENTERED APRIL 24,2009 were sewed via ECF on the following:

Andrew B. Cripe, Esq.
HINSHAW & CULBERTSON, L.L.P.
222 N. LaSalle Street
Chicago, Illinois 60601
Richard Supple, Jr., Esq.
HINSHAW & CULBERTSON, L.L.P.
780 Third Avenue
New York. New York 100 17
Eric Roman, Esq.
Ian H. Hurnmel, Esq.
BAKER BOTTS LLP
30 Rockefeller Plaza

**A-696**

44' Floor
New York, New York 101 12
Steven G. Schortgen, Esq.
Jonathan B. Rubenstein, Esq.
BAKER BOTTS LLP
2001 Ross Avenue
Suite 600
Dallas, TX 75244
s/Lee Squitieri
Lee Squitieri

# APPENDIX
# TABLE OF CONTENTS

## (Volume I of III)

Page

District Court Docket Entries......................................................................................................... A-1

Cover Letter by Jonathan B. Rubenstein for Defendants Clear Channel Communications, Inc. ("Clear" and Live Nation, Inc. ("Live") delivering Motion to Dismiss for Lack of Personal Jurisdiction, lack of Subject Matter Jurisdiction and Failure to State a claim For Which Relief Can be Granted and supporting documents, dated June 28, 2006 ........................................... A-16

Memorandum of Law, by Defendants Clear and Live, in Support of Motion to Dismiss, dated June 28, 2006 ....................................................................................................................... A-17

Declaration of Hamlet T. Newsom, Jr., for Defendant Clear, in Support of Motion to Dismiss, filed June 26, 2006..................................................................................................................... A-35

Declaration of Richard A. Munisteri, for Defendant Live, in Support of Motion to Dismiss, filed June 26, 2006 ............................................................................................................................... A-38

Notice of Motion and Motion by Defendants Clear and Live to Dismiss for Lack of Personal Jurisdiction, All Defendants' Notice of Motion and Motion to Dismiss for Lack of Subject Matter Jurisdiction and All Defendants' Notice of Motion and Motion to Dismiss for Failure to State a Claim for Which Relief Can Be Granted, dated June 28, 2006 .................................... A-40

Attachment to Motion – Proposed Order, undated ............................................................... A-42

Letter from Plaintiff to Richard Supple. Esq., dated July 11, 2006......................................... A-43

Notice of Motion, by Defendant Cowan, Liebowitz & Latman, P.C. ("Cowan") to Compel Arbitration and Stay Proceedings Pending the Completion of Arbitration, dated July 14, 2006 ..................................................................................................................... A-44

Declaration of Simon Gerson, for Defendant Cowan, in Support of Motion to Compel Arbitration and Say Proceedings in this Matter, dated July 14, 2006...................................... A-46

Attachment to Declaration of Gerson, Memorandum Agreement Between Cowan and Amy. R. Gurvey, undated........................... A-47

Memorandum of Law in Support of Defendant Cowan's Motion to Compel Arbitration and Stay Proceedings, dated July 14, 2006........................................................................... A-52

Letter from Plaintiff to the Honorable Barbara S. Jones, dated August 10, 2006 ................... A-58

Letter from Plaintiff to the Honorable Barbara S. Jones, dated August 18, 2006 ................... A-61

Notice of Cross-Motion by Plaintiff for Rule 11 Sanctions and Leave to File and Serve a
Second Amended Complaint, dated October 9, 2006 ................................................................ A-64

Affidavit, by Plaintiff, in Support of Cross-Motion for Rule 11 Sanctions and Leave to
File and Serve a Second Amended Complaint, dated October 9, 2006 .................................. A-66

Exhibit 1 to Affidavit, Second Amended Complaint dated October 9, 2006 ........................ A-89

Exhibit 2 to Affidavit, excerpt from Motion of Defendants Clean and
Live Motion to Dismiss ....................................................................................................... A-121

Exhibit 3 to Affidavit, Defendant Clear Form 10-K Filed with United States Securities
and Exchange Commission ("SEC"), selected pages, for fiscal year ended
December 31, 2005; Defendant Clear Selected Press Releases; Defendant Clear
Corporate Description; Defendant Clear List of Venues; Defendant Live Nation web
page Contact Information; Defendant Clear web page "About" and Company History;
Defendant Clear Form 10-K Filed with SEC for fiscal year ended
December 31, 2002, selected pages .................................................................................... A-125

Exhibit 4 to Affidavit, Provisional Patent Cover Sheet, dated May 24, 2002 ..................... A-197

Exhibit 5 to Affidavit, Defendant Clear's Motion to Dismiss Plaintiff's Amended Complaint
with Supporting Memorandum of Law in *Spanish Broadcasting System, Inc. vs. Clear
Channel Communications, Inc.* and *Hispanic Broadcasting Corporation*,
Case No. 02-21755-Civ-Seitz/Bandstra, United States District Court, Southern District
Of Florida, filed August 29, 2002 ...................................................................................... A-199

Exhibit 6 to Affidavit, clipping, *BusinessWeek* and Business Week online, July 12, 2004,
"Burning to Burn Instant CDs" ........................................................................................... A-243

Exhibit 7 to Affidavit, Affidavit of H. Scott Gurvey ........................................................... A-246

Exhibit 8 to Affidavit, clipping, *The New York Times*, "Concert CDs Sold on the Spot by
A Radio Giant", undated ..................................................................................................... A-249

Exhibit 9 to Affidavit, press release, "Clear Channel Entertainment Launches Instant Live
In Boston", dated May 5, 2003, various web site presentations, various dates ................. A-252

Exhibit 10 to Affidavit, newspaper clipping by Ray Waddell, "UMG Deal Should Boost
Concert CD Business", undated ............................................................................................ A263

Exhibit 11 to Affidavit, newspaper clipping, Upfront, Touring by Ray Waddell, "Clear
Channel Spinoff Outlines New Structure", undated ......................................................... A-265

Exhibit 12 to Affidavit, clipping, *The Wall Street Journal Online*, "Bootlegs Go Corporate" by Ethan Smith, dated September 27, 2005 ................................................................... A-267

Exhibit 13 to Affidavit, Amended Complaint filed June 5, 2006 ........................................ A-271

Letter from Plaintiff to the Honorable Barbara S. Jones, dated October 27, 2006 ................. A-288

Letter from Eric Roman for Defendants Clear and Live to the Honorable Barbara S. Jones, dated November 3, 2006 ....................................................................................... A-290

Letter from Schuyler B. Kraus for Defendant Cowan to the Honorable Barbara S. Jones, dated November 3, 2006 ....................................................................................... A-291

Opposition by Defendants Clear and Live to Plaintiff's Cross-Motion for Leave to File and Serve a Second Amended Complaint dated November 3, 2006 ........................................... A-292

**(Volume II of III)**

Memorandum of Law in Further Support of Defendant Cowan's Motion to Compel Arbitration and in Opposition to Plaintiff's Cross Motion to File a Second Amended Complaint, dated November 3, 2006 ............................................................... A-300

Letter from Plaintiff to the Honorable Barbara S. Jones, dated November 13, 2006 ............. A-306

Letter from Plaintiff to the Honorable Barbara S. Jones, dated November 22, 2006 ............. A-308

Letter from Plaintiff to the Honorable Barbara S. Jones, dated November 30, 2006 ............. A-310

Letter from Plaintiff to the Honorable Barbara S. Jones, dated December 24, 2006 ............. A-312

Letter from Plaintiff to the Honorable Barbara S. Jones, dated January 10, 2007 ................. A-315

Letter from Plaintiff to the Honorable Barbara S. Jones, dated January 19, 2007 ................. A-317

Letter order, letter from Defendant Cowan to the Honorable Barbara S. Jones dated January 28, 2008 ....................................................................................... A-319

Order of the Honorable Barbara S. Jones dated February 11, 2008 ....................................... A-321

Notice of Motion and Motion by Defendants Live and Clear to Dismiss for Lack of Personal Jurisdiction, and Live, Clear, InstantLive Concerts, LLC's and Nextticketing, LLC's Notice of Motion and Motion to Dismiss for Failure to State a Claim for Which Relief Can Be Granted, dated April 25, 2008 ............................................................... A-323

Attachment to Motion, Proposed order, undated .............................................................. A-327

Declaration of Hamlet T. Newsom, Jr., in Support of Defendant Clear's
Motion to Dismiss, dated June 26, 2006, filed April 25, 2008 ............................................ A-329

Declaration of Richard A. Munisteri, for Defendants Live and Clear, in Support of Motion to
Dismiss, dated June 26, 2006, filed April 25, 2008 .............................................................. A-332

Notice of Motion, by Defendants Cowan, William Borchard, Midge Hyman, Baila Celedonia
and Christopher Jensen (collectively, the "CCL Defendants"), for an Order Dismissing
Allegations, filed April 25, 2008 ........................................................................................ A-334

Declaration of Schuyler B. Kraus, for Defendants CCL, in Support of Motion to Dismiss
Allegations, filed April 25, 2008 ........................................................................................ A-336

Exhibit A to Kraus Declaration –
Contract Between Cowan and Amy Gurvey, dated January 15, 2002 ................................ A-339

Exhibit B to Kraus Declaration –
Provisional Patent Application 60, 382, 710 ...................................................................... A-346

Exhibit C to Kraus Declaration –
Provisional Patent Application No. 60, 382, 949 ................................................................ A-355

Exhibit D to Kraus Declaration –
*New York Times* Article Entitled: "Concert CD's Sold on the Spot by a Radio Giant",
dated May 5, 2003 ............................................................................................................. A-361

Exhibit E to Kraus Declaration –
Complaint, dated February 12, 2006 ................................................................................. A-365

Exhibit F to Kraus Declaration –
Summons and Amended Complaint, dated June 5, 2006 .................................................... A-376

Exhibit G to Kraus Declaration –
Third Amended Complaint, dated March 4, 2008 .............................................................. A-395

Exhibit H to Kraus Declaration –
Letter from Richard Supple to Lee Squitieri, dated March 18, 2008 ................................. A-435

Exhibit I to Kraus Declaration –
Letter from Lee Squitieri to Richard Supple, dated March 27, 2008 ................................. A-438

Memorandum of Law, by Defendants CLL, in Support of Motion to Dismiss Allegations,
filed April 25, 2008 ........................................................................................................... A-439

Memorandum of Law, by Plaintiff, in Opposition to Defendants CLL's Motion to Dismiss Allegations, dated June 11, 2008 ................................................................ A-471

Declaration of Maria J. Ciccia, for Plaintiffs, in Support of Opposition to Defendants Live and Clear's Motion to Dismiss, dated June 11, 2008 .......................................... A-504

   Exhibit A to Ciccia Declaration –
   Print out from New York State Department of State, Division of Corporations Entity Information ................................................................................. A-506

   Exhibit B to Ciccia Declaration –
   Excerpts from the 2007 10-k filed by Defendant Clear with the SEC ............................ A-507

   Exhibit C to Ciccia Declaration –
   Print out from www.google.com/maps of Live Nation, Inc.'s New York Office ........... A-515

   Exhibit D to Ciccia Declaration –
   Print out from www.livenation.com of Live Nation, Inc.'s New York Venues .............. A-516

   Exhibit E to Ciccia Declaration –
   Excerpts from the 2007 Annual Report and 10-k filed by Defendant Live to the SEC .. A-520

   Exhibit F to Ciccia Declaration –
   Print out from www.clearchannelny.com .................................................... A-528

   Exhibit G to Ciccia Declaration –
   Copy of EEO Public File Report for Defendant Clear for the Period Between February 1, 2004 - January 31, 2005 ....................................................... A-519

Memorandum of Law, by Plaintiffs, in Opposition to Defendants Live and Clear's Motion to Dismiss, dated June 11, 2008 ................................................................ A-538

Reply Memorandum of Law, by Defendants CLL, in Further Support of Motion to Dismiss, dated June 30, 2008 ................................................................................. A-569

Reply Memorandum of Law, by Defendants Live and Clear, in Further Support of Motion to Dismiss, dated June 30, 2008 .......................................................................... A-587

**(Volume III of III)**

Opinion and Order of the Honorable Barbara S. Jones, dated March 16, 2009 ................... A-613

Opinion and Order of the Honorable Barbara S. Jones, dated April 23, 2009 ..................... A-622

Judgment, dated April 27, 2009, with Attachments ............................................. A-637

Notice of Motion, by Plaintiff, for Re-argument and Reconsideration of 4/23/09 Opinion and Order, dated May 8, 2009 ............................................................................................ A-643

Memorandum of Law, by Plaintiff, in Support of Motion for Re-argument and Reconsideration, dated May 8, 2009 ...................................................................................... A-645

Response by Defendants Live and Clear in Opposition to Motion for Re-argument and Reconsideration, dated May 22, 2009 ................................................................. A-652

Notice of Appeal, by Plaintiff, dated May 22, 2009 ........................................... A-663

Notice of Motion, by Plaintiff, to Withdraw as Counsel of Record, dated April 21, 2010 ... A-665

Declaration of Lee Squitieri, for Squitieri & Fearon, LLP, in Support of Motion to Withdraw as Counsel, dated April 21, 2010 ............................................................... A-667

Amended Notice of Motion, by Squitieri & Fearon, LLP, to Withdraw as Counsel of Record, dated April 21, 2010 .................................................................................... A-669

Plaintiff's Notice of Motion under Rule 60(b), To Vacate and Serve Fourth Amended Complaint, date stamped April 22, 2010 ............................................................... A-671

Affidavit in Support, by Plaintiff, of Motion under Rule 60(b) To Vacate and Serve Fourth Amended Complaint, date stamped April 22, 2010 .................................. A-672

Introduction, 2010 .............................................................................................. A-665

Fourth Amended Complaint .................................................................................. A-675

Memorandum of Law, by Plaintiff, in Support of Motion under Rule 60(b) To Vacate and Serve Fourth Amended Complaint, date stamped April 22, 2010 ...................... A-688

Letter from Plaintiff to the Honorable Barbara S. Jones, dated May 4, 2010 ...................... A-697

Fourth Amended Complaint as proposed in Plaintiff's Rule 60(b) Motion to Vacate filed April 22, 2010 ......................................................................................... A-704

Order of the Honorable Barbara S. Jones, dated September 20, 2010 ................................... A-743

Order of the Honorable Barbara S. Jones, dated September 21, 2010 ................................... A-747

Letter from Plaintiff to the Honorable Barbara S. Jones, dated September 22, 2010 ............ A-748

Notice of Appeal by Plaintiff, filed September 27, 2010 ..................................................... A-751

Order of the Honorable Barbara S. Jones, dated October 14, 2010 ....................................... A-752

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.,*<br><br>            *Plaintiffs,*<br><br>   v.<br><br>TICKETMASTER ENTERTAINMENT,<br>INC., *et al*and LIVE NATION<br>ENTERTAINMENT, INC.,<br><br>            *Defendants.* | Case: 1:10-cv-00139-RMC<br>Assigned to: Collyer, Rosemary M.<br>Assign. Date: 1/25/2010<br>Description: Antitrust |

## [PROPOSED] AMENDED FINAL JUDGMENT

WHEREAS, plaintiffs, United States of America, and the States of Arizona, Arkansas,

California, Florida, Illinois, Iowa, Louisiana, Nebraska, Nevada, Ohio, Oregon, Rhode Island,

Tennessee, Texas, and Wisconsin, and the Commonwealths of Massachusetts and Pennsylvania

("Plaintiff States") filed their Complaint on January 25, 2010, and whereas the States of New

Jersey and Washington joined as Plaintiff States pursuant to an Amended Complaint filed

January 28, 2010, the United States, Plaintiff States, and defendants, Ticketmaster

Entertainment, Inc. and Live Nation, Inc., by their respective attorneys, have consented to the

entry of this Final Judgment without trial or adjudication of any issue of fact or law, and

without this Final Judgment constituting any evidence against or admission by any party

regarding any issue of fact or law;

    AND WHEREAS, the United States and Defendants have consented to the entry of this

Amended Final Judgment;

1

AND WHEREAS, defendants agree to be bound by the provisions of this Amended Final Judgment pending its approval by the Court;

AND WHEREAS, the essence of this Amended Final Judgment is the prompt and certain divestiture of certain rights or assets by the defendants and the imposition of certain conduct restrictions on defendants, to assure that competition is not substantially lessened;

AND WHEREAS, the United States requires defendants to make certain divestitures for the purpose of remedying the loss of competition alleged in the Complaint;

AND WHEREAS, defendants have represented to the United States that the divestitures required below can and will be made and that defendants will later raise no claim of hardship or difficulty as grounds for asking the Court to modify any of the divestiture provisions contained below;

NOW THEREFORE, before any testimony is taken, without trial or adjudication of any issue of fact or law, and upon consent of the parties, it is ORDERED, ADJUDGED AND DECREED:

## I. Jurisdiction

This Court has jurisdiction over the subject matter of and each of the parties to this action. The Complaint states a claim upon which relief may be granted against defendants under Section 7 of the Clayton Act, as amended (15 U.S.C. § 18).

## II. Definitions

As used in this Amended Final Judgment:

A.     "AEG" means Anschutz Entertainment Group, Inc., a company with its headquarters in Los Angeles, California, its successors and assigns, and its subsidiaries,

divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees.

B.      "Acquirer" or "Acquirers" means the entity or entities to whom defendants divest the Divestiture Assets.

C.      "Client Ticketing Data" means financial data relating to a ticketing client's events including on-sale dates for a client's events, the number of tickets sold for the specific event, the proceeds from those sales for a specific event, ticket inventory that is made available on the Ticketmaster system, the number and location of tickets that are sold, the amount for which the tickets are sold, pricing, marketing and promotions run for the event, the sales as a result of the marketing or promotions, and the status of the ticket inventory. "Client ticketing data" does not include data that Defendants collect through other means (e.g., website tracking, user group surveys, public sources). Client Ticketing Data does not include data that is made public by a client or third party.

D.      "Comcast-Spectacor" means Comcast-Spectacor, L.P., a company with its headquarters in Philadelphia, Pennsylvania, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees.

E.      "Condition" means to explicitly or practically require buyers to take one product or set of services if they want to obtain a second product or set of services. In the absence of explicit conditioning, providing the buyer with an opportunity to buy the two products or sets of services separately is only conditioning if no reasonable buyer would be expected to accept the terms of the separate offers.

F.      "Covered Employee" means any employee of Defendants whose principal job responsibility involves the operation or day-to-day management of Defendants' venues, concert promotions, or artist management services.

G.      "Defendants" means either defendant acting individually or both defendants acting collectively, as appropriate. Where the Amended Final Judgment imposes an obligation to engage in or refrain from engaging in certain conduct, that obligation shall apply as broadly as reasonable to each defendant individually, both defendants acting together, and the merged firm.

H.      "Divestiture Assets" means the Ticketmaster Host Platform (via the binding agreement to license and to provide private label ticketing services to the Ticketmaster Host Platform Acquirer as required in Section IV.A) and Paciolan.

I.       "Exempted Employee" means any employee of Defendants who is not a Covered Employee, including: (a) any senior corporate officer, director or manager with responsibilities that include oversight of Defendants provision of Primary Ticketing Services; and (b) any employee whose primary responsibilities solely include accounting, human resources, legal, information systems, and/or finance.

J.       "Live Entertainment Event" means a live music concert for which tickets are sold to the public.

K.      "Live Nation" means defendant Live Nation, Inc., a Delaware corporation with its headquarters in Beverly Hills, California, its successors and assigns, and its subsidiaries (whether partially or wholly owned), divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees.

L.      "Merger" means the merger of Ticketmaster and Live Nation.

M.     "Paciolan" means Paciolan, Inc., a Delaware corporation which is engaged in the

provision of ticketing services to venues or other organizations under the Paciolan or

Ticketmaster Irvine names, and which includes:

    1.    All tangible assets that comprise the Paciolan line of business, including

servers and other computer hardware; research and development activities;

all fixed assets, personal property, inventory, office furniture, materials,

supplies, and other tangible property and all assets used exclusively in

connection with Paciolan; all licenses, permits and authorizations issued

by any governmental organization relating to Paciolan; all contracts,

teaming arrangements, agreements, leases (including the lease to the

Paciolan headquarters in Irvine, California), commitments, certifications,

and understandings, relating to Paciolan, including supply agreements; all

customer lists, contracts, accounts, and credit records; all repair and

performance records and all other records relating to Paciolan;

    2.    All intangible assets used in the development, distribution, production,

servicing and sale of Paciolan, including, but not limited to, all patents,

contractual rights (including contractual rights to provide ticketing

services and employment contracts), licenses and sublicenses, intellectual

property, copyrights, trademarks, trade names, service marks, service

names, technical information, computer software and related

documentation, know-how, trade secrets, drawings, blueprints, designs,

design protocols, specifications for materials, specifications for parts and

devices, safety procedures for the handling of materials and substances, all

research data concerning historic and current research and development relating to Paciolan, quality assurance and control procedures, design tools and simulation capability, all manuals and technical information defendants provide to their own employees, customers, suppliers, agents or licensees, and all research data concerning historic and current research and development efforts relating to Paciolan, including, but not limited to, designs of experiments, and the results of successful and unsuccessful designs and experiments. Preexisting commitments to transfer contractual rights from Paciolan to another entity that are specifically identified in the Paciolan sales agreement are excluded from this definition.

N.    "Paciolan Acquirer" means the entity to whom defendants divest Paciolan.

O.    "Primary Ticketing Services" means a collection of services provided to venues or other customers to enable the initial sale of tickets for live entertainment events directly to customers and enable the validation of tickets at the venue to control access to the event.

P.    "Provide Live Entertainment Events" and "Provision of Live Entertainment Events" mean to supply a Live Entertainment Event, Live Entertainment Events and/or services reasonably necessary to plan, promote, market and settle a Live Entertainment Event, including but not limited to concert promotion services provided by firms such as Live Nation and the provision of artists managed by firms such as Front Line. The Promotion of Live Entertainment Events specifically does not include the provision of primary ticketing services, venue management services and/or tour design and construction services.

Q.    "Retaliate" means refusing to Provide Live Entertainment Events to a Venue Owner, or Providing Live Entertainment Events to a Venue Owner on less favorable terms, for

6

the purpose of punishing or disciplining a Venue Owner because the Venue Owner has contracted or is contemplating contracting with a company other than Defendants for Primary Ticketing Services. The term "Retaliate" does not mean pursuing a more advantageous deal with a competing Venue Owner.

R.      "Ticket Buyer Data" means non-public identifying information for ticket buyers for a specific event (including, if provided, the buyer's name, phone number, e-mail address, and mailing address) that Defendants collect in the course of providing a ticketing client's Primary Ticketing Services. Ticket Buyer Data does not include data that Defendants collect solely through other means (e.g., website tracking, user group surveys, public sources).

S.      "Ticketmaster" means defendant Ticketmaster Entertainment, Inc., a Delaware corporation with its headquarters in West Hollywood, California, its successors and assigns, and its subsidiaries (whether partially or wholly owned), divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees.

T.      "Ticketmaster Host Platform" means the primary Ticketmaster software used by Ticketmaster to sell primary tickets in the United States. The Ticketmaster Host Platform includes the following software: Ticketmaster Classic Ticketing System (also called Ticketmaster Host); Ticketmaster.com full website package; Access Management; payment processing and settlements; and PCI point of sale system (for phone and outlets).

U.      "Ticketmaster Host Platform Acquirer" means AEG, the entity with whom defendants will enter into a binding agreement to license the Ticketmaster Host Platform.

V.      "Venue Owner" means a person or company that owns, operates, or manages one or more venues that host Live Entertainment Events.

W.      "Management" means all directors and officers of Defendants, or any other employee with management or supervisory responsibilities for Defendants' business or operations related to negotiating the provision of Primary Ticketing Services or the Provision of Live Entertainment Events.

Z.      "Relevant Employees" means Defendants' employees with responsibility for negotiating the provision of Primary Ticketing Services or the Provision of Live Entertainment Events.

### III. Applicability

A.      This Amended Final Judgment applies to Ticketmaster and Live Nation, as defined above, and all other persons in active concert or participation with any of them who receive actual notice of this Amended Final Judgment by personal service or otherwise.

B.      If, prior to complying with Sections IV and V of this Amended Final Judgment, Defendants sell or otherwise dispose of all or substantially all of their assets or of lesser business units that include the Divestiture Assets, they shall require the purchaser to be bound by the provisions of this Amended Final Judgment. Defendants need not obtain such an agreement from the Acquirers of the assets divested pursuant to this Amended Final Judgment.

### IV. Divestiture

A.      Defendants are ordered and directed not to consummate the Merger until they have entered into a binding agreement to license the Ticketmaster Host Platform to the Ticketmaster Host Platform Acquirer and to provide private label ticketing services to the Ticketmaster Host Platform Acquirer in a manner consistent with this Amended Final Judgment and with the following terms and conditions:

1.     The agreement shall include the option, exercisable at the discretion of the Ticketmaster Host Platform Acquirer, to acquire a non-exclusive, perpetual, fully-paid up license to the Ticketmaster Host Platform. The license shall include a copy of the source code of the Ticketmaster Host Platform and shall permit the Ticketmaster Host Platform Acquirer to modify the software in any manner without limitation and without any requirement to license back any improvements to Defendants. If the option is exercised, Defendants shall promptly begin the installation of a fully functional ticketing system and website in the facilities of the Ticketmaster Host Platform Acquirer and shall complete the installation within a reasonable time pursuant to a schedule subject to approval by the United States, after consultation with Plaintiff States. Defendants shall warrant that the system is current as of the time of installation and operational for use in providing Primary Ticketing Services. Defendants shall provide reasonable training and support to enable the Ticketmaster Host Platform Acquirer to operate the software and to understand the source code so that it can make independent changes to the code. The license shall permit the Ticketmaster Host Platform Acquirer to transfer the license following the complete installation of the Ticketmaster Host Platform. The scope of use of the license shall be at least the United States.

2.     The agreement shall include a private label ticketing agreement pursuant to which Ticketmaster shall provide private label ticketing services to the

Ticketmaster Host Platform Acquirer for a period of no more than five years from the date of execution of the license. The private label ticketing agreement shall be on such reasonable terms and conditions that will enable the Ticketmaster Host Platform Acquirer to compete effectively against Ticketmaster to secure contracts for the provision of Primary Ticketing Services. The private label ticketing agreement shall give the Ticketmaster Host Platform Acquirer all control over the ticketing fees charged individual consumers or clients of the Ticketmaster Host Platform Acquirer for tickets sold pursuant to the agreement and Defendants shall have no right or ability to set these ticketing fees. Ticketmaster shall, at the request of the Ticketmaster Host Platform Acquirer, post on the main Ticketmaster public website links to events sold under the private label ticketing agreement, subject to reasonable, non-discriminatory, and customary terms and conditions. Ticketmaster shall customize a separate website for the Ticketmaster Host Platform Acquirer with branding, look, and feel to be determined by the Ticketmaster Host Platform Acquirer. The private label ticketing services as described in this Section shall be operational within six months from the date that the binding agreement to license Ticketmaster Host Platform becomes effective.

B.      Defendants shall implement the Ticketmaster Host Platform binding agreement required by Section IV.A and any resulting Ticketmaster Host Platform license in a manner consistent with the terms of Section IV.A. Defendants shall comply with the terms of the Ticketmaster Host Platform binding agreement required by Section IV.A and any resulting

10

Ticketmaster Host Platform license, provided that nothing in the Ticketmaster Host Platform

binding agreement or resulting Ticketmaster Host Platform license can relieve Defendants of any

obligations imposed by this Amended Final Judgment.

C.      Defendants shall, as soon as possible, but within one business day after

completion of the relevant event, notify the United States and Plaintiff States of: (1) the effective

date of the Merger and (2) the effective date of the binding agreement to license to the

Ticketmaster Host Platform Acquirer.

D.      If the Ticketmaster Host Platform Acquirer exercises its option to license the

Ticketmaster Host Platform, Defendants shall waive any non-compete agreements that would

prevent any employee of Defendants whose primary responsibility is the development or

operation of the Ticketmaster Host Platform from joining the Ticketmaster Host Platform

Acquirer.

E.      Defendants are ordered and directed, concurrently with the closing of the Merger,

to enter into a Letter of Intent to divest Paciolan to Comcast-Spectacor in a manner consistent

with this Amended Final Judgment. Within sixty (60) calendar days of closing the Merger,

Defendants shall complete the divestiture of Paciolan in a manner consistent with this Amended

Final Judgment to Comcast-Spectacor or an alternative Acquirer acceptable to the United States,

in its sole discretion, after consultation with Plaintiff States. Defendants agree to use their best

efforts to divest the Divestiture Assets as expeditiously as possible.

F.      Defendants shall provide the United States and the Paciolan Acquirer information

relating to the personnel involved in the production, operation, development and sale of Paciolan

at any time since Ticketmaster acquired Paciolan to enable the Paciolan Acquirer to make offers

of employment. Defendants will not interfere with any negotiations by the Paciolan Acquirer to

employ any defendant employee whose primary responsibility is the production, operation, development, and sale of Paciolan, and shall waive any non-compete agreements that would prevent any such employee from joining the Paciolan Acquirer. Nothing in this Section shall prohibit defendants from making offers of continued employment to, continuing to employ, or continuing to use the services of any of their employees, including personnel involved in the production, operation, development and marketing of Paciolan and its ticketing system, subject to the overarching limitation that the agreement to sell Paciolan to the Paciolan Acquirer must ensure that the Paciolan Acquirer will be able to adequately staff Paciolan in a manner that enables the Paciolan Acquirer to successfully compete as a provider of Primary Ticketing Services, as determined by United States in its sole discretion. In addition, nothing in this Section shall prohibit defendants from maintaining any reasonable restrictions on the disclosure by an employee who accepts an offer of employment with the Paciolan Acquirer of the defendants' proprietary non-public information that is (1) not otherwise required to be disclosed by this Amended Final Judgment, (2) related solely to the defendants' businesses and clients, and (3) not related to the production, operation, development, and marketing of Paciolan and its ticketing system.

G.      Defendants shall permit the Paciolan Acquirer to have reasonable access to personnel and to make inspections of the physical facilities of Paciolan; access to any and all environmental, zoning, and other permit documents and information; access to any and all financial, operational, or other documents and information customarily provided as part of a due diligence process.

H.      Defendants shall warrant to the Paciolan Acquirer that each asset it acquires will be operational on the date of sale.

I.     Defendants shall warrant to the Paciolan Acquirer that there are no material

defects in the environmental, zoning, or other permits pertaining to the operation of Paciolan,

and that following the sale of Paciolan, defendants will not undertake, directly or indirectly, any

challenges to the environmental, zoning, or other permits relating to the operation of Paciolan.

J.     Defendants shall not take any action that will impede in any way the permitting,

operation, use, or divestiture of the Divestiture Assets.

K.     Unless the United States otherwise consents in writing, after consultation with

Plaintiff States, the divestitures pursuant to Section IV of this Amended Final Judgment shall

include the entire Divestiture Assets, and shall be accomplished in such a way as to satisfy the

United States, in its sole discretion, after consultation with Plaintiff States, that the Divestiture

Assets can and will be used by the Acquirer(s) as part of a viable, ongoing business, engaged in

providing Primary Ticketing Services. Divestiture of the Divestiture Assets may be made to one

or more Acquirers, provided that in each instance it is demonstrated to the sole satisfaction of the

United States, after consultation with Plaintiff States, that the Divestiture Assets will remain

viable and the divestiture of such assets will remedy the competitive harm alleged in the

Complaint. The divestitures, whether pursuant to Section IV or Section V of this Amended Final

Judgment,

      1.     shall be made to an Acquirer(s) that, in the United States's sole judgment,

          after consultation with Plaintiff States, has the intent and capability

          (including the necessary managerial, operational, technical and financial

          capability) of competing effectively in the business of providing Primary

          Ticketing Services; and

2.      shall be accomplished so as to satisfy the United States, in its sole

discretion, after consultation with Plaintiff States, that none of the terms of

any agreement between an Acquirer(s) and Defendants give Defendants

the ability unreasonably to raise the Acquirer's costs, to lower the

Acquirer's efficiency, or otherwise to interfere in the ability of the

Acquirer to compete effectively.

### V. Appointment of Trustee to Effect Divestiture

A.      If Defendants have not divested Paciolan as specified in Section IV.E, defendants

shall notify the United States of that fact in writing. Upon application of the United States, the

Court shall appoint a trustee selected by the United States and approved by the Court to divest

Paciolan in a manner consistent with this Amended Final Judgment. Defendants consent to

appointment of a trustee prior to entry of this Amended Final Judgment if Paciolan has not been

divested within the time periods provided in Section IV.E.

B.      After the appointment of a trustee becomes effective, only the trustee shall have

the right to sell Paciolan. The trustee shall have the power and authority to accomplish the

divestiture to an Acquirer acceptable to the United States, after consultation with Plaintiff States,

at such cash price and on such terms as are then obtainable upon reasonable effort by the trustee,

subject to the provisions of Sections IV, V, and VI of this Amended Final Judgment, and shall

have such other powers as this Court deems appropriate.

C.      Subject to Section V.E of this Amended Final Judgment, the trustee may hire at

the cost and expense of defendants any investment bankers, attorneys, or other agents, who shall

be solely accountable to the trustee, reasonably necessary in the trustee's judgment to assist in

the divestiture.

D.     Defendants shall not object to a sale by the trustee on any ground other than the trustee's malfeasance. Any such objections by defendants must be conveyed in writing to the United States and the trustee within ten (10) calendar days after the trustee has provided the notice required under Section VI.

E.     The trustee shall serve at the cost and expense of defendants, on such terms and conditions as the United States approves, and shall account for all monies derived from the sale of the assets sold by the trustee and all costs and expenses so incurred. After approval by the Court of the trustee's accounting, including fees for its services and those of any professionals and agents retained by the trustee, all remaining money shall be paid to defendants and the trust shall then be terminated. The compensation of the trustee and any professionals and agents retained by the trustee shall be reasonable in light of the value of Paciolan and based on a fee arrangement providing the trustee with an incentive based on the price and terms of the divestiture and the speed with which it is accomplished, but timeliness is paramount.

F.     Defendants shall use their best efforts to assist the trustee in accomplishing the required divestiture. The trustee and any consultants, accountants, attorneys, and other persons retained by the trustee shall have full and complete access to the personnel, books, records, and facilities of the business to be divested, including any information provided to the United States during its investigation of the merger related to the business to be divested, and defendants shall develop financial and other information relevant to such business as the trustee may reasonably request, subject to reasonable protection for trade secret or other confidential research, development, or commercial information. Defendants shall take no action to interfere with or to impede the trustee's accomplishment of the divestiture.

15

G.      After its appointment, the trustee shall file monthly reports with the United States, Plaintiff States, and the Court setting forth the trustee's efforts to accomplish the divestiture ordered under this Amended Final Judgment. To the extent such reports contain information that the trustee deems confidential, such reports shall not be filed in the public docket of the Court. Such reports shall include the name, address, and telephone number of each person who, during the preceding month, made an offer to acquire, expressed an interest in acquiring, entered into negotiations to acquire, or was contacted or made an inquiry about acquiring, any interest in Paciolan, and shall describe in detail each contact with any such person. The trustee shall maintain full records of all efforts made to divest Paciolan.

H.      If the trustee has not accomplished the divestiture ordered under this Amended Final Judgment within six (6) months after its appointment, the trustee shall promptly file with the Court a report setting forth (1) the trustee's efforts to accomplish the required divestiture, (2) the reasons, in the trustee's judgment, why the required divestiture has not been accomplished, and (3) the trustee's recommendations. To the extent such reports contain information that the trustee deems confidential, such reports shall not be filed in the public docket of the Court. The trustee shall at the same time furnish such report to the United States which shall have the right to make additional recommendations consistent with the purpose of the trust. The Court thereafter shall enter such orders as it shall deem appropriate to carry out the purpose of the Amended Final Judgment, which may, if necessary, include extending the trust and the term of the trustee's appointment by a period requested by the United States.

### VI. Notice of Proposed Divestiture

A.      Within two (2) business days following execution of a definitive divestiture agreement, defendants shall notify the United States and Plaintiff States of any proposed

divestiture required by Section IV of this Amended Final Judgment. Within two (2) business days following execution of a definitive divestiture agreement, the trustee shall notify the United States and Plaintiff States of any proposed divestiture required by Section V of this Amended Final Judgment. The notice shall set forth the details of the proposed divestiture and list the name, address, and telephone number of each person not previously identified who offered or expressed an interest in or desire to acquire any ownership interest in Paciolan, together with full details of the same.

B.      Within fifteen (15) calendar days of receipt by the United States and Plaintiff States of such notice, the United States may request from defendants, the proposed Acquirer(s), any other third party, or the trustee if applicable, additional information concerning the proposed divestiture, the proposed Acquirer(s), and any other potential Acquirer. Defendants and the trustee shall furnish any additional information requested within fifteen (15) calendar days of the receipt of the request, unless the parties shall otherwise agree.

C.      Within thirty (30) calendar days after receipt of the notice or within twenty (20) calendar days after the United States and Plaintiff States has been provided the additional information requested from defendants, the proposed Acquirer(s), any third party, and the trustee, whichever is later, the United States shall provide written notice to defendants and the trustee, if there is one, stating whether or not it objects to the proposed divestiture. If the United States, after consultation with Plaintiff States, provides written notice that it does not object, the divestiture may be consummated, subject only to defendants' limited right to object to the sale under Section V.C of this Amended Final Judgment. Absent written notice that the United States does not object to the proposed Acquirer(s) or upon objection by the United States, a divestiture proposed under Section IV or Section V shall not be consummated. Upon objection by

17

defendants under Section V.D, a divestiture proposed under Section V shall not be consummated unless approved by the Court.

## VII. Financing

Defendants shall not finance all or any part of any purchase made pursuant to Section IV or V of this Amended Final Judgment.

## VIII. Hold Separate

Until the divestiture required by this Amended Final Judgment has been accomplished, defendants shall take all steps necessary to comply with the Hold Separate Stipulation and Order entered by this Court. Defendants shall take no action that would jeopardize the divestiture ordered by this Court.

## IX. Anti-Retaliation Provision and Other Provisions Designed to Promote Competition

A.     Defendants shall not:

1.     Retaliate against a Venue Owner because it is known to Defendants that the Venue Owner is or is contemplating contracting with a company other than Defendants for Primary Ticketing Services;

2.     Condition or threaten to Condition the Provision of Live Entertainment Events to a Venue Owner based on that Venue Owner refraining from contracting with a company other than Defendants for Primary Ticketing Services; or. For the avoidance of doubt, this provision prohibits Defendants from threatening to withhold the Provision of Live Entertainment Events if a Venue decides to contract with a company other than Defendants for Primary Ticketing Services; or

3.  Condition or threaten to Condition the provision of Primary Ticketing Services to a Venue Owner based on that Venue Owner refraining from contracting with a company other than Defendants for the Provision of Live Entertainment Events.

For the avoidance of doubt, Section IX prohibits Defendants from Conditioning, Retaliating, or threatening to Condition with respect to the provision of one or more Live Entertainment Events. Live Nation waives any argument that this Amended Final Judgment only prohibits Retaliation or Conditioning with respect to all Live Nation content. Particular conduct may violate more than one provision of this Amended Final Judgment, e.g., Sections IX.A.1. and IX.A.2. of this Amended Final Judgment are not mutually exclusive.

Nothing in this Section prevents Defendants from bundling their services and products in any combination or from exercising their own business judgment in whether and how to pursue, develop, expand, or compete for any ticketing, venue, promotions, artist management, or any other business, so long as Defendants do so in a manner that is not inconsistent with the provisions of this Section.

Evidence that Defendants do or do not (a) bid for, contract with, win, or retain a venue, artist, or promoter as a client, and/or (b) promote a show or shows in particular buildings or group of buildings (even where similar shows historically have been promoted in those buildings) is not alone sufficient to establish, or create a presumption of, a violation of this Section. For the avoidance of doubt, Live Nation waives any argument that Plaintiffs must identify particular shows that have been withheld in order to prevail on a claim of Retaliation.

B.  Defendants shall not disclose to any Covered Employee any Client Ticketing Data. Defendants however: (1) may disclose Client Ticketing Data concerning a specific event to

any Covered Employee involved in the promotion of that event or the management of the artist who performed at that event, if it does so on the same terms it generally provides such information to other promoters or artist managers not affiliated with Defendants; (2) may disclose Client Ticketing Data to an Exempted Employee who requires the information in order to perform his or her job function(s); provided however, that such Exempted Employee may not use Client Ticketing Data to perform any job function(s) that primarily involve(s) the day-to-day operation or management of Defendants' venues, concert promotions, or artist management services; and (3) may disclose Client Ticketing Data to any Defendant employee where so required by law, government regulation, legal process, or court order, so long as such disclosure is limited to fulfillment of that purpose.

C.      If any client of Defendants' primary ticketing services chooses not to renew a contract for Primary Ticketing Services with Defendants for some or all of its venues, upon the expiration of that contract and the written request of the client, Defendants shall within forty-five (45) days provide the client with a complete copy of all Client Ticketing Data and all Ticket Buyer Data historically maintained by Defendants for such venue(s) in the ordinary course of business, in a form that is reasonably usable by the client. Nothing in this provision shall be read to: (1) alter any rights Defendants would otherwise have to Client Ticketing Data or Ticket Buyer Data pursuant to the Primary Ticketing Services contract with the client, and/or its historical custom, practice, and course of dealing with the client; or (2) limit any rights the client would otherwise have to its Client Ticketing Data or Ticket Buyer Data pursuant to the Primary Ticketing Services contract with Defendants and/or its historical custom, practice, and course of dealing with Defendants. Defendants shall maintain Client Ticketing Data and Ticket Buyer Data

on behalf of its clients for no less than three (3) years. This provision only applies to contracts for Primary Ticketing Services in effect prior to the entry of this Amended Final Judgment.

## X. Affidavits

A.    Within twenty (20) calendar days of the filing of the Complaint in this matter, and every thirty (30) calendar days thereafter until the divestitures have been completed under Section IV or Section V, defendants shall deliver to the United States and Plaintiff States an affidavit as to the fact and manner of its compliance with Section IV or Section V of this Amended Final Judgment. Each such affidavit shall include the name, address, and telephone number of each person who, during the preceding thirty (30) calendar days, made an offer to acquire, expressed an interest in acquiring, entered into negotiations to acquire, or was contacted or made an inquiry about acquiring, any interest in the Divestiture Assets, and shall describe in detail each contact with any such person during that period. Each such affidavit shall also include a description of the efforts defendants have taken to solicit buyers for the Divestiture Assets, and to provide required information to prospective Acquirers, including the limitations, if any, on such information. Assuming the information set forth in the affidavit is true and complete, any objection by the United States, after consultation with Plaintiff States, to information provided by defendants, including limitation on information, shall be made within fourteen (14) calendar days of receipt of such affidavit.

B.    Every two (2) months prior to the private label ticketing agreement described in Section IV.A.2 becoming operational, and every six (6) months thereafter, defendants shall deliver to the United States and Plaintiff States an affidavit that describes in reasonable detail all actions defendants have taken and all steps defendants have implemented on an ongoing basis to comply with Section IV.A and the terms of Ticketmaster Host Platform binding agreement.

C.      Defendants shall, in addition, deliver to the United States and Plaintiff States an affidavit describing any revised or amended agreements with the Ticketmaster Host Platform Acquirer relating to the agreement required by Section IV.A. Such notice shall be delivered to the United States and Plaintiff States at least fifteen (15) calendar days prior to the effective date of the revised or amended agreement and Defendants shall not implement any amended agreement if the United States, after consultation with Plaintiff States, objects during the fifteen (15) day notice period.

D.      Within twenty (20) calendar days of the filing of the Complaint in this matter, defendants shall deliver to the United States and Plaintiff States an affidavit that describes in reasonable detail all actions defendants have taken and all steps defendants have implemented on an ongoing basis to comply with Section VIII of this Amended Final Judgment. Defendants shall deliver to the United States and Plaintiff States an affidavit describing any changes to the efforts and actions outlined in defendants' earlier affidavits filed pursuant to this section within fifteen (15) calendar days after the change if implemented.

E.      Defendants shall keep all records of all efforts made to preserve and divest the Divestiture Assets until one year after such divestiture has been completed.

## XI. Compliance Inspection

A.      For purposes of determining or securing compliance with this Amended Final Judgment, or of determining whether the Amended Final Judgment should be modified or vacated, and subject to any legally recognized privilege, from time to time duly authorized representatives of the United States Department of Justice, including consultants and other persons retained by the United States, shall, upon written request of an authorized representative

of the Assistant Attorney General in charge of the Antitrust Division, and on reasonable notice to

defendants, be permitted:

    1.      access during defendants' office hours to inspect and copy, or at the option

of the United States, to require defendants to provide hard copy or

electronic copies of, all books, ledgers, accounts, records, data, and

documents in the possession, custody, or control of defendants, relating to

any matters contained in this Amended Final Judgment; and

    2.      to interview, either informally or on the record, defendants' officers,

employees, or agents, who may have their individual counsel present,

regarding such matters. The interviews shall be subject to the reasonable

convenience of the interviewee and without restraint or interference by

defendants.

B.      Upon the written request of an authorized representative of the Assistant Attorney

General in charge of the Antitrust Division, defendants shall submit written reports, under oath if

requested, relating to any of the matters contained in this Amended Final Judgment as may be

requested. Written reports authorized under this paragraph may, at the sole discretion of the

United States, require Defendants to conduct, at Defendants' cost, an independent audit or

analysis relating to any of the matters contained in this Amended Final Judgment.

C.      No information or documents obtained by the means provided in this section shall

be divulged by the United States to any person other than an authorized representative of the

executive branch of the United States, or the Attorney General's Office of any other plaintiff,

except in the course of legal proceedings to which the United States is a party (including grand

jury proceedings), or for the purpose of securing compliance with this <u>Amended</u> Final Judgment, or as otherwise required by law.

      D.     If at the time information or documents are furnished by defendants to the United States, defendants represent and identify in writing the material in any such information or documents to which a claim of protection may be asserted under Rule 26(c)(1)(G) of the Federal Rules of Civil Procedure, and defendants mark each pertinent page of such material, "Subject to claim of protection under Rule 26(c)(1)(G) of the Federal Rules of Civil Procedure," then the United States shall give defendants ten (10) calendar days' notice prior to divulging such material in any legal proceeding (other than a grand jury proceeding).

## XII. Notification

Unless such transaction is otherwise subject to the reporting and waiting period requirements of the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, 15 U.S.C. § 18a (the "HSR Act"), defendants, without providing advance notification to the United States and Plaintiff States, shall not directly or indirectly acquire any assets of or any interest, including any financial, security, loan, equity or management interest, in any person that, at any time during the twelve (12) months immediately preceding such acquisition, was engaged in the United States in providing Primary Ticketing Services during the term of this <u>Amended</u> Final Judgment.

Such notification shall be provided to the United States and Plaintiff States in the same format as, and per the instructions relating to the Notification and Report Form set forth in the Appendix to Part 803 of Title 16 of the Code of Federal Regulations as amended. Notification shall be provided at least thirty (30) calendar days prior to acquiring any such interest, and shall include, beyond what may be required by the applicable instructions, the names of the principal

24

representatives of the parties to the agreement who negotiated the agreement, and any

management or strategic plans discussing the proposed transaction. If within the 30-day period

after notification, representatives of the United States make a written request for additional

information, defendants shall not consummate the proposed transaction or agreement until

twenty (20) calendar days after submitting all such additional information. Early termination of

the waiting periods in this paragraph may be requested and, where appropriate, granted in the

same manner as is applicable under the requirements and provisions of the HSR Act and rules

promulgated thereunder. This Section shall be broadly construed and any ambiguity or

uncertainty regarding the filing of notice under this Section shall be resolved in favor of filing

notice.

For purposes of this Amended Final Judgment, any notice or other communication

required to be provided to Plaintiffs shall be sent to the person at the address and emails set forth

below (or such other addresses as a Plaintiff may specify in writing to Defendants):

United States
Owen Kendler
Chief
Media, Entertainment, and Professional Services Section
U.S. Department of Justice
Antitrust Division
450 Fifth Street, NW, Suite 4000
Washington, D.C. 20530
Owen.Kendler@usdoj.gov

Arizona
Unit Chief Counsel
Arizona Attorney General's Office
Antitrust Unit
2005 N. Central Ave.
Phoenix, AZ 85004
Dana.Vogel@azag.gov

Arkansas
Public Protection Department

Arkansas Office of the Attorney General
323 Center Street, Suite 200
Little Rock, Arkansas 72201
johnathan.carter@arkansasag.gov

California
Antitrust Law Section
State of California Department of Justice
300 S. Spring Street, Suite 1720
Los Angeles, CA  90013
Paula.Gibson@doj.ca.gov

Florida
Antitrust Division
Office of the Attorney General of Florida
The Capitol PL-01
Tallahassee, FL 32399-1050
lee.istrail@myfloridalegal.com

Illinois
Antitrust Bureau
Office of the Illinois Attorney General
100 W Randolph St., Floor 13
Chicago, IL, 60601-3397
JChervin@atg.state.il.us

Iowa
Max M. Miller
Consumer Protection Division
Office of the Iowa Attorney General
1305 E. Walnut St.
Des Moines, IA 50319
Max.Miller@ag.iowa.gov

Louisiana
Stacie Lambert deBlieux
Chief, Complex Litigation Section
Louisiana Department of Justice
1885 N. 3rd Street
Baton Rouge, LA 70802
deblieuxs@ag.state.la.us

Massachusetts
Chief, Antitrust Division
Massachusetts Office of the Attorney General
One Ashburton Place, 18th Floor

Boston, MA 02108
michael.mackenzie@state.ma.us

Nebraska
Chief, Consumer Protection Division
Nebraska Attorney General's Office
2115 State Capitol Building
Lincoln, NE 68509
meghan.stoppel@nebraska.gov

Nevada
Bureau of Consumer Protection
Office of the Nevada Attorney General
8945 W. Russell Road, Suite 204
Las Vegas, Nevada 89148
LTucker@ag.nv.gov

New Jersey
Consumer Fraud Prosecution Section
Department of Law & Public Safety – Division of Law
State of New Jersey Office of the Attorney General
124 Halsey Street, P.O. Box 45029
Newark, New Jersey 07101
patricia.schiripo@law.njoag.gov

Ohio
Chief
Antitrust Section
Ohio Attorney General's Office
150 East Gay Street, 22nd Floor
Columbus, Ohio 43215
jennifer.pratt@ohioattorneygeneral.gov

Oregon
Civil Enforcement Division
Oregon Department of Justice
1162 Court St NE, Salem, OR 97301-4096
Tim.D.Nord@doj.state.or.us

Pennsylvania
Commonwealth of Pennsylvania
Office of Attorney General
Antitrust Section
Strawberry Square, 14th Floor
Harrisburg, PA 17120
jbetsko@attorneygeneral.gov

Rhode Island
Chief, Civil Division
Rhode Island Office of the Attorney General
150 South Main Street
Providence, RI 02903
KHoffmann@riag.ri.gov

Tennessee
Deputy, Consumer Protection Division
Office of Tennessee Attorney General
P.O. Box 20207
Nashville, TN  37202
David.McDowell@ag.tn.gov

Texas
Division Chief
Antitrust Division
Office of the Texas Attorney General
300 W. 15th Street
Austin, Texas 78701
David.Ashton@oag.texas.gov

Wisconsin
Unit Director
Division of Legal Services – Public Protection Unit
State of Wisconsin Department of Justice
17 West Main Street
PO Box 7857
Madison, WI 53707-7857
CooleyGJ@DOJ.STATE.WI.US

Washington
Paula Pera C.
Assistant Attorney General, Antitrust Division
Washington State Office of the Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
paula.pera@atg.wa.gov

## XIII. No Reacquisition

A.     Defendants may not reacquire any part of the Divestiture Assets during the term

of this Amended Final Judgment.

28

B.      Following the expiration of the private label ticketing agreement with the

Ticketmaster Host Platform Acquirer required by Section IV.A.2: (1) Defendants shall not

provide Primary Ticketing Services to any venues in North America for which, by virtue of an

ownership interest, the Ticketmaster Host Platform Acquirer controls the rights to select the

Primary Ticketing Services provider; and (2) for all other venues in North America, Defendants

shall not provide Primary Ticketing Services on behalf of or pursuant to a ticketing contract with

the Ticketmaster Host Platform Acquirer. Nothing in this Section shall prevent Defendants from:

(1) competing to provide Primary Ticketing Services to venues (including such venues managed

by the Ticketmaster Host Platform Acquirer) other than those for which, by virtue of an

ownership interest, the Ticketmaster Host Platform Acquirer controls the rights to select the

Primary Ticketing Services provider; and (2) providing Primary Ticketing Services to artist fan

clubs in venues owned, operated, or managed by the Ticketmaster Host Platform Acquirer.

## XIV. Retention of Jurisdiction

This Court retains jurisdiction to enable any party to this Amended Final Judgment to

apply to this Court at any time for further orders and directions as may be necessary or

appropriate to carry out or construe this Amended Final Judgment, to modify any of its

provisions, to enforce compliance, and to punish violations of its provisions.

## XV. Expiration of Amended Final Judgment

~~Unless this Court grants an extension, this Final Judgment shall expire ten years from the~~

~~date of its entry.~~

Sections I, II, III, IX, XI, XII, XIII.A., XIV, XV, XVI, XVII, XVIII, and XIX of this

Amended Final Judgment are extended and shall expire on December 31, 2025, unless the Court

grants further extension. All other provisions in this Amended Final Judgment shall expire on July 30, 2020.

## XVI. Public Interest Determination

Entry of this Amended Final Judgment is in the public interest. The parties have previously complied with the requirements of the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16, including making copies available to the public of this Final Judgment, entered by the Court on July 30, 2010 (the "2010 Final Judgment"), the Competitive Impact Statement, and any comments thereon and the United States' responses to comments. Based upon the record before the Court, which includes the Competitive Impact Statement and any comments and response to comments filed with the Court, entry of this entry of this Amended Final Judgment is in the public interest.

## XVII. Compliance Provisions

A.      Appointment of an Independent Monitoring Trustee

1.      Upon application of the United States, after consultation with Plaintiff States, the Court will appoint an independent Monitoring Trustee selected by the United States, after consultation with Defendants, and approved by the Court.

2.      The Monitoring Trustee will have the power and authority to monitor Defendants' compliance with the terms of this Amended Final Judgment and will have other powers as the Court deems appropriate. If the Monitoring Trustee determines that any violation of this Amended Final Judgment has occurred, the Monitoring Trustee shall promptly

recommend an appropriate remedy to the United States, which, in its sole discretion, after consultation with Plaintiff States, can accept, modify, or reject a recommendation to pursue a remedy.

3.    Defendants may not object to actions taken by the Monitoring Trustee in fulfillment of the Monitoring Trustee's responsibilities pursuant to this Amended Final Judgment or any other Order of the Court on any ground other than malfeasance by the Monitoring Trustee.  Objections by Defendants to actions taken by the Monitoring Trustee must be conveyed in writing to the United States and the Monitoring Trustee within ten calendar days of the Monitoring Trustee's action that gives rise to Defendants' objection.

4.    The Monitoring Trustee will serve at the cost and expense of Defendants as detailed in a written agreement, on terms and conditions, including terms and conditions governing confidentiality requirements and conflict-of-interest certifications, that are approved by the United States after consultation with Defendants.

5.    The Monitoring Trustee may hire, at the cost and expense of Defendants, agents or consultants, including investment bankers, attorneys, and accountants, reasonably necessary in the Monitoring Trustee's judgment to assist with the Monitoring Trustee's duties. Agents or consultants will be accountable solely to the Monitoring Trustee and will serve on terms and conditions, including terms and conditions governing confidentiality

requirements and conflict-of-interest certifications, that are approved by
the United States after consultation with Defendants.

6.      The compensation of the Monitoring Trustee and agents or consultants
retained by the Monitoring Trustee must be on reasonable and customary
terms commensurate with the individuals' experience and responsibilities.
If the Monitoring Trustee and Defendants are unable to reach agreement
on the Monitoring Trustee's compensation or other terms and conditions
of engagement within twenty-one calendar days of the appointment of the
Monitoring Trustee, the United States, in its sole discretion, may take
appropriate action, including by making a recommendation to the Court.
Within three business days of hiring an agent or consultant, the
Monitoring Trustee must provide written notice of the hiring and the rate
of compensation to Defendants and the United States.

7.      The Monitoring Trustee must account for all costs and expenses incurred.

8.      Defendants must use their best efforts to assist the Monitoring Trustee to
monitor Defendants' compliance with their obligations under this
Amended Final Judgment. The Monitoring Trustee and agents or
consultants retained by the Monitoring Trustee must, subject to protections
for trade secrets, other confidential research, development, or commercial
information, and any applicable privileges, have full and complete access
to all personnel, books, records, and facilities relating to compliance with
this Amended Final Judgment. Defendants may not take any action to

interfere with or to impede the Monitoring Trustee's accomplishment of its responsibilities.

9.     The Monitoring Trustee must investigate and report on Defendants' compliance with this Amended Final Judgment.  The Monitoring Trustee must provide periodic reports to Plaintiffs setting forth Defendants' efforts to comply with Defendants' obligations under this Amended Final Judgment.  The United States, in its sole discretion, will set the frequency of the Monitoring Trustee reports.

10.     The Monitoring Trustee will serve until the expiration of this Amended Final Judgment.

11.     If the United States, after consultation with Plaintiff States, determines that the Monitoring Trustee is not acting diligently or in a reasonably cost-effective manner, the United States may recommend that the Court appoint a substitute.

B.     Antitrust Compliance Officer.

1.     Within twenty-one days of entry of this Amended Final Judgment, Defendants shall appoint an Antitrust Compliance Officer who is an internal employee or officer of one of Defendants, and identify to Plaintiffs the Antitrust Compliance Officer's name, business address, telephone number, and email address. Within forty-five days of a vacancy in the Antitrust Compliance Officer position, Defendants shall appoint a replacement, and shall identify to Plaintiffs the replacement Antitrust Compliance Officer's name, business address, telephone number, and

email address. In all events, Defendants' appointment of any Antitrust

Compliance Officer is subject to the approval of the United States, in its

sole discretion.

2.     The Antitrust Compliance Officer shall have the following minimum

qualifications:

a.     be an active member in good standing of the bar in any U.S.

jurisdiction; and

b.     have at least five years' experience in legal practice, including

experience with antitrust, regulatory or compliance matters.

3.     The Antitrust Compliance Officer shall, directly or through the employees

or counsel working under the Antitrust Compliance Officer's authority

and direction:

a.     Within twenty-one days after the Antitrust Compliance Officer's

appointment, furnish to all of Defendants' Management and Relevant

Employees a copy of this Amended Final Judgment;

b.     Within thirty days after the Antitrust Compliance Officer's

appointment, in a manner to be devised by Defendants and approved by the

United States, provide Defendants' Management and Relevant Employees

reasonable notice of the meaning and requirements of this Amended Final

Judgment;

c.     Twice during the first year, then annually thereafter, brief

Defendants' Management and Relevant Employees on the meaning and

requirements of this Amended Final Judgment, with written materials for each briefing to be approved by the United States in its sole discretion;

d.      Brief any person who succeeds a person identified as Management or a Relevant Employee within sixty days of such succession;

e.      Obtain from each person designated as Management or a Relevant Employee, within thirty days of that person's receipt of this Amended Final Judgment, a certification that the person (i) has read and understands and agrees to abide by the terms of this Amended Final Judgment; (ii) is not aware of any violation of this Amended Final Judgment that has not been reported to Defendants; and (iii) understands that failure to comply with this Amended Final Judgment may result in an enforcement action for civil or criminal contempt of court; and

f.      Annually communicate to Defendants' Management and Relevant Employees that they may disclose to the Antitrust Compliance Officer or Monitoring Trustee, without reprisal or adverse consequence for such disclosure, information concerning any violation or potential violation of this Amended Final Judgment or the U.S. antitrust laws by Defendants.

C.      Venue Disclosure. Defendants shall provide notice and a copy of this Amended Final Judgment, in a form and manner to be proposed by Defendants and approved by the United States in its sole discretion, to: (1) every Venue Owner for whom Ticketmaster provides Primary Ticketing Services, or with whom Ticketmaster is negotiating or discussing the provision of Primary Ticketing Services, within thirty days of entry of this Amended Final Judgment; and (2) every Venue Owner at the beginning of any negotiation with Ticketmaster and/or Live Nation

related in whole or in part to Primary Ticketing Services. Defendants shall provide Plaintiffs with its proposed notice, including the list of recipients, within ten days of the filing of this Amended Final Judgment. The notice shall include an explanation of the requirements of Section IX of this Amended Final Judgment, a statement encouraging Venue Owners to contact the Department of Justice and any Plaintiff State if they are or become aware of any potential violations of this Amended Final Judgment, and a statement waiving any contractual obligation the venue may have to provide notice to Live Nation or Ticketmaster about any such contacts.

    D.    Reporting, Investigation, and Certification Requirements

        1.    Defendants shall:

            a.    Upon Management or the Antitrust Compliance Officer learning of any violation or potential violation of any provision of this Amended Final Judgment, (i) promptly notify the Monitoring Trustee and take appropriate action to investigate, and in the event of a violation, terminate or modify the activity so as to comply with this Amended Final Judgment, (ii) maintain all documents related to any violation or potential violation of this Amended Final Judgment for a period of five years or the duration of this Amended Final Judgment, whichever is shorter, and (iii) maintain, and furnish to Plaintiffs upon request, a log of (a) all such documents for which Defendants claim protection under the attorney-client privilege or the attorney work product doctrine, and (b) all potential and actual violations, even if no documentary evidence regarding the violations exist;

            b.    Within seven days of Management or the Antitrust Compliance Officer learning of any violation or potential violation of any

provision of this Amended Final Judgment, notify Plaintiffs and the Monitoring Trustee of the violation or potential violation;

       c.     Within thirty days of Management or the Antitrust Compliance Officer learning of any violation or potential violation of any provision of this Amended Final Judgment, provide to Plaintiffs and the Monitoring Trustee a statement describing the violation or potential violation, which shall include a description of any communications constituting the violation or potential violation, including the date and place of the communication, the persons involved, and the subject matter of the communication;

       d.     Establish a whistleblower protection policy, which provides that any employee may disclose, without reprisal or adverse consequence for such disclosure, to the Antitrust Compliance Officer or the Monitoring Trustee information concerning any violation or potential violation by the Defendants of this Amended Final Judgment or the U.S. antitrust laws;

       e.     Have Live Nation's CEO certify in writing to Plaintiffs 180 days after entry of this Amended Final Judgment, and thereafter annually on the anniversary date of the entry of this Amended Final Judgment, that Defendants have complied with the provisions of this Amended Final Judgment; and

       f.     Maintain and produce to Plaintiffs upon request: (i) a list identifying all employees having received the compliance training required under Sections XVII.B.3.c and XVII.B.3.d of this Amended Final Judgment, and the dates on which the employees received the training; and (ii) copies of

all materials distributed as part of the annual antitrust compliance training required under XVII.B.3.c and XVII.B.3.d of this Amended Final Judgment. For all materials requested to be produced pursuant to this paragraph for which Defendants claim protection under the attorney-client privilege or the attorney work product doctrine, Defendants shall furnish to Plaintiffs a privilege log.

### XVIII. Future Enforcement

A.      In any future civil contempt action, any motion to show cause, or any similar civil action brought by any Plaintiff regarding an alleged violation of this Amended Final Judgment, Plaintiff(s) may establish a violation of this Amended Final Judgment and the appropriateness of any remedy therefor by a preponderance of the evidence.

B.      This Amended Final Judgment should be interpreted to give full effect to the procompetitive purposes of the antitrust laws and to restore all competition Plaintiffs alleged was harmed by the challenged conduct in this Amended Complaint. Defendants agree that they may be held in contempt of, and that the Court may enforce, any provision of this Amended Final Judgment that, as interpreted by the Court in light of these procompetitive principles and applying ordinary tools of interpretation, is stated specifically and in reasonable detail, whether or not it is clear and unambiguous on its face. In any such interpretation, the terms of this Amended Final Judgment should not be construed against either party as the drafter.

C.      Defendants will pay a penalty of $1,000,000 per violation of each enumerated paragraph of Section IX, as modified, payable to the United States of America. For the avoidance of doubt, a single violation for purposes of calculating this penalty refers to any and all conduct prohibited by this Amended Final Judgment that occurs in relation to a Venue Owner's ticketing contract cycle, except that a violation of Section IX.A.1. shall be deemed a separate violation than

a violation of Section IX.A.2. and will be subject to a separate penalty. If, for example, there are multiple threats to Condition during the same contracting cycle, Live Nation would pay $1,000,000. If, for example, there are multiple threats to Condition and Live Nation Retaliates during the same contracting cycle, Live Nation would pay $2,000,000. For the avoidance of doubt, for these purposes, a new ticketing contract cycle begins when the previous contract is signed such that a ticketing contract cycle exists at all times for each Venue Owner.

D.     For a period of four years following the expiration of this Amended Final Judgment, if any Plaintiff has evidence that a Defendant violated this Amended Final Judgment before expiration, any Plaintiff may file an action against that Defendant in this Court requesting that the Court order (1) Defendant to comply with the terms of this Amended Final Judgment for an additional term of at least four years following the filing of the enforcement action under this Section, (2) any appropriate contempt remedies, (3) an extension of this Amended Final Judgment, (4) any additional relief needed to ensure the Defendant complies with the terms of this Amended Final Judgment, and (5) fees or expenses.

E.     For future disputes regarding Defendants' compliance with the terms of this Amended Final Judgment, the parties may agree that any such dispute may be referred to a third-party arbiter.

## XIX. Fees and Costs

Defendants shall pay the United States its reasonable costs and attorney fees incurred in investigating Defendants' conduct and in connection with its investigation of violation of the 2010 Final Judgment, in an amount of $3 million, to be paid within 60 days of entry of this Amended Final Judgment.

Date: ——30 July 2010——

39

Court approval subject to procedures of the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16.

~~/s/ Rosemary M.~~

~~Collyer~~_____

United States District Judge

For Opinion See 2010-2 Trade Cases P 77113

United States District Court, District of Columbia.
UNITED STATES OF AMERICA, et al., Plaintiffs,
v.
TICKETMASTER ENTERTAINMENT, INC. and Live Nation, Inc., Defendants.
No. 110-cv-00139.
January 25, 2010.

Assign. Date: 1/25/2010
Description: Antitrust

Competitive Impact Statement

Aaron D. Hoag, Attorney, U.S. Department of Justice, Antitrust Division, 450 Fifth Street, N.W., Suite 4000, Washington D.C 20530, Telephone: (202) 514-5038, Fax: (202) 514-7038, Email: aaron.hoag@usdoj.gov.

Assigned to: Collyer, Rosemary M.

Plaintiff United States of America ("United States"), pursuant to Section 2(b) of the Antitrust Procedures and Penalties Act ("APPA" or "Tunney Act"), 15 U.S.C. § 16(b)-(h), files this Competitive Impact Statement relating to the proposed Final Judgment submitted for entry in this civil antitrust proceeding.

## I. NATURE AND PURPOSE OF THE PROCEEDING

Defendant Ticketmaster Entertainment, Inc. ("Ticketmaster") and Defendant Live Nation, Inc. ("Live Nation") entered into an agreement, dated February 10, 2009, pursuant to which they would merge into a new entity to be known as Live Nation Entertainment. The United States, and the States of Arizona, Arkansas, California, Florida, Illinois, Iowa, Louisiana, Nebraska, Nevada, Ohio, Oregon, Rhode Island, Tennessee, Texas, and Wisconsin, and the Commonwealths of Massachusetts and Pennsylvania filed a civil antitrust Complaint on January 25, 2010, seeking to enjoin the proposed transaction because its likely effect would be to lessen competition substantially for primary ticketing services to major concert venues located in the United States in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18. This loss of competition likely would result in higher prices for and less innovation in primary ticketing services.

At the same time the Complaint was filed, the United States also filed a Hold Separate Stipulation and Order ("Hold Separate") and proposed Final Judgment, which are designed to eliminate the anticompetitive effects of the acquisition. Under the proposed Final Judgment, which is explained more fully below, Defendants are required to grant a perpetual license to their Host platform and to divest their entire Paciolan business in order to establish two independent ticketing companies capable of competing effectively with the merged entity. The Final Judgment also prohibits Defendants from engaging in certain conduct that would prevent equally efficient firms from competing effectively. Under the terms of the Hold Separate, Ticketmaster will take certain steps to ensure that the Paciolan business is operated as a competitively independent, economically viable and ongoing business concern that will remain independent and uninfluenced by the consummation of the transaction and to ensure that competition is maintained during the pendency of the ordered divestiture.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

The United States and Defendants have stipulated that the proposed Final Judgment may be entered after compliance with the APPA. Entry of the proposed Final Judgment would terminate this action, except that the Court would retain jurisdiction to construe, modify, or enforce the provisions of the proposed Final Judgment and to punish and remedy violations thereof.

## II. DESCRIPTION OF THE EVENTS GIVING RISE TO THE ALLEGED VIOLATION

### A. The Concert Industry

Staging concerts traditionally has required the participation of several parties. *Artists* provide the entertainment that makes the concert possible. *Managers* and/or *agents* represent artists in negotiations to establish the commercial terms on which artists will perform. Promoters contract with artists to perform at particular concerts, assume the financial risk of staging the concerts, make the arrangements for the concerts to occur at certain times and places, and market the concerts. *Venues* are the physical locations where concerts occur, and venues' owners, operators, or managers usually arrange for the sale of tickets to concerts at their venues. *Primary ticketing companies* provide services - such as websites, call centers, and retail networks from which tickets may be purchased - that facilitate the initial sale of tickets to concertgoers.[FN1]

> FN1. After their initial sale, concert tickets may be resold on the secondary ticketing market. *Ticket brokers purchase* tickets with the intention of reselling them to concertgoers. *Secondary ticketing companies* provide services that facilitate the resale of tickets to concertgoers by ticket brokers and others.

Contracts between venues and primary ticketing companies are individually negotiated. In a typical contract, a venue agrees to use one primary ticketing company as its exclusive service provider for several years. In exchange, the primary ticketing company often agrees to pay to the venue a portion of the fees that the primary ticketing company charges to concertgoers who purchase tickets to events at the venue. The primary ticketing company also may agree to pay an up-front bonus or advance upon execution of the contract. Primary ticketing contracts typically prohibit venues from reselling the primary ticketing services they receive.

### B. The Defendants and the Proposed Transaction

Ticketmaster is the largest primary ticketing company in the United States. In 2008, Ticketmaster earned gross revenues of about $800 million from its U.S. primary ticketing business. Ticketmaster offers two principal primary ticketing products to venues: (1) Host, a Ticketmaster-managed platform for selling tickets through Ticketmaster's website and other sales channels; and (2) Paciolan, a venue-managed platform for selling tickets through the venue's own website and other sales channels. In 2008, Ticketmaster provided primary ticketing services to venues representing more than 80% of major concert venues.[FN2] In addition to its primary ticketing operations, Ticketmaster expanded into the artist management business in 2008 by acquiring a controlling interest in Front Line Management Group Inc. ("Front Line"), an important artist management firm with clients such as the Eagles, Neil Diamond, Jimmy Buffett, Christina Aguilera and John Mayer.

> FN2. While the conclusions reached in the antitrust analysis described below are not sensitive to the precise number of venues included within this class, for purposes of this Competitive Impact Statement, "major concert venues" are the 500 U.S. venues generating the greatest concert revenues in 2008, as reported in Pollstar, a leading source of concert industry information. Concert ticket revenues from events at these venues represent more than 90% of the concert ticket revenues at all venues reported in Pollstar. Major concert venues are a diverse group, which includes large stadiums and arenas with relatively few concerts (*e.g.*, the Verizon Center in Washington, DC), mid-sized amphitheaters that host concerts regularly during certain seasons (*e.g.*, Nissan Pavilion in Bristow, VA), and smaller clubs and theaters with frequent concerts

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

throughout the year (*e.g.*, Warner Theatre in Washington, DC and Live Nation's House of Blues clubs). To account for this diversity, venues are weighted by their capacity in calculating shares of the market for primary ticketing services to major concert venues. Only public sources of information were used to calculate the market shares described in this Competitive Impact Statement

Live Nation is the largest concert promoter in the United States, earning more than $1.3 billion in revenue from its U.S. promotions business in 2008 and promoting shows representing 33% of the concert revenues at major concert venues in 2008. Live Nation has entered long-term partnerships with several popular artists - including Madonna and Jay-Z - to exclusively promote their concerts, sell recordings of their music, and market artist-branded merchandise such as T-shirts. Live Nation also owns or operates about 70 major concert venues throughout the United States. And as explained further below, Live Nation entered the market for primary ticketing services in late December 2008.

On February 10, 2009, less than two months after its entry into primary ticketing, Live Nation agreed to merge with Ticketmaster. That proposed transaction would substantially lessen competition and is the subject of the Complaint and proposed Final Judgment filed by the United States in this matter.

### C. The Market for Primary Ticketing Services to Major Concert Venues in the United States

Antitrust law, including Section 7 of the Clayton Act, protects consumers from anticompetitive conduct, such as firms' acquisition of the ability to raise prices above levels that would prevail in a competitive market. Market definition assists antitrust analysis by focusing attention on the relevant portions of the economy where competitive effects are likely to be felt. Well-defined markets encompass the economic actors - including both sellers and buyers whose conduct most strongly influences the nature and magnitude of competitive effects. To ensure that antitrust analysis takes account of a broad enough set of products to evaluate whether a transaction is likely to lead to a substantial lessening of competition, defining relevant markets in horizontal merger cases frequently begins by identifying a collection of products or set of services over which a hypothetical monopolist profitably could impose a small but significant and non-transitory increase in price. Here, the United States's investigation revealed that major concert venues would have no alternatives to primary ticketing services if prices were to rise significantly above the levels that would have prevailed but for the proposed transaction, so the hypothetical-monopolist test would exclude all other products or services from the relevant market. But that is not the end of the market-definition exercise.

When sellers are unable to set different terms of sale for different buyers, all buyers will face similar competitive effects, and a relevant product market properly (if implicitly) encompasses not only all sellers of the relevant product, but all buyers as well. But when different buyers may experience different competitive effects, a well-defed product market encompassing fewer than all buyers can focus antitrust analysis appropriately on those buyers most vulnerable to suffering probable and significant competitive harm. It also avoids conflating in that analysis those buyers whose prices are likely to be significantly affected with others who are unlikely to be harmed substantially.

One situation in which different buyers experience different effects involves price discrimination, such as when sellers are able to charge different prices to different buyers for equivalent products. Sellers can price discrinate when they are able to identify and target vulnerable buyers for price increases and when buyers facing low prices cannot resell to those facing higher prices. Both conditions are present here. Venues and primary ticketing companies individually negotiate their contracts, and the terms of those contracts typically make it impossible for venues to resell (arbitrage) primary ticketing services.

Because primary ticketing companies can price discriminate among different venues, the proposed transaction could affect different classes of venues differently, and antitrust analysis requires attention to those venues with few alternative primary ticketing providers to Ticketmaster and Live Nation because, if the proposed transaction were consummated, their real-world choices would be reduced differently than would be other venues' options.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Major concert venues require more sophisticated primary ticketing services than other venues, so each tends to select a primary ticketing company with an established reputation for providing good service to similar venues. Ticketmaster has shown that its primary ticketing platform is able to withstand the heavy transaction volume associated with the first hours when tickets to popular concerts become available to concertgoers ("high-volume on-sales "), offer integrated marketing capabilities, and otherwise provides proven, high-quality service to venues. When the proposed transaction was announced, Live Nation was building experience selling tickets to concerts at its own venues as a way to demonstrate to other venues that its primary ticketing platform also performed well. No primary ticketing company other than Ticketmaster and Live Nation has amassed or likely could have amassed in the near term sufficient scale to develop a reputation for successfully delivering similarly sophisticated primary ticketing services. Additionally, Live Nation planned to compete for primary ticketing contracts with major concert venues, but had less interest in serving non-concert venues outside its historically core concert expertise. Because they would have no equally attractive alternative primary ticketing provider to the merged firm, and because they would have benefited more from competition between Ticketmaster and Live Nation, major concert venues are more vulnerable than smaller venues to anticompetitive harms caused by the proposed transaction, and a well-defined relevant market should not encompass customers other than major concert venues. For example, a high school that hires a student to sell tickets to one of its musical productions could be said to be buying "primary ticketing services," but the relevant market can exclude such other venues because there is no significant risk that sales to them would affect Defendants' ability to exercise market power over major concert venues.

Antitrust analysis also must consider the geographic dimensions of competition. Section 7 protects against harm to competition "in any section of the country." 15 U.S.C. § 18. Here, domestic anticompetitive harms would be experienced by major concert venues located throughout the United States. Because the merged firm could price disiminate, any effects of the proposed transaction on foreign venues would be distinct from any effects on domestic venues. Thus, including only major concert venues located in the United States within the relevant market poses no risk of omitting buyers whose inclusion would significantly alter the antitrust analysis.[FN3]

> FN3. In this case, there are not significant transportation costs associated with the relevant services, so sellers' locations do little to inform the market-definition inquiry, though they are not irrelevant to antitrust analysis. To the contrary, only sellers capable of serving major concert venues located in the United States can compete with Defendants in the relevant market. Many of those sellers are located within the United States, but some are foreign firms, as suggested by Live Nation adaptation of a European primary ticketing platform for use in the United States, which is discussed below. Foreign sellers historically have not competed effectively in the United States because of the significant investments required to enter the domestic market. Still, Live Nation'S example suggests that, with a significant investment of time and money, foreign primary ticketing companies might be capable of adapting their products for U.S. customers.

In short, the sale of primary ticketing services to major concert venues in the United States is a well-defined relevant market for the purpose of analyzing the effects of the proposed transaction.

### D. The Competitive Effects of the Proposed Transaction

Until 2009, Ticketmaster dominated the market for primary ticketing services to major concert venues in the United States with greater than 80% market share. The only other primary ticketing companies with greater than a 1% share in 2008 were Tickets.com (4%), Front Gate Tickets (3%), New Era Tickets (2%), Live Nation (2%),[FN4] and Tessitura (1%). Ticketmaster's largest customer for primary ticketing services was Live Nation, the owner or operator of venues representing about 15% of capacity at all major concert venues in the United States in 2008. Ticketmaster renews its primary ticketing contracts at a very high rate. Even though Ticketmaster's distribution costs have declined dramatically as concertgoers have shifted their purchases toward the internet and away from traditional sales channels, the ticketing fees retained by Ticketmaster have not fallen, and Ticketmaster has continued to enjoy large profit margins on its primary ticketing business for many years.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

These margins have persisted because they are protected by high barriers to other companies successfully, substantially, and profitably entering or attempting to expand in the market for primary ticketing services to major concert venues. First, the platforms required to provide primary ticketing services to major concert venues are technologically complicated and expensive to develop and deploy. Second, major concert venues are reluctant to enter long-term exclusive contracts with new primary ticketing companies because they lack Ticketmaster's established reputation for capably handling high-volume on-sales and providing high-quality service to venues. Third, the costs of installing and training employees to use new equipment make it expensive for venues to switch between primary ticketing companies. Fourth, because there are high fixed costs to develop and maintain a primary ticketing platform, entrants struggle to obtain sufficient scale to compete successfully with Ticketmaster on price. Fifth, Ticketmaster's scale provides another important incumbent advantage over other firms- extensive data about individual concertgoers collected over many years. Ticketmaster can use that data as a powerful marketing tool to secure venue contracts for primary ticketing services. Sixth, Ticketmaster's practice of signing long-term exclusive contracts with venues limits how quickly other firms can amass sufficient scale to compete effectively with Ticketmaster on any of these dimensions.

> FN4. Before 2009, by virtue as its position as a promoter, Live Nation received roughly 10% of the tickets to concerts it promoted, and it sold those tickets to concertgoers through its MusicToday subsidiary and a platform licensed from eTix. Live Nation also used the MusicToday platform to provide primary ticketing services to a few small venues.

By 2008, Ticketmaster's longstanding dominance faced a major threat. Live Nation was better positioned to overcome the entry barriers discussed above than any other existing or potential competitor because it could achieve sufficient scale to compete effectively with Ticketmaster simply by ticketing its own venues. Live Nation also possessed a unique competitive advantage in that it could bundle access to important concerts with its ticketing service. Recognizing Live Nation's potential to disrupt its dominant position in the market for primary ticketing services, Ticketmaster attempted to renew Live Nation's primary ticketing contract before its December 31, 2008 expiration. But Live Nation instead chose to license technology from CTS Eventim AG ("CTS") that would enable it to sell concert tickets to its own venues beginning in 2009 and to compete with Ticketmaster for other venues' primary ticketing contracts in the future.

This competition began even before Live Nation's contract with Ticketmaster expired. On September 11, 2008, Live Nation announced that SMG - the largest venue management company in the United States, with the ability to control or influence the selection of primary ticketing companies at more than 40 major concert venues - had agreed to use Live Nation's primary ticketing services, if Live Nation could provide a primary ticketing platform comparable to other leading primary ticketing companies. SMG was Ticketmaster's third largest customer (behind only Live Nation and Anschutz Entertainment Group, Inc.), but it switched to Live Nation because SMG expected that, if it used Live Nation's primary ticketing services, Live Nation would use its strength in promotions to bring more concerts to SMG-managed venues. On October 14, 2008, Live Nation announced that it would provide primary ticketing services to New York City's Roseland Ballroom, another former Ticketmaster client. By 2009, Live Nation provided primary ticketing services to more than 15% of the capacity at major concert venues in the United States.

Ticketmaster responded to competition from Live Nation in several ways. First, it offered more attractive renewal terms to customers with expiring contracts than it had customarily offered in order to lock customers into long-term deals before Live Nation could sign them. Second, Ticketmaster acquired a controlling interest in Front Line on October 23, 2008. Front Line's strength in artist management enabled Ticketmaster for the first time to offer venues a package of primary ticketing services and concert content that could rival Live Nation's ticketing-and-content package. Finally, Ticketmaster moved to eliminate Live Nation entirely as a competitor by agreeing to the proposed transaction less than two months after Live Nation began ticketing with the CTS platform.

The proposed transaction would extinguish competition between Ticketmaster and Live Nation and thereby eliminate the financial benefits that venues enjoyed during the brief period when Live Nation was poised to challenge Ticketmaster's dominance. The proposed transaction would also diminish innovation in primary ticketing services because

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

the merged firm would have reduced incentives to develop new features. Further, the proposed transaction would result in even higher barriers to entry and expansion in the market for primary ticketing services. In addition to the long-standing entry barriers discussed above, the merged firm's ability to bundle primary ticketing services (implicitly or explicitly) with access to artists managed by Front Line and/or promoted by Live Nation would require competitors to offer venues both primary ticketing services and access to content in order to compete most effectively.

Defendants have asserted that the proposed transaction will generate efficiencies sufficient to counteract any anti-competitive effects. More specifically, they have contended that the vertical integration of Ticketmaster and Live Nation's complementary businesses will reduce the number of industry participants who currently must be compensated for a concert to be produced and, thus, will allow the merged entity to reduce the prices paid by venues for primary ticketing services and by concertgoers for tickets. While appreciating that vertical integration may benefit consumers in some situations, the United States does not fully credit Defendants' efficiency claims because they each could realize many of the asserted efficiencies without consummating the proposed transaction. Ticketmaster and Live Nation each already had expanded vertically before they agreed to the proposed transaction, and but for the proposed transaction, venues and concertgoers would have continued to enjoy the benefits of competition between two vertically integrated competitors. A vertically integrated monopoly is less likely to spur innovation and efficiency than competition between vertically integrated firms, and a vertically integrated monopoly is unlikely to pass the benefits of innovation and efficiency onto consumers.

Defendants also contended that Live Nation's impact on ticketing would be minimal because of shortcomings in Live Nation's ticketing platform, including the absence of a season ticketing component, which is important for a number of venues. Though the CTS platform was originally designed for use in Europe, Live Nation and CTS have invested heavily to adapt it for use in the United States. In the first six months of 2009, Live Nation used the CTS platform to sell more than 6 million tickets to concerts at its U.S. venues. Before entering the proposed transaction, Live Nation had planned to continue improving the CTS platform, including developing a season ticketing component, to make it more attractive to potential third-party venue clients in the United States.

### III. EXPLANATION OF THE PROPOSED FINAL JUDGMENT

The proposed Final Judgment will eliminate the anticompetitive effects of the proposed transaction in the market for primary ticketing services to major concert venues in four principal ways.

First, the Final Judgment will enable Anschutz Entertainment Group, Inc. ("AEG ") to become a new, independent, economically viable, and vertically integrated competitor in the market for primary ticketing services to major concert venues. AEG is the second largest promoter in the United States (behind Live Nation), promoting shows representing about 14% of concert revenues at major concert venues in 2008. No company other than AEG or Live Nation promotes concerts representing more than 4% of the concert revenues from major concert venues. AEG also owns, operates, or manages more than 30 major concert venues, representing about 8% of the capacity at major U.S. concert venues, and it can select (or influence the selection of) the primary ticketing company for those venues. In addition, AEG owns one-half of an important artist management firm with several popular clients, including Justin Timberlake and the Jonas Brothers. Due to its significant presence in promotions, venues, and artist management, AEG is the company best positioned to achieve the necessary scale, overcome the other entry barriers discussed above, and compete successfully with the merged form in the market for primary ticketing services to major concert venues.

The Final Judgment facilitates AEG's entry through a two-stage process that gives it access to Ticketmaster's core primary ticketing platform, which AEG can then use to service its own venues and to sell primary ticketing services to third-party venues. In the first stage, which must begin within six months of the proposed transaction's consummation and may continue for up to five years, the Final Judgment requires Defendants to provide AEG with its own branded website based on Ticketmaster's Host platform, including any upgrades and enhancements (the "AEG Site"). AEG has the right to use the AEG Site to sell tickets to events at specified venues it currently owns, operates, and manages as well as to events at any other venues from which AEG secures the right to provide primary ticketing services. Though

AEG must pay Defendants royalties for each ticket sold through the AEG Site, those royalties are below the average rate Ticketmaster currently charges, and Defendants have no control over AEG's final prices. These provisions immediately provide AEG incentives to compete with Defendants and diminish the risk that AEG would be unable to compete successfully had it attempted to deploy a less established primary ticketing platform.

The Final Judgment also requires Defendants to provide AEG with an option to acquire a perpetual, fully paid-up license to the then-current version of Ticketmaster's Host platform, including a copy of the source code, which Defendants must install and then support during the first six months after its installation. AEG is permitted to exercise this option within four years of the proposed transaction's consummation, which will allow AEG to assume full responsibility for operating its own primary ticketing business, independently of Defendants.

The Final Judgment gives AEG incentives to exercise its option to acquire a copy of Host (or to develop or acquire a competing primary ticketing platform) by prohibiting Defendants from providing primary ticketing services to AEG's venues after AEG's right to use the AEG Site expires. That provision is critical to preserving competition in the primary ticketing services market because it guarantees that, within five years, AEG will have to either supply its own primary ticketing services or obtain them from some company other than the merged firm. Because AEG cannot rely indefinitely on the AEG Site, it will have incentives to plan for the future. Even if AEG's plans do not involve exercising its option to acquire a copy of Host, the Final Judgment will preserve competition because AEG will have to contract for primary ticketing services with one of Defendants' rivals. AEG's ticket volume would give that primary ticketing company sufficient scale and credibility to compete effectively with the merged firm.

Second, the Final Judgment's requirement that Defendants divest Ticketmaster's entire Paciolan business will establish another independent and economically viable competitor in the market for primary ticketing services to major concert venues. Ticketmaster currently licenses its Paciolan platform both directly to venues representing 3% of major U.S. concert venue capacity and to other primary ticketing companies that sublicense the Paciolan platform to venues representing an additional 4% of the relevant market. Before consummating the proposed transaction, Defendants must enter a letter of intent to divest to Comcast-Spectacor, L.P. ("Comcast-Spectacor") the entire Paciolan business, including all intellectual property in the Paciolan platform and all contracts with venue and primary ticketing company licensees of that platform. Through its New Era Tickets ("New Era") subsidiary, which currently licenses the Paciolan platform from Ticketmaster, Comcast-Spectacor already provides primary ticketing services to venues representing 2% of major concert venue capacity. In addition to its interest in New Era, Comcast-Spectacor owns 2 major U.S. concert venues and manages 15 others. When combined with New Era's ticketing business and Comcast-Spectacor's venue presence, the Paciolan business that the Final Judgment requires Defendants to divest would provide Comcast-Spectacor sufficient scale to compete effectively and independently with the merged firm in the market for primary ticketing services to major concert venues. Comcast-Spectacor and others have contended that the movement in primary ticketing services will be towards "self-enablement" models, such as Paciolan, which allow a venue to manage its own ticketing platform.

Within 60 days of signing the letter of intent, the Paciolan business must be divested in such a way as to satisfy the United States in its sole discretion, and in consultation with the Plaintiff states, that the operations can and will be operated by Comcast-Spectacor or an alternative purchaser as a viable, ongoing business that can compete effectively in the relevant market. Defendants must take all reasonable steps necessary to accomplish the divestiture quickly and shall cooperate with any prospective purchaser. In the event that Defendants do not accomplish the Paciolan divestiture in a timely fashion, the Final Judgment provides that the Court will appoint a trustee selected by the United States to effect the divestiture. If a trustee is appointed, the proposed Final Judgment provides that Defendants will pay all costs and expenses of the trustee. The trustee's commission will be structured so as to provide an incentive for the trustee based on the price obtained and the speed with which the divestiture is accomplished. After his or her appointment becomes effective, the trustee will file monthly reports with the Court and the United States setting forth his or her efforts to accomplish the divestiture. At the end of six months, if the divestiture has not been accomplished, the trustee and the United States will make recommendations to the Court, which shall enter such orders as appropriate, in order to carry out the purpose of the trust, including extending the trust or the term of the trustee's appointment.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Third, the Final Judgment prohibits Defendants from engaging in certain conduct that would impede effective competition from equally efficient rivals that may or may not be not vertically integrated. Thus, the Final Judgment proscribes retaliation against venue owners who contract or consider contracting for primary ticketing services with Defendants' competitors. The Final Judgment also prohibits Defendants from explicitly or practically requiring venues to take their primary ticketing services if the venues only want to obtain concerts the Defendants promote or concerts by artists the Defendants manage, and it likewise prohibits Defendants from explicitly or practically requiring venues to take concerts they promote or concerts by artists they manage if those venues only want to obtain the Defendants' primary ticketing services. These provisions preserve the ability of primary ticketing companies that do not also have access to content (and promoters and artist managers that do not also provide primary ticketing services) to continue competing with Defendants. Elsewhere, the Final Judgment prevents Defendants from abusing their position in the primary ticketing market to impede competition among promoters and artist managers by requiring that Defendants either refrain from using certain ticketing data in their non-ticketing businesses or provide that data to other promoters and artist managers. Finally, the Final Judgment mandates that Defendants provide any current primary ticketing client with that client's ticketing data promptly upon request, if the client chooses not to renew its primary ticketing contract. That provision reduces venues' switching costs and lowers barriers to other companies competing for Defendants' primary ticketing clients because it ensures that those venue clients will not be forced to relinquish valuable data if they decide to switch primary ticketing service providers.

*Fourth,* the Final Judgment requires Defendants to notify the United States at least thirty days before acquiring any assets of or any interest in any firm engaged in providing primary ticketing services in the United States, regardless of whether the acquisition would otherwise be subject to reporting pursuant to the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, 15 U.S.C. § 18a. If the United States requests additional information within thirty days of the Defendants notifying it of an acquisition, the Final Judgment prohibits Defendants from consummating the acquisition until twenty days after providing the requested information. These provisions facilitate the vigilant and effective oversight that will be necessary to guard against the potential for Defendants to frustrate the purposes of the Final Judgment.

In short, the Final Judgment will eliminate the anticompetitive effects of the proposed transaction in the provision of primary ticketing services to major concert venues in the United States while preserving the possibility of efficiency-enhancing vertical integration in the concert industry and also preserving competition from Defendants' non-vertically integrated rivals.

## IV. REMEDIES AVAILABLE TO POTENTIAL PRIVATE LITIGANTS

Section 4 of the Clayton Act, 15 U.S.C. § 15, provides that any person who has been injured as a result of conduct prohibited by the antitrust laws may bring suit in federal court to recover three times the damages the person has suffered, as well as costs and reasonable attorneys' fees. Entry of the proposed Final Judgment will neither impair nor assist the bringing of any private antitrust damage action. Under the provisions of Section 5(a) of the Clayton Act, 15 U.S.C. § 16(a), the proposed Final Judgment has no prima facie effect in any subsequent private lawsuit that may be brought against Defendants.

## V. PROCEDURES AVAILABLE FOR MODIFICATION OF THE PROPOSED FINAL JUDGMENT

The United States and Defendants have stipulated that the proposed Final Judgment may be entered by the Court after compliance with the provisions of the APPA, provided that the United States has not withdrawn its consent. The APPA conditions entry upon the Court's determination that the proposed Final Judgment is in the public interest.

The APPA provides a period of at least sixty (60) days preceding the effective date of the proposed Final Judgment within which any person may submit to the United States written comments regarding the proposed Final Judgment.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Any person who wishes to comment should do so within sixty (60) days of the date of publication of this Competitive Impact Statement in the Federal Register, or the last date of publication in a newspaper of the summary of this Competitive Impact Statement, whichever is later. All comments received during this period will be considered by the United States Department of Justice, which remains free to withdraw its consent to the proposed Final Judgment at any time prior to the Court's entry of judgment. The comments and the response of the United States will be filed with the Court and published in the Federal Register.

Written comments should be submitted to:
John R. Read
Chief, Litigation III Section
Antitrust Division
United States Department of Justice
450 Fifth Street, NW, Suite 4000
Washington, DC 20530

The proposed Final Judgment provides that the Court retains jurisdiction over this action, and the parties may apply to the Court for any order necessary or appropriate for the modification, interpretation, or enforcement of the Final Judgment.

## VI. ALTERNATIVES TO THE PROPOSED FINAL JUDGMENT

The United States considered, as an alternative to the proposed Final Judgment, a settlement that would have required Defendants to divest the current set of divestiture assets to Comcast-Spectacor. The United States rejected that settlement because it would not have been as effective as the remedy embodied in the proposed Final Judgment at replicating the competitive dynamics that would have prevailed in the market for primary ticketing services had the proposed transaction not occurred.

As another alternative to the proposed Final Judgment, the United States considered a full trial on the merits against Defendants. The United States could have continued the litigation and sought preliminary and permanent injunctions against Defendants' merger. The United States is satisfied, however, that the divestiture of assets and prohibitions of anticompetitive practices described in the proposed Final Judgment will preserve competition for the provision of primary ticketing services to major concert venues in the United States. Thus, the proposed Final Judgment would protect competition as effectively as would any remedy available through litigation, but avoids the time, expense, and uncertainty of a full trial on the merits of the Complaint.

## VII. STANDARD OF REVIEW UNDER THE APPA FOR THE PROPOSED FINAL JUDGMENT

The Clayton Act, as amended by the APPA, requires that proposed consent judgments in antitrust cases brought by the United States be subject to a sixty-day comment period, after which the court shall determine whether entry of the proposed Final Judgment "is in the public interest." 15 U.S.C. § 16(e)(1). In making that determination, the court, in accordance with the statute as amended in 2004, is required to consider:
(A) the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration of relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and
(B) the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial

15 U.S.C. § 16(e)(1)(A) & (B). In considering these statutory factors, the court's inquiry is necessarily a limited one as

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

States "need only provide a factual basis for concluding that the settlements are reasonably adequate remedies for the alleged harms." *SBC Commc'ns,* 489 F. Supp. 2d at 17.

Moreover, the court's role under the APPA is limited to reviewing the remedy in relationship to the violations that the United States has alleged in its Complaint, and does not authorize the court to "construct [its] own hypothetical case and then evaluate the decree against that case." *Microsoft,* 56 F.3d at 1459; *see also InBev,* 2009 U.S. Dist. LEXIS 84787, at \*20 ("[T]he 'public interest' is not to be measured by comparing the violations alleged in the complaint against those the court believes could have, or even should have, been alleged."). Because the "court's authority to review the decree depends entirely on the government's exercising its prosecutorial discretion by bringing a case in the first place," it follows that "the court is only authorized to review the decree itself," and not to "effectively redraft the complaint" to inquire into other matters that the United States did not pursue. *Microsoft,* 56 F.3d at 1459-60. As this Court recently confirmed in SBC Communications, courts "cannot look beyond the complaint in making the public interest determination unless the complaint is drafted so narrowly as to make a mockery of judicial power." *SBC Commc'ns,* 489 F. Supp. 2d at 15.

In its 2004 amendments, Congress made clear its intent to preserve the practical benefits of utilizing consent decrees in antitrust enforcement, adding the unambiguous instruction that "[n]othing in this section shall be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene." 15 U.S.C. § 16(e)(2). The language wrote into the statute what Congress intended when it enacted the Tunney Act in 1974, as Senator Tunney explained: "[t]he court is nowhere compelled to go to trial or to engage in extended proceedings which might have the effect of vitiating the benefits of prompt and less costly settlement through the consent decree process." 119 Cong. Rec. 24,598 (1973) (statement of Senator Tunney). Rather, the procedure for the public interest determination is left to the discretion of the court, with the recognition that the court's "scope of review remains sharply proscribed by precedent and the nature of Tunney Act proceedings." *SBC Commc'ns,* 489 F. Supp.2d at 11.[FN7]

> FN7. *See United States v. Enova Corp.,* 107 F. Supp. 2d 10, 17 (D.D.C. 2000) (noting that the "Tunney Act expressly allows the court to make its public interest determination on the basis of the competitive impact statement and response to comments alone"); *United States v. Mid-Am. Dairymen, Inc.,* 1977-1 Trade Cas. (CCH) ¶ 61,508, at 71,980 (W.D. Mo. 1977) ("Absent a showing of corrupt failure of the government to discharge its duty, the Court, in making its public interest finding, should ... carefully consider the explanations of the government in the competitive impact statement and its responses to comments in order to determine whether those explanations are reasonable under the circumstances."); S. Rep. No. 93-298, 93d Cong., 1st Sess., at 6 (1973) ("Where the public interest can be meaningfully evaluated simply on the basis of briefs and oral arguments, that is the approach that should be utilized.")

## VIII. DETERMINATIVE DOCUMENTS

In formulating the proposed Final Judgment, the United States considered the AEG/TM Technology Agreement, dated January 11, 2010 and attached hereto as Exhibit A,[FN8] to be a determinative document within the meaning of the APPA.

> FN8. The United States redacted competitively sensitive information and information unrelated to U.S. markets from the version of the AEG/TM Technology Agreement attached as Exhibit A.

Dated: January 25, 2010

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 5699134 (D.D.C.), 2010-2 Trade Cases P 77,113
**(Cite as: 2010 WL 5699134 (D.D.C.))**

C

United States District Court,
District of Columbia.
UNITED STATES of America, et al., Plaintiffs,
v.
**TICKETMASTER** ENTERTAINMENT, INC., et
al., Defendants.

No. 1:10-cv-00139.
July 30, **2010.**

Aaron D. Hoag, U.S. Department of Justice, Washington, DC, for Plaintiffs.

Jennifer Lynn Giordano, Michael G. Egge, Joshua N. Holian, Karen E. Silverman, Latham & Watkins, LLP, Washington, DC, for Defendants.

### FINAL JUDGMENT
ROSEMARY M. COLLYER, District Judge.

**\*1** WHEREAS, plaintiffs, United States of America, and the States of Arizona, Arkansas, California, Florida, Illinois, Iowa, Louisiana, Nebraska, Nevada, Ohio, Oregon, Rhode Island, Tennessee, Texas, and Wisconsin, and the Commonwealths of Massachusetts and Pennsylvania ("Plaintiff States") filed their Complaint on January 25, **2010,** and whereas the States of New Jersey and Washington joined as Plaintiff States pursuant to an Amended Complaint filed January 28, **2010,** the United States, Plaintiff States, and defendants, **Ticketmaster** Entertainment, Inc. and **Live Nation,** Inc., by their respective attorneys, have consented to the entry of this Final Judgment without trial or adjudication of any issue of fact or law, and without this Final Judgment constituting any evidence against or admission by any party regarding any issue of fact or law;

AND WHEREAS, defendants agree to be bound by the provisions of this Final Judgment pending its approval by the Court;

AND WHEREAS, the essence of this Final Judgment is the prompt and certain divestiture of certain rights or assets by the defendants and the imposition of certain conduct restrictions on defendants,

to assure that competition is not substantially lessened;

AND WHEREAS, the United States requires defendants to make certain divestitures for the purpose of remedying the loss of competition alleged in the Complaint;

AND WHEREAS, defendants have represented to the United States that the divestitures required below can and will be made and that defendants will later raise no claim of hardship or difficulty as grounds for asking the Court to modify any of the divestiture provisions contained below;

NOW THEREFORE, before any testimony is taken, without trial or adjudication of any issue of fact or law, and upon consent of the parties, it is ORDERED, ADJUDGED AND DECREED:

### I. Jurisdiction
This Court has jurisdiction over the subject matter of and each of the parties to this action. The Complaint states a claim upon which relief may be granted against defendants under Section 7 of the Clayton Act, as amended (15 U.S.C. § 18).

### II. Definitions
As used in this Final Judgment:

A. "AEG" means Anschutz Entertainment Group, Inc., a company with its headquarters in Los Angeles, California, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees.

B. "Acquirer" or "Acquirers" means the entity or entities to whom defendants divest the Divestiture Assets.

C. "Client Ticketing Data" means financial data relating to a ticketing client's events including on-sale dates for a client's events, the number of tickets sold for the specific event, the proceeds from those sales for a specific event, ticket inventory that is made available on the **Ticketmaster** system, the number

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 5699134 (D.D.C.), 2010-2 Trade Cases P 77,113
**(Cite as: 2010 WL 5699134 (D.D.C.))**

and location of tickets that are sold, the amount for which the tickets are sold, pricing, marketing and promotions run for the event, the sales as a result of the marketing or promotions, and the status of the ticket inventory. "Client ticketing data" does not include data that Defendants collect through other means (e.g., website tracking, user group surveys, public sources). Client Ticketing Data does not include data that is made public by a client or third party.

**\*2** D. "Comcast-Spectacor" means Comcast-Spectacor, L.P., a company with its headquarters in Philadelphia, Pennsylvania, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees.

E. "Condition" means to explicitly or practically require buyers to take one product or set of services if they want to obtain a second product or set of services. In the absence of explicit conditioning, providing the buyer with an opportunity to buy the two products or sets of services separately is only conditioning if no reasonable buyer would be expected to accept the terms of the separate offers.

F. "Covered Employee" means any employee of Defendants whose principal job responsibility involves the operation or day-to-day management of Defendants' venues, concert promotions, or artist management services.

G. "Defendants" means either defendant acting individually or both defendants acting collectively, as appropriate. Where the Final Judgment imposes an obligation to engage in or refrain from engaging in certain conduct, that obligation shall apply as broadly as reasonable to each defendant individually, both defendants acting together, and the merged firm.

H. "Divestiture Assets" means the **Ticketmaster** Host Platform (via the binding agreement to license and to provide private label ticketing services to the **Ticketmaster** Host Platform Acquirer as required in Section IV.A) and Paciolan.

I. "Exempted Employee" means any employee of Defendants who is not a Covered Employee, including: (a) any senior corporate officer, director or manager with responsibilities that include oversight of Defendants provision of Primary Ticketing Services;

and (b) any employee whose primary responsibilities solely include accounting, human resources, legal, information systems, and/or finance.

J. "Live Entertainment Event" means a live music concert for which tickets are sold to the public.

K. "Live Nation" means defendant **Live Nation**, Inc., a Delaware corporation with its headquarters in Beverly Hills, California, its successors and assigns, and its subsidiaries (whether partially or wholly owned), divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees.

L. "Merger" means the **merger** of **Ticketmaster** and **Live Nation**.

M. "Paciolan" means Paciolan, Inc., a Delaware corporation which is engaged in the provision of ticketing services to venues or other organizations under the Paciolan or **Ticketmaster** Irvine names, and which includes:

1. All tangible assets that comprise the Paciolan line of business, including servers and other computer hardware; research and development activities; all fixed assets, personal property, inventory, office furniture, materials, supplies, and other tangible property and all assets used exclusively in connection with Paciolan; all licenses, permits and authorizations issued by any governmental organization relating to Paciolan; all contracts, teaming arrangements, agreements, leases (including the lease to the Paciolan headquarters in Irvine, California), commitments, certifications, and understandings, relating to Paciolan, including supply agreements; all customer lists, contracts, accounts, and credit records; all repair and performance records and all other records relating to Paciolan;

**\*3** 2. All intangible assets used in the development, distribution, production, servicing and sale of Paciolan, including, but not limited to, all patents, contractual rights (including contractual rights to provide ticketing services and employment contracts), licenses and sublicenses, intellectual property, copyrights, trademarks, trade names, service marks, service names, technical information, computer software and related documentation, know-how, trade secrets, drawings, blueprints, designs, design

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

protocols, specifications for materials, specifications for parts and devices, safety procedures for the handling of materials and substances, all research data concerning historic and current research and development relating to Paciolan, quality assurance and control procedures, design tools and simulation capability, all manuals and technical information defendants provide to their own employees, customers, suppliers, agents or licensees, and all research data concerning historic and current research and development efforts relating to Paciolan, including, but not limited to, designs of experiments, and the results of successful and unsuccessful designs and experiments. Preexisting commitments to transfer contractual rights from Paciolan to another entity that are specifically identified in the Paciolan sales agreement are excluded from this definition.

N. "Paciolan Acquirer" means the entity to whom defendants divest Paciolan.

O. "Primary Ticketing Services" means a collection of services provided to venues or other customers to enable the initial sale of tickets for live entertainment events directly to customers and enable the validation of tickets at the venue to control access to the event.

P. "Provide Live Entertainment Events" and "Provision of Live Entertainment Events" mean services reasonably necessary to plan, promote, market and settle a Live Entertainment Event, including but not limited to concert promotion services provided by firms such as **Live Nation** and the provision of artists managed by firms such as Front Line. The Promotion of Live Entertainment Events specifically does not include the provision of primary ticketing services, venue management services and/or tour design and construction services.

Q. "Retaliate" means refusing to Provide Live Entertainment Events to a Venue Owner, or Providing Live Entertainment Events to a Venue Owner on less favorable terms, for the purpose of punishing or disciplining a Venue Owner because the Venue Owner has contracted or is contemplating contracting with a company other than Defendants for Primary Ticketing Services. The term "Retaliate" does not mean pursuing a more advantageous deal with a competing Venue Owner.

R. "Ticket Buyer Data" means non-public identifying information for ticket buyers for a specific event (including, if provided, the buyer's name, phone number, e-mail address, and mailing address) that Defendants collect in the course of providing a ticketing client's Primary Ticketing Services. Ticket Buyer Data does not include data that Defendants collect solely through other means (e.g ., website tracking, user group surveys, public sources).

**\*4** S. "**Ticketmaster**" means defendant **Ticketmaster** Entertainment, Inc., a Delaware corporation with its headquarters in West Hollywood, California, its successors and assigns, and its subsidiaries (whether partially or wholly owned), divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees.

T. "**Ticketmaster** Host Platform" means the primary **Ticketmaster** software used by **Ticketmaster** to sell primary tickets in the United States. The **Ticketmaster** Host Platform includes the following software: **Ticketmaster** Classic Ticketing System (also called **Ticketmaster** Host); *Ticketmaster.com* full website package; Access Management; payment processing and settlements; and PCI point of sale system (for phone and outlets).

U. "**Ticketmaster** Host Platform Acquirer" means AEG, the entity with whom defendants will enter into a binding agreement to license the **Ticketmaster** Host Platform.

V. "Venue Owner" means a person or company that owns, operates, or manages one or more venues that host Live Entertainment Events.

### III. Applicability
A. This Final Judgment applies to **Ticketmaster** and **Live Nation**, as defined above, and all other persons in active concert or participation with any of them who receive actual notice of this Final Judgment by personal service or otherwise.

B. If, prior to complying with Sections IV and V of this Final Judgment, Defendants sell or otherwise dispose of all or substantially all of their assets or of lesser business units that include the Divestiture Assets, they shall require the purchaser to be bound by the provisions of this Final Judgment. Defendants

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 5699134 (D.D.C.), 2010-2 Trade Cases P 77,113
**(Cite as: 2010 WL 5699134 (D.D.C.))**

need not obtain such an agreement from the Acquirers of the assets divested pursuant to this Final Judgment.

### IV. Divestiture

A. Defendants are ordered and directed not to consummate the **Merger** until they have entered into a binding agreement to license the **Ticketmaster** Host Platform to the **Ticketmaster** Host Platform Acquirer and to provide private label ticketing services to the **Ticketmaster** Host Platform Acquirer in a manner consistent with this Final Judgment and with the following terms and conditions:

1. The agreement shall include the option, exercisable at the discretion of the **Ticketmaster** Host Platform Acquirer, to acquire a non-exclusive, perpetual, fully-paid up license to the **Ticketmaster** Host Platform. The license shall include a copy of the source code of the **Ticketmaster** Host Platform and shall permit the **Ticketmaster** Host Platform Acquirer to modify the software in any manner without limitation and without any requirement to license back any improvements to Defendants. If the option is exercised, Defendants shall promptly begin the installation of a fully functional ticketing system and website in the facilities of the **Ticketmaster** Host Platform Acquirer and shall complete the installation within a reasonable time pursuant to a schedule subject to approval by the United States, after consultation with Plaintiff States. Defendants shall warrant that the system is current as of the time of installation and operational for use in providing Primary Ticketing Services. Defendants shall provide reasonable training and support to enable the **Ticketmaster** Host Platform Acquirer to operate the software and to understand the source code so that it can make independent changes to the code. The license shall permit the **Ticketmaster** Host Platform Acquirer to transfer the license following the complete installation of the **Ticketmaster** Host Platform. The scope of use of the license shall be at least the United States.

**\*5** 2. The agreement shall include a private label ticketing agreement pursuant to which **Ticketmaster** shall provide private label ticketing services to the **Ticketmaster** Host Platform Acquirer for a period of no more than five years from the date of execution of the license. The private label ticketing agreement shall be on such reasonable terms and conditions that will enable the **Ticketmaster** Host

Platform Acquirer to compete effectively against **Ticketmaster** to secure contracts for the provision of Primary Ticketing Services. The private label ticketing agreement shall give the **Ticketmaster** Host Platform Acquirer all control over the ticketing fees charged individual consumers or clients of the **Ticketmaster** Host Platform Acquirer for tickets sold pursuant to the agreement and Defendants shall have no right or ability to set these ticketing fees. **Ticketmaster** shall, at the request of the **Ticketmaster** Host Platform Acquirer, post on the main **Ticketmaster** public website links to events sold under the private label ticketing agreement, subject to reasonable, non-discriminatory, and customary terms and conditions. **Ticketmaster** shall customize a separate website for the **Ticketmaster** Host Platform Acquirer with branding, look, and feel to be determined by the **Ticketmaster** Host Platform Acquirer. The private label ticketing services as described in this Section shall be operational within six months from the date that the binding agreement to license **Ticketmaster** Host Platform becomes effective.

B. Defendants shall implement the **Ticketmaster** Host Platform binding agreement required by Section IV.A and any resulting **Ticketmaster** Host Platform license in a manner consistent with the terms of Section IV.A. Defendants shall comply with the terms of the **Ticketmaster** Host Platform binding agreement required by Section IV.A and any resulting **Ticketmaster** Host Platform license, provided that nothing in the **Ticketmaster** Host Platform binding agreement or resulting **Ticketmaster** Host Platform license can relieve Defendants of any obligations imposed by this Final Judgment.

C. Defendants shall, as soon as possible, but within one business day after completion of the relevant event, notify the United States and Plaintiff States of: (I) the effective date of the **Merger** and (2) the effective date of the binding agreement to license to the **Ticketmaster** Host Platform Acquirer.

D. If the **Ticketmaster** Host Platform Acquirer exercises its option to license the **Ticketmaster** Host Platform, Defendants shall waive any non-compete agreements that would prevent any employee of Defendants whose primary responsibility is the development or operation of the **Ticketmaster** Host Platform from joining the **Ticketmaster** Host Platform

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Acquirer.

E. Defendants are ordered and directed, concurrently with the closing of the **Merger**, to enter into a Letter of Intent to divest Paciolan to Comcast-Spectacor in a manner consistent with this Final Judgment. Within sixty (60) calendar days of closing the **Merger**, Defendants shall complete the divestiture of Paciolan in a manner consistent with this Final Judgment to Comcast-Spectacor or an alternative Acquirer acceptable to the United States, in its sole discretion, after consultation with Plaintiff States. Defendants agree to use their best efforts to divest the Divestiture Assets as expeditiously as possible.

**\*6** F. Defendants shall provide the United States and the Paciolan Acquirer information relating to the personnel involved in the production, operation, development and sale of Paciolan at any time since **Ticketmaster** acquired Paciolan to enable the Paciolan Acquirer to make offers of employment. Defendants will not interfere with any negotiations by the Paciolan Acquirer to employ any defendant employee whose primary responsibility is the production, operation, development, and sale of Paciolan, and shall waive any non-compete agreements that would prevent any such employee from joining the Paciolan Acquirer. Nothing in this Section shall prohibit defendants from making offers of continued employment to, continuing to employ, or continuing to use the services of any of their employees, including personnel involved in the production, operation, development and marketing of Paciolan and its ticketing system, subject to the overarching limitation that the agreement to sell Paciolan to the Paciolan Acquirer must ensure that the Paciolan Acquirer will be able to adequately staff Paciolan in a manner that enables the Paciolan Acquirer to successfully compete as a provider of Primary Ticketing Services, as determined by United States in its sole discretion. In addition, nothing in this Section shall prohibit defendants from maintaining any reasonable restrictions on the disclosure by an employee who accepts an offer of employment with the Paciolan Acquirer of the defendants' proprietary non-public information that is (1) not otherwise required to be disclosed by this Final Judgment, (2) related solely to the defendants' businesses and clients, and (3) not related to the production, operation, development, and marketing of Paciolan and its ticketing system.

G. Defendants shall permit the Paciolan Acquirer to have reasonable access to personnel and to make inspections of the physical facilities of Paciolan; access to any and all environmental, zoning, and other permit documents and information; access to any and all financial, operational, or other documents and information customarily provided as part of a due diligence process.

H. Defendants shall warrant to the Paciolan Acquirer that each asset it acquires will be operational on the date of sale.

I. Defendants shall warrant to the Paciolan Acquirer that there are no material defects in the environmental, zoning, or other permits pertaining to the operation of Paciolan, and that following the sale of Paciolan, defendants will not undertake, directly or indirectly, any challenges to the environmental, zoning, or other permits relating to the operation of Paciolan.

J. Defendants shall not take any action that will impede in any way the permitting, operation, use, or divestiture of the Divestiture Assets.

K. Unless the United States otherwise consents in writing, after consultation with Plaintiff States, the divestitures pursuant to Section IV of this Final Judgment shall include the entire Divestiture Assets, and shall be accomplished in such a way as to satisfy the United States, in its sole discretion, after consultation with Plaintiff States, that the Divestiture Assets can and will be used by the Acquirer(s) as part of a viable, ongoing business, engaged in providing Primary Ticketing Services. Divestiture of the Divestiture Assets may be made to one or more Acquirers, provided that in each instance it is demonstrated to the sole satisfaction of the United States, after consultation with Plaintiff States, that the Divestiture Assets will remain viable and the divestiture of such assets will remedy the competitive harm alleged in the Complaint. The divestitures, whether pursuant to Section IV or Section V of this Final Judgment,

**\*7** 1. shall be made to an Acquirer(s) that, in the United States's sole judgment, after consultation with Plaintiff States, has the intent and capability (including the necessary managerial, operational, technical and financial capability) of competing effectively in the business of providing Primary

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 5699134 (D.D.C.), 2010-2 Trade Cases P 77,113
(Cite as: 2010 WL 5699134 (D.D.C.))

Ticketing Services; and

2. shall be accomplished so as to satisfy the United States, in its sole discretion, after consultation with Plaintiff States, that none of the terms of any agreement between an Acquirer(s) and Defendants give Defendants the ability unreasonably to raise the Acquirer's costs, to lower the Acquirer's efficiency, or otherwise to interfere in the ability of the Acquirer to compete effectively.

## V. Appointment of Trustee to Effect Divestiture

A. If Defendants have not divested Paciolan as specified in Section IV.E, defendants shall notify the United States of that fact in writing. Upon application of the United States, the Court shall appoint a trustee selected by the United States and approved by the Court to divest Paciolan in a manner consistent with this Final Judgment. Defendants consent to appointment of a trustee prior to entry of this Final Judgment if Paciolan has not been divested within the time periods provided in Section IV.E.

B. After the appointment of a trustee becomes effective, only the trustee shall have the right to sell Paciolan. The trustee shall have the power and authority to accomplish the divestiture to an Acquirer acceptable to the United States, after consultation with Plaintiff States, at such cash price and on such terms as are then obtainable upon reasonable effort by the trustee, subject to the provisions of Sections IV, V, and VI of this Final Judgment, and shall have such other powers as this Court deems appropriate.

C. Subject to Section V.E of this Final Judgment, the trustee may hire at the cost and expense of defendants any investment bankers, attorneys, or other agents, who shall be solely accountable to the trustee, reasonably necessary in the trustee's judgment to assist in the divestiture.

D. Defendants shall not object to a sale by the trustee on any ground other than the trustee's malfeasance. Any such objections by defendants must be conveyed in writing to the United States and the trustee within ten (10) calendar days after the trustee has provided the notice required under Section VI.

E. The trustee shall serve at the cost and expense of defendants, on such terms and conditions as the United States approves, and shall account for all

monies derived from the sale of the assets sold by the trustee and all costs and expenses so incurred. After approval by the Court of the trustee's accounting, including fees for its services and those of any professionals and agents retained by the trustee, all remaining money shall be paid to defendants and the trust shall then be terminated. The compensation of the trustee and any professionals and agents retained by the trustee shall be reasonable in light of the value of Paciolan and based on a fee arrangement providing the trustee with an incentive based on the price and terms of the divestiture and the speed with which it is accomplished, but timeliness is paramount.

**\*8** F. Defendants shall use their best efforts to assist the trustee in accomplishing the required divestiture. The trustee and any consultants, accountants, attorneys, and other persons retained by the trustee shall have full and complete access to the personnel, books, records, and facilities of the business to be divested, including any information provided to the United States during its investigation of the **merger** related to the business to be divested, and defendants shall develop financial and other information relevant to such business as the trustee may reasonably request, subject to reasonable protection for trade secret or other confidential research, development, or commercial information. Defendants shall take no action to interfere with or to impede the trustee's accomplishment of the divestiture.

G. After its appointment, the trustee shall file monthly reports with the United States, Plaintiff States, and the Court setting forth the trustee's efforts to accomplish the divestiture ordered under this Final Judgment. To the extent such reports contain information that the trustee deems confidential, such reports shall not be filed in the public docket of the Court. Such reports shall include the name, address, and telephone number of each person who, during the preceding month, made an offer to acquire, expressed an interest in acquiring, entered into negotiations to acquire, or was contacted or made an inquiry about acquiring, any interest in Paciolan, and shall describe in detail each contact with any such person. The trustee shall maintain full records of all efforts made to divest Paciolan.

H. If the trustee has not accomplished the divestiture ordered under this Final Judgment within six (6) months after its appointment, the trustee shall

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

promptly file with the Court a report setting forth (1) the trustee's efforts to accomplish the required divestiture, (2) the reasons, in the trustee's judgment, why the required divestiture has not been accomplished, and (3) the trustee's recommendations. To the extent such reports contain information that the trustee deems confidential, such reports shall not be filed in the public docket of the Court. The trustee shall at the same time furnish such report to the United States which shall have the right to make additional recommendations consistent with the purpose of the trust. The Court thereafter shall enter such orders as it shall deem appropriate to carry out the purpose of the Final Judgment, which may, if necessary, include extending the trust and the term of the trustee's appointment by a period requested by the United States.

### VI. Notice of Proposed Divestiture

A. Within two (2) business days following execution of a definitive divestiture agreement, defendants shall notify the United States and Plaintiff States of any proposed divestiture required by Section IV of this Final Judgment. Within two (2) business days following execution of a definitive divestiture agreement, the trustee shall notify the United States and Plaintiff States of any proposed divestiture required by Section V of this Final Judgment. The notice shall set forth the details of the proposed divestiture and list the name, address, and telephone number of each person not previously identified who offered or expressed an interest in or desire to acquire any ownership interest in Paciolan, together with full details of the same.

*9 B. Within fifteen (15) calendar days of receipt by the United States and Plaintiff States of such notice, the United States may request from defendants, the proposed Acquirer(s), any other third party, or the trustee if applicable, additional information concerning the proposed divestiture, the proposed Acquirer(s), and any other potential Acquirer. Defendants and the trustee shall furnish any additional information requested within fifteen (15) calendar days of the receipt of the request, unless the parties shall otherwise agree.

C. Within thirty (30) calendar days after receipt of the notice or within twenty (20) calendar days after the United States and Plaintiff States has been provided the additional information requested from defendants, the proposed Acquirer(s), any third party, and the trustee, whichever is later, the United States shall

provide written notice to defendants and the trustee, if there is one, stating whether or not it objects to the proposed divestiture. If the United States, after consultation with Plaintiff States, provides written notice that it does not object, the divestiture may be consummated, subject only to defendants' limited right to object to the sale under Section V.C of this Final Judgment. Absent written notice that the United States does not object to the proposed Acquirer(s) or upon objection by the United States, a divestiture proposed under Section IV or Section V shall not be consummated. Upon objection by defendants under Section V.D, a divestiture proposed under Section V shall not be consummated unless approved by the Court.

### VII. Financing

Defendants shall not finance all or any part of any purchase made pursuant to Section IV or V of this Final Judgment.

### VIII. Hold Separate

Until the divestiture required by this Final Judgment has been accomplished, defendants shall take all steps necessary to comply with the Hold Separate Stipulation and Order entered by this Court. Defendants shall take no action that would jeopardize the divestiture ordered by this Court.

### IX. Anti-Retaliation Provision and Other Provisions Designed to Promote Competition

A. Defendants shall not:

1. Retaliate against a Venue Owner because it is known to Defendants that the Venue Owner is or is contemplating contracting with a company other than Defendants for Primary Ticketing Services;

2. Condition or threaten to Condition the Provision of Live Entertainment Events to a Venue Owner based on that Venue Owner refraining from contracting with a company other than Defendants for Primary Ticketing Services; or

3. Condition or threaten to Condition the provision of Primary Ticketing Services to a Venue Owner based on that Venue Owner refraining from contracting with a company other than Defendants for the Provision of Live Entertainment Events.

Nothing in this Section prevents Defendants from

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 5699134 (D.D.C.), 2010-2 Trade Cases P 77,113
(Cite as: 2010 WL 5699134 (D.D.C.))

bundling their services and products in any combination or from exercising their own business judgment in whether and how to pursue, develop, expand, or compete for any ticketing, venue, promotions, artist management, or any other business, so long as Defendants do so in a manner that is not inconsistent with the provisions of this Section.

**\*10** Evidence that Defendants do or do not (a) bid for, contract with, win, or retain a venue, artist, or promoter as a client, and/or (b) promote a show or shows in particular buildings or group of buildings (even where similar shows historically have been promoted in those buildings) is not alone sufficient to establish, or create a presumption of, a violation of this Section.

B. Defendants shall not disclose to any Covered Employee any Client Ticketing Data. Defendants however: (1) may disclose Client Ticketing Data concerning a specific event to any Covered Employee involved in the promotion of that event or the management of the artist who performed at that event, if it does so on the same terms it generally provides such information to other promoters or artist managers not affiliated with Defendants; (2) may disclose Client Ticketing Data to an Exempted Employee who requires the information in order to perform his or her job function(s); provided however, that such Exempted Employee may not use Client Ticketing Data to perform any job function(s) that primarily involve(s) the day-to-day operation or management of Defendants' venues, concert promotions, or artist management services; and (3) may disclose Client Ticketing Data to any Defendant employee where so required by law, government regulation, legal process, or court order, so long as such disclosure is limited to fulfillment of that purpose.

C. If any client of Defendants' primary ticketing services chooses not to renew a contract for Primary Ticketing Services with Defendants for some or all of its venues, upon the expiration of that contract and the written request of the client, Defendants shall within forty-five (45) days provide the client with a complete copy of all Client Ticketing Data and all Ticket Buyer Data historically maintained by Defendants for such venue(s) in the ordinary course of business, in a form that is reasonably usable by the client. Nothing in this provision shall be read to: (1) alter any rights Defendants would otherwise have to Client Ticketing

Data or Ticket Buyer Data pursuant to the Primary Ticketing Services contract with the client, and/or its historical custom, practice, and course of dealing with the client; or (2) limit any rights the client would otherwise have to its Client Ticketing Data or Ticket Buyer Data pursuant to the Primary Ticketing Services contract with Defendants and/or its historical custom, practice, and course of dealing with Defendants. Defendants shall maintain Client Ticketing Data and Ticket Buyer Data on behalf of its clients for no less than three (3) years. This provision only applies to contracts for Primary Ticketing Services in effect prior to the entry of this Final Judgment.

## X. Affidavits

A. Within twenty (20) calendar days of the filing of the Complaint in this matter, and every thirty (30) calendar days thereafter until the divestitures have been completed under Section IV or Section V, defendants shall deliver to the United States and Plaintiff States an affidavit as to the fact and manner of its compliance with Section IV or Section V of this Final Judgment. Each such affidavit shall include the name, address, and telephone number of each person who, during the preceding thirty (30) calendar days, made an offer to acquire, expressed an interest in acquiring, entered into negotiations to acquire, or was contacted or made an inquiry about acquiring, any interest in the Divestiture Assets, and shall describe in detail each contact with any such person during that period. Each such affidavit shall also include a description of the efforts defendants have taken to solicit buyers for the Divestiture Assets, and to provide required information to prospective Acquirers, including the limitations, if any, on such information. Assuming the information set forth in the affidavit is true and complete, any objection by the United States, after consultation with Plaintiff States, to information provided by defendants, including limitation on information, shall be made within fourteen (14) calendar days of receipt of such affidavit.

**\*11** B. Every two (2) months prior to the private label ticketing agreement described in Section IV.A.2 becoming operational, and every six (6) months thereafter, defendants shall deliver to the United States and Plaintiff States an affidavit that describes in reasonable detail all actions defendants have taken and all steps defendants have implemented on an ongoing basis to comply with Section IV.A and the terms of **Ticketmaster** Host Platform binding agreement.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

C. Defendants shall, in addition, deliver to the United States and Plaintiff States an affidavit describing any revised or amended agreements with the **Ticketmaster** Host Platform Acquirer relating to the agreement required by Section IV.A. Such notice shall be delivered to the United States and Plaintiff States at least fifteen (15) calendar days prior to the effective date of the revised or amended agreement and Defendants shall not implement any amended agreement if the United States, after consultation with Plaintiff States, objects during the fifteen (15) day notice period.

D. Within twenty (20) calendar days of the filing of the Complaint in this matter, defendants shall deliver to the United States and Plaintiff States an affidavit that describes in reasonable detail all actions defendants have taken and all steps defendants have implemented on an ongoing basis to comply with Section VIII of this Final Judgment. Defendants shall deliver to the United States and Plaintiff States an affidavit describing any changes to the efforts and actions outlined in defendants' earlier affidavits filed pursuant to this section within fifteen (15) calendar days after the change if implemented.

E. Defendants shall keep all records of all efforts made to preserve and divest the Divestiture Assets until one year after such divestiture has been completed.

### XI. Compliance Inspection

A. For purposes of determining or securing compliance with this Final Judgment, or of determining whether the Final Judgment should be modified or vacated, and subject to any legally recognized privilege, from time to time duly authorized representatives of the United States Department of Justice, including consultants and other persons retained by the United States, shall, upon written request of an authorized representative of the Assistant Attorney General in charge of the Antitrust Division, and on reasonable notice to defendants, be permitted:

1. access during defendants' office hours to inspect and copy, or at the option of the United States, to require defendants to provide hard copy or electronic copies of, all books, ledgers, accounts, records, data, and documents in the possession, custody, or control of defendants, relating to any mat-

ters contained in this Final Judgment; and

2. to interview, either informally or on the record, defendants' officers, employees, or agents, who may have their individual counsel present, regarding such matters. The interviews shall be subject to the reasonable convenience of the interviewee and without restraint or interference by defendants.

*12 B. Upon the written request of an authorized representative of the Assistant Attorney General in charge of the Antitrust Division, defendants shall submit written reports, under oath if requested, relating to any of the matters contained in this Final Judgment as may be requested. Written reports authorized under this paragraph may, at the sole discretion of the United States, require Defendants to conduct, at Defendants' cost, an independent audit or analysis relating to any of the matters contained in this Final Judgment.

C. No information or documents obtained by the means provided in this section shall be divulged by the United States to any person other than an authorized representative of the executive branch of the United States, or the Attorney General's Office of any other plaintiff, except in the course of legal proceedings to which the United States is a party (including grand jury proceedings), or for the purpose of securing compliance with this Final Judgment, or as otherwise required by law.

D. If at the time information or documents are furnished by defendants to the United States, defendants represent and identify in writing the material in any such information or documents to which a claim of protection may be asserted under Rule 26(c)(1)(G) of the Federal Rules of Civil Procedure, and defendants mark each pertinent page of such material, "Subject to claim of protection under Rule 26(c)(1)(G) of the Federal Rules of Civil Procedure," then the United States shall give defendants ten (10) calendar days notice prior to divulging such material in any legal proceeding (other than a grand jury proceeding).

### XII. Notification

Unless such transaction is otherwise subject to the reporting and waiting period requirements of the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, 15 U.S.C. § 18a (the "HSR Act"),

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 5699134 (D.D.C.), 2010-2 Trade Cases P 77,113
**(Cite as: 2010 WL 5699134 (D.D.C.))**

defendants, without providing advance notification to the United States and Plaintiff States, shall not directly or indirectly acquire any assets of or any interest, including any financial, security, loan, equity or management interest, in any person that, at any time during the twelve (12) months immediately preceding such acquisition, was engaged in the United States in providing Primary Ticketing Services during the term of this Final Judgment.

Such notification shall be provided to the United States and Plaintiff States in the same format as, and per the instructions relating to the Notification and Report Form set forth in the Appendix to Part 803 of Title 16 of the Code of Federal Regulations as amended. Notification shall be provided at least thirty (30) calendar days prior to acquiring any such interest, and shall include, beyond what may be required by the applicable instructions, the names of the principal representatives of the parties to the agreement who negotiated the agreement, and any management or strategic plans discussing the proposed transaction. If within the 30-day period after notification, representatives of the United States make a written request for additional information, defendants shall not consummate the proposed transaction or agreement until twenty (20) calendar days after submitting all such additional information. Early termination of the waiting periods in this paragraph may be requested and, where appropriate, granted in the same manner as is applicable under the requirements and provisions of the HSR Act and rules promulgated thereunder. This Section shall be broadly construed and any ambiguity or uncertainty regarding the filing of notice under this Section shall be resolved in favor of filing notice.

### XIII. No Reacquisition
*13 A. Defendants may not reacquire any part of the Divestiture Assets during the term of this Final Judgment.

B. Following the expiration of the private label ticketing agreement with the **Ticketmaster** Host Platform Acquirer required by Section IV.A.2: (1) Defendants shall not provide Primary Ticketing Services to any venues in North America for which, by virtue of an ownership interest, the **Ticketmaster** Host Platform Acquirer controls the rights to select the Primary Ticketing Services provider; and (2) for all other venues in North America, Defendants shall not provide Primary Ticketing Services on behalf of or

pursuant to a ticketing contract with the **Ticketmaster** Host Platform Acquirer. Nothing in this Section shall prevent Defendants from: (1) competing to provide Primary Ticketing Services to venues (including such venues managed by the **Ticketmaster** Host Platform Acquirer) other than those for which, by virtue of an ownership interest, the **Ticketmaster** Host Platform Acquirer controls the rights to select the Primary Ticketing Services provider; and (2) providing Primary Ticketing Services to artist fan clubs in venues owned, operated, or managed by the **Ticketmaster** Host Platform Acquirer.

### XIV. Retention of Jurisdiction
This Court retains jurisdiction to enable any party to this Final Judgment to apply to this Court at any time for further orders and directions as may be necessary or appropriate to carry out or construe this Final Judgment, to modify any of its provisions, to enforce compliance, and to punish violations of its provisions.

### XV. Expiration of Final Judgment
Unless this Court grants an extension, this Final Judgment shall expire ten years from the date of its entry.

### XVI. Public Interest Determination
Entry of this Final Judgment is in the public interest. The parties have complied with the requirements of the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16, including making copies available to the public of this Final Judgment, the Competitive Impact Statement, and any comments thereon and the United States' responses to comments. Based upon the record before the Court, which includes the Competitive Impact Statement and any comments and response to comments filed with the Court, entry of this Final Judgment is in the public interest.

D.D.C.,2010.
U.S. v. Ticketmaster Entertainment, Inc.
Slip Copy, 2010 WL 5699134 (D.D.C.), 2010-2 Trade Cases P 77,113

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

## CERTIFICATION OF SERVICE

Amy R. Gurvey, a US patentee admitted to practice law in the State of California certifies that on February 28, 2020 she served a true and accurate copy of the within motion for reconsideration of the Court's order entered February 13, 2020. The envelopes were addressed as follows:

Hinshaw & Culbertson, LLP
800 Third Avenue  13th FL
New York, NY  10022

Baker Botts, LLP
30 Rockefeller Plaza
New York, NY  10112

Greenberg & Traurig
54 State Street  6th FL
Albany, NY  12207

_____
AMY R. GURVEY

# FedEx

## Express

USMP3 SDNY

Align top of FedEx Express® shipping label here



ORIGIN ID:TNTA (917) 733-9901
AMY WEISSBRODGURVEY
315 HIGHLAND AVE

MONTCLAIR, NJ 07043
UNITED STATES US

TO PRO SE OFFICE RM 200
US DISTRICT CT. SOUTHERN DIS OF NY
500 PEARL ST
RM 200
NEW YORK NY 10007
(212) 805-0175

SHIP DATE: 29FEB20
ACTWGT: 1.5 LB
CAD: 6902703/SSF02021

BILL CREDIT CARD

REF:

DEPT:

TRK#
0201   3907 5312 2143

SA PCTA

WED – 04 MAR 4:
EXPRESS SAV

100
NY–US EV

FedE
EXP